# INDEX OF EXHIBITS

| EXHIBIT | ARIZONA CORPORATION COMMISSION DOCUMENT |
|---|---|
| 1. | Decision No. 71854 (Aug. 25, 2010), Docket No. WS-02987A-08-0180 |
| 2. | Decision No. 72579 (Sep. 15, 2011), Docket No. WS-02987A-08-0180 |
| 3. | Decision No. 73992 (Jul. 16, 2013), Docket No. WS-02987A-08-0180 |
| 4. | Formal Complaint of Delton Munday, et al. (Jun. 19, 2017), Docket No. WS-02987A-17-0192 (attachments omitted) |
| 5. | Johnson Utilities, LLC and Johnson International, Inc.'s Motion to Dismiss (Jul. 10, 2017), Docket No. WS-02987A-17-0192 |
| 6. | ACC Staff's Motion to Dismiss (Jul. 10, 2017), Docket No. WS-02987A-17-0192 |
| 7. | Johnson Utilities, LLC and Johnson International, Inc.'s Reply in Support of Motion to Dismiss (Jul. 26, 2017), Docket No. WS-02987A-17-0192 |
| 8. | Decision No. 76467 (Nov. 17, 2017), Docket No. WS-02987A-17-0192 |
| 9. | Application of Johnson Utilities, LLC, for Determination of Fair Value of Its Water and Wastewater Utility Plant and Property, For Increases in Its Rates and Charges for Water and Wastewater Utility Service, and for Related Approvals (Dec. 29, 2017), Docket No. WS-02987A-17-0392 (attachments omitted) |
| 10. | Decision No. 76889 (Sep. 20, 2018), Docket No. WS-02987A-17-0392 |

149884967.1

# EXHIBIT 1

**EXHIBIT 1**

0000116169

BEFORE THE ARIZONA CORPORATION COMMISSION

COMMISSIONERS

KRISTIN K. MAYES - Chairman
GARY PIERCE
PAUL NEWMAN
SANDRA D. KENNEDY
BOB STUMP

Arizona Corporation Commission
DOCKETED

AUG 2 5 2010

| DOCKETED BY |
| --- |
| ne |

| | |
| --- | --- |
| IN THE MATTER OF THE APPLICATION OF JOHNSON UTILITIES, L.L.C., DBA JOHNSON UTILITIES COMPANY FOR AN INCREASE IN ITS WATER AND WASTEWATER RATES FOR CUSTOMERS WITHIN PINAL COUNTY, ARIZONA. | DOCKET NO. WS-02987A-08-0180 DECISION NO. **71854** **OPINION AND ORDER** |

DATES OF HEARING:            January 27, February 26 (Procedural Conferences); April 20, (Pre-Hearing Conference); April 23, 24, 27 (Hearing); July 23 (Procedural Conference/Oral Arguments); September 21, 24, 25, October 1, 2, 5, 6, and 7, 2009 (Hearing).

PLACE OF HEARING:            Phoenix, Arizona

ADMINISTRATIVE LAW JUDGE:        Teena Wolfe

APPEARANCES:            Mr. Jeffrey W. Crockett, Mr. Bradley S. Carroll and Mr. Robert Metli, SNELL & WILMER, on behalf of Johnson Utilities, LLC;

                                 Mr. Craig A. Marks, CRAIG A. MARKS, PLC, on behalf of Swing First Golf, LLC;

                                 Ms. Jodi Jerich, Director, Mr. Daniel Pozefsky, Chief Counsel and Ms. Michelle Wood, Staff Attorney, on behalf of the Residential Utility Consumer Office;

                                 Mr. James E. Mannato, Town Attorney, on behalf of the Town of Florence; and

                                 Ms. Nancy Scott, Ms. Ayesha Vohra, and Ms. Robin Mitchell, Staff Attorneys, Legal Division, on behalf of the Utilities Division of the Arizona Corporation Commission.

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................. 2

**APPLICATION** ................................................................................................... 3

**RATE BASE** .................................................................................................... 4

Plant in Service .................................................................................................. 4

    Inadequately Supported Plant ...................................................................... 5

       AIAC and CIAC Related to Unsupported Plant ................................... 9

    Post-Test Year Plant ...................................................................................... 10

    Plant Not Used and Useful ........................................................................... 14

       Rickee Main ............................................................................................. 15

       Magma Sewer Force Main .................................................................... 16

       Precision WWTP .................................................................................... 16

    Excess Capacity ............................................................................................. 17

       Anthem System Well and Storage Capacity ...................................... 17

          Anthem System Well Capacity .................................................... 18

          Storage Capacity ........................................................................... 20

       San Tan WWTP ...................................................................................... 22

    Affiliate Profit ............................................................................................... 23

       Affiliate/Related party Constructed Plant in Service ...................... 24

       Affiliate/Related Party Ownership ..................................................... 26

       Reasonableness of Affiliate/Related Party Transactions ................. 28

       Affiliate/Related Party Profit Adjustment ......................................... 30

       Affiliate/Related Party Transactions ................................................. 32

Contributions in Aid of Construction ("CIAC") – Unexpended Hook-up Fees ("HUF") .... 33

Fair Value Rate Base Summary ........................................................................ 35

**OPERATING INCOME ISSUES** ..................................................................... 35

Central Arizona Groundwater Replenishment District ("CAGRD") ................ 35

    Staff Proposed Adjustor and Conditions ...................................................... 38

    Company Arguments Against Conditions ...................................................... 39

       Condition No. 3 ....................................................................................... 39

       Condition No. 4 ....................................................................................... 40

       Condition No. 5 ....................................................................................... 40

       Condition No. 7 ....................................................................................... 41

       Condition No. 8 ....................................................................................... 41

    RUCO Proposed Expense Adjustment and Opposition to Adjustor ............. 42

    Conclusion ..................................................................................................... 43

Rate Case Expense ............................................................................................ 44

Income Tax Expense .......................................................................................... 45

Operating Income Summary .............................................................................. 47

**COST OF CAPITAL/OPERATING MARGIN** .............................................. 47

Company's Position ........................................................................................... 47

RUCO's Position ............................................................................................... 48

Staff's Position .................................................................................................. 49

Conclusion................................................................................................ 49
**AUTHORIZED INCREASE/DECREASE** .................................................. 50
Water Division ......................................................................................... 50
Wastewater Division ............................................................................... 50
**RATE DESIGN** ......................................................................................... 51
**OTHER ISSUES**....................................................................................... 51
Discontinuance of Hook-Up Fees ........................................................... 51
Water Loss for Johnson Ranch System.................................................... 52
ADEQ Compliance .................................................................................. 53
Swing First Golf's Recommendations ..................................................... 56
**FINDINGS OF FACT** ............................................................................... 58
**CONCLUSIONS OF LAW** ....................................................................... 70
**ORDER** .................................................................................................... 71

DECISION NO. __**71854**__

1  **BY THE COMMISSION:**

2  **I.    INTRODUCTION**

3  On March 31, 2008, Johnson Utilities, LLC, dba Johnson Utilities Company ("Johnson,"
4  "Johnson Utilities," or "Company") filed with the Arizona Corporation Commission
5  ("Commission") a rate application for its water and wastewater utility services, using a test year
6  ended December 31, 2007.

7  Johnson is a water and wastewater provider serving portions of Pinal County, Arizona. The
8  Company served approximately 17,541 water customers and 21,525 wastewater customers during
9  the test year. This is the first rate case filed by Johnson since the grant of its original Certificate of
10 Convenience and Necessity ("CC&N") in Decision No. 60223 (May 27, 1997). Decision No. 60223
11 set initial rates for the Company's water and wastewater services and ordered the Company to file a
12 rate review 36 months from the date it first provided service to any customer. On October 25, 2005,
13 in Decision Nos. 68235, 68236, and 68237, Johnson was ordered to file a rate case by May 1, 2007,
14 using a 2006 test year. Prior to that date and on several occasions thereafter, the Company docketed
15 filings requesting an extension of the filing date.[1] No action was taken on the requests for an
16 extension of time. The Company filed the instant rate case on a date supported by the Commission's
17 Utilities Division ("Staff").[2]

18 On August 1, 2008, following Staff's issuance of two Letters of Deficiency and filings by
19 Johnson to address the items required to deem the application sufficient for processing, Staff filed a
20 Letter of Sufficiency informing the Company that the application had met the Commission's
21 sufficiency requirements and classifying the Company as a Class A utility.

22 On August 15, 2008, a Rate Case Procedural Order was issued setting a hearing on the rate
23 application to commence on April 23, 2009, and setting associated procedural deadlines, including
24 public notice requirements.

25 Intervention in this matter was granted to Swing First Golf, LLC ("Swing First"), the Town
26 of Florence ("Florence"), and the Residential Utility Consumer Office ("RUCO"). The hearing

27 ─────────────
   [1] *See, e.g.,* December 6, 2007 Letter to Docket Control and accompanying attachments in Docket No. WS-02987A-04-
28 0288.
   [2] *See id.*

2       DECISION NO. __**71854**

1  commenced as scheduled on April 23, 2009 before a duly authorized Administrative Law Judge of

2  the Commission.  The Company, Swing First, Florence, RUCO, and Staff appeared through counsel

3  and cross-examined witnesses.  The Company, Swing First, RUCO, and Staff presented evidence in

4  the form of testimony and exhibits.  At the hearing on April 27, 2009, an exhibit was presented

5  which necessitated the suspension of the hearing schedule to allow time for briefing and oral

6  argument on the admissibility and confidentiality of the exhibit.  The hearing resumed on September

7  21, 2009, and concluded on October 7, 2009.  The parties filed post-hearing briefs, and the matter

8  was taken under advisement pending the submission of a Recommended Opinion and Order

9  ("ROO") for the Commission's consideration.

10  ## II.    APPLICATION

11  For its water division, Johnson is requesting a decrease in revenues of $2,879,022 from

12  adjusted test year revenues of $13,172,899, or a decrease of 21.86 percent, for a total revenue

13  requirement of $10,293,877.[3]  RUCO is recommending a decrease in revenues of $73,718 from

14  adjusted test year revenues of $13,172,899, or a decrease of 0.56 percent, for a total revenue

15  requirement of $13,099,181.[4]  Staff is recommending a decrease in revenues of $3,016,800 from

16  adjusted test year revenues of $13,172,899, or a decrease of 22.90 percent, for a total revenue

17  requirement of $10,156,099.[5]

18  For its wastewater division, Johnson is requesting an increase in revenues of $2,325,720 over

19  adjusted test year revenues of $11,354,826, or an increase of 20.48 percent, for a total revenue

20  requirement of $13,680,546.[6]  RUCO is recommending a decrease in revenues of $515,397, or a

21  decrease of 4.54 percent, from adjusted test year revenues of $11,354,014, for a total revenue

22  requirement of $10,838,617.[7]  Staff is recommending a revenue decrease of $895,100, or a decrease

23  of 7.88 percent, from adjusted test year revenues of $11,354,014, for a total revenue requirement of

26  [3] Company Water Division Final Schedule A-1.
[4] RUCO Final Water Schedule SURR RLM-1.
27  [5] Staff Final Schedule JMM-W1.
[6] Company Wastewater Division Final Schedule A-1.
28  [7] RUCO Final Wastewater Schedule SURR RLM-1.

3

DECISION NO. **71854**

$10,458,914.[8]   Florence requested that Staff's final schedules be adopted.[9]   Florence stated that having considered the testimony of each party's witnesses in this matter, Florence believes that Staff's recommendations will promote equity in the provision of water and wastewater treatment services rendered to the citizens of the Town of Florence.[10]

## III.   RATE BASE

For its water division, the Company proposes a fair value rate base ("FVRB"), which is its original cost rate base ("OCRB"),[11] of $3,539,562.[12]   RUCO recommends a FVRB of ($5,556,766).[13]  Staff recommends a FVRB of ($13,863,166).[14]

For its wastewater division, the Company proposes a FVRB of $17,479,735.[15]   RUCO recommends a FVRB of $11,252,776.[16]  Staff recommends a FVRB of $136,562.[17]

### A.   Plant in Service

For its water division, the Company proposes net utility plant in service of $69,177,566.[18]  RUCO recommends net utility plant in service of $68,574,918.[19]  Staff recommends net utility plant in service of $56,916,360.[20]

For its wastewater division, the Company proposes net utility plant in service of $115,454,166.[21]   RUCO recommends net utility plant in service of $109,672,733.[22]   Staff recommends net utility plant in service of $89,190,774.[23]

---

[8] Staff Final Schedule JMM-WW1.
[9] Florence Br. at 1.
[10] *Id.* at 1-2.
[11] The Company did not prepare schedules showing the elements of Reconstruction Cost New Rate Base ("RCND").
[12] Company Water Division Final Schedule A-1.
[13] RUCO Final Water Schedule SURR RLM-1.
[14] Staff Final Schedule JMM-W1.
[15] Company Wastewater Division Final Schedule A-1.
[16] RUCO Final Wastewater Schedule SURR RLM-1.
[17] Staff Final Schedule JMM-WW1.
[18] Company Water Division Final Schedule B-2, p. 1.
[19] RUCO Final Water Schedule SURR RLM-2.
[20] Staff Final Schedule JMM-W2.
[21] Company Wastewater Division Final Schedule B-2, p. 1.
[22] RUCO Final Wastewater Schedule SURR RLM-2.

DOCKET NO. WS-02987A-08-0180

## 1.    Inadequately Supported Plant

Staff is recommending a 10 percent disallowance of plant for inadequately supported plant costs, for a disallowance of $7,433,707 for the water division[24] and $10,892,391 for the wastewater division.[25]   Staff calculated its proposed 10 percent disallowance on plant balances after first deducting the disallowances Staff recommended, as discussed further below, for plant not used and useful and for excess capacity plant.[26]   Staff also proposed corresponding adjustments to accumulated depreciation balances[27] and depreciation expense.[28]   Staff's witness testified that rather than disallowing the entire cost of unsubstantiated plant, Staff believes a minimal 10 percent disallowance is warranted.[29]   RUCO took no position on the issue.[30]   The Company argued that the 10 percent disallowance proposed by Staff is arbitrary, and that Staff should instead have identified and removed specific unsupported or inadequately supported plant costs.[31]

Staff stated that the Company failed to provide complete and authentic information in regard to its plant in accordance with Commission rules.[32]   Staff's witness testified that for independent third-party transactions, complete and authentic information is source documentation that includes but is not limited to vendor invoices for materials, supplies and labor, contracts, cancelled checks, time sheets, and reliable accounting records.[33]   Staff stated that such information would allow identification of what was purchased and whether the item was allowable, and further, would allow

---

[23] Staff Final Schedule JMM-WW2.
[24] Staff Br. at 7; Staff Final Schedule JMM-W3, p. 1 of 2.
[25] Staff Br. at 7; Staff Final Schedule JMM-WW3, p. 1 of 2.
[26] Staff Br. at 7.
[27] Staff Final Schedules JMM-W9, JMM-WW9.
[28] Staff Br. at 7; Staff Final Schedules JMM-W22, JMM-WW20.
[29] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 14.
[30] RUCO Br. at 4; RUCO Reply Br. at 1.
[31] Co. Br. at 6; Co. Reply Br. at 5-6, 17-18.
[32] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 11.
A.A.C. R14-2-610(D)(1) and A.A.C. R14-2-411(D)(1) each provide, in part:
   D.  Accounts and records
   1.  Each utility shall keep general and auxiliary accounting records reflecting the cost of its properties, operating income and expense, assets and liabilities, and all other accounting and statistical data necessary to give complete and authentic information as to its properties and operations.
[33] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 11.

DECISION NO. **71854**

Staff to identify the amount of the purchase and whether the amount was reasonable.[34] Staff stated that in the case of transactions with affiliates, Staff would request source documents in addition to fair competitive bids.[35] For Class A utilities such as Johnson, the Commission's Affiliate Interests Rules[36] require the affiliate to provide all source documentation.[37]

The Company's witness asserted that Johnson "provided contracts, invoices, cancelled checks and/or main extension agreements which supported all but $885,064 of the $79,591,151 in plant in service."[38] The Company argued that the documentation that the Company provided, line extension agreements, construction agreements, invoices, receipts and other supporting documentation, are the types of documentation that a utility would traditionally submit to substantiate plant costs.[39] In the Company's rejoinder testimony, the Company provided a table representing a summary of its claimed plant costs listed by the type of supporting documentation provided to Staff.[40] Staff did not dispute that the Company submitted voluminous documents, but

---

[34] *Id.*
[35] *Id.*
[36] A.A.C. R14-2-801 *et seq.*
[37] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 11.
[38] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 12.
[39] Co. Reply Br. at 6.
[40] Rejoinder Testimony of Company witness Thomas Bourassa (Exh. A-4) Vol. II at 13-14. The table the Company's witness provided for its water division is reproduced here, without footnotes, as it was reproduced on page 6 of the Company's closing brief:

| Type of Documentation | Cost Booked |
|---|---|
| | |
| LXA only | $ 23,126,031 |
| LXA plus back-up | $ 15,402,986 |
| Invoices | $ 5,703,569 |
| Contracts, Cancelled Checks, Bank Statements | $ 29,222,823 |
| Plant costs booked in earlier year but subsequently removed and not in test year rate base | $ 81,087 |
| Total | $ 73,536,516 |
| Total requested by Staff | $ 74,421,579 |
| Missing documentation | $ 885,064 |

The Company's witness provided a similar table for its wastewater division in the Rejoinder Testimony of Company witness Thomas Bourassa (Exh. A-4) Vol. III at 12. The table the Company's witness provided for its wastewater division is reproduced here, without footnotes, as it was reproduced on page 18 of the Company's closing brief:

DOCKET NO. WS-02987A-08-0180

1  stated that Staff's audit and analysis could not verify the Company's claims.[41]   Staff stated that its

2  audit process was made difficult in this case by the Company's failure to keep its records in

3  accordance with the National Association of Regulatory Utility Commissioners ("NARUC")

4  Uniform System of Accounts ("USOA") and Commission rules.[42]   While the USOA requires plant

5  records to be kept by plant account, the documentation the Company provided was not provided by

6  plant account, but instead by project, which could span several years.   Staff's witness testified that

7  the Company provided canceled checks showing the amount that Johnson paid to its affiliate, as

8  opposed to the actual cost of the asset, and did not provide any evidence that costs charged by the

9  affiliates were supported by competitive bids.[43]   The Company also provided Staff with advances in

10  aid of construction ("AIAC") agreements that pertained to the years 2000 to 2007, most of which

11  were filed with the Commission in 2008.[44]   Staff stated that while most of the AIAC agreements are

12  with affiliates of Johnson, indicating that nearly all of the Company's plant was constructed by

13  affiliates, Johnson did not maintain complete invoices and records to support the transactions with its

14  affiliates.[45]

15        Staff further stated that the difficulty presented by the Company's failure to properly keep its

16  records was compounded by the lack of timeliness of the Company's response to Staff's data

| Type of Documentation | Cost Booked |
|---|---|
| LXA only | $ 31,275,040 |
| LXA plus back-up | $ 20,453,490 |
| Invoices | $ 8,197,464 |
| Contracts, Cancelled Checks, Bank Statements | $ 59,806,578 |
| Total | $ 126,810,065 |
| Total requested by Staff | $ 126,810,065 |
| Missing documentation | $ 1,047,941 |

[41] Staff Br. at 7-8.
[42] *Id.*, citing to Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 13.
[43] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 12-13.
[44] *Id.*
[45] Staff Br. at 8; Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 11-12.

DECISION NO.  **71854**

DOCKET NO. WS-02987A-08-0180

1    requests.[46]   During the course of its plant audit, Staff sent the Company additional data requests

2    attempting to obtain information that the Company was not providing to Staff, and some of the

3    Company's responses were vague or non-responsive, which in turn, resulted in more data requests.[47]

4    In one instance, the Company supplemented its response to an August 2008 data request on April 21,

5    2009, after Staff had filed its direct testimony, and 21 days before Staff's surrebuttal testimony was

6    due.[48]   That supplemental data response included documents relating to water and sewer

7    infrastructure for 17 subdivision projects.[49]   Staff's witness testified that despite the late provision of

8    the documents, Staff did nevertheless attempt to review them.[50]

9

10        The Company argued that Staff should have identified and removed each specific plant item

11   that was unsupported by the documentation it provided, and that because Staff's proposed

12   disallowance does not apply to specific plant items, the Company "never received sufficient

13   information to challenge the disallowance or raise a reasonable defense regarding the plant costs that

14   were disallowed."[51]   As Staff pointed out, however, this argument presupposes that it is the

15   Commission's Staff that bears the burden of proof.  Staff argues that its conclusion regarding the

16   inadequacy of the Company's documentation is corroborated by a similar conclusion reached in the

17

18   2006 audit report prepared by Henry & Horne.[52]

19        We believe the record does not support a specific disallowance figure for the water division,

20   notwithstanding the Company's record keeping issues as discussed in this proceeding.  Further, we

21

22   [46]Staff Br. at 7-8, citing to Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 13.
     [47] Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 12 and (Exh. S-45) at 14.

23   [48] Staff Br. at 8, citing to Hearing Exhibit S-46 (cover letter to copies of documents provided to support water and sewer
     infrastructure for 17 subdivision projects).

24   [49] Hearing Exhibit S-46 (cover letter to copies of documents provided to support water and sewer infrastructure for 17
     subdivision projects).

25   [50] Tr. at 1712-1713.
     [51] Co. Br. at 6-7.

26   [52] Staff Reply Br. at 3.  Staff's witness testified that the Henry & Horne audit found the following: "Because of the
     inadequacy of accounting records for the years prior to 2006, we were unable to form an opinion regarding the amounts

27   at which utility plant in service and accumulated depreciation are recorded in the accompanying balance sheet at
     December 31, 2006 (stated at $168,974,434 and $8,930,075 respectively), or the amount of depreciation expense from

28   the year then ended (stated at $1,799,271)."  Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 12-13
     and (Exh. S-45) at 15.

DECISION NO. **71854**

DOCKET NO. WS-02987A-08-0180

believe it is in the ratepayers' best interests for the Company to keep its records in accord with

NARUC USOA and Commission rules.  While the Company argued that it made "herculean" efforts

to supplement the documents requested by Staff,[53] and that Staff, and not the Company, was at fault

for failing to organize the disparate and incomplete pieces of information the Company eventually

provided when prodded by Staff,[54] it is clear from the record that the Company's records were

inadequately kept, and could therefore not be produced in the manner necessary to demonstrate the

actual cost of its properties in a form that provides complete and authentic information for public

audit.  It is incumbent upon all regulated utilities to keep the records necessary to demonstrate the

actual cost of its properties in a form that provides complete and authentic information.   The

evidence in this case demonstrates that the Company has not complied with regulatory accounting

requirements, and has not met its burden of proof regarding the actual cost of its properties.  While

additional evidence is not necessary to support a conclusion that the Company failed to meet its

burden, we find that the conclusion of Henry & Horne, an independent accounting firm employing

certified public accountants, regarding the adequacy of the Company's accounting records, provides

additional evidence corroborating Staff's position that the Company failed to maintain accounting

records sufficient to provide complete and authentic information to support its plant additions.[55]  It is

reasonable and in the public interest to require the Company to keep its records in accordance with

the NARUC USOA and Commission rules in a manner that will support its filings with the

Commission.

        a.       <u>AIAC and CIAC Related to Unsupported Plant</u>

      The Company argued that Staff's adjustment for inadequately supported plant is one sided

because it failed to consider corresponding adjustments associated with AIAC and Contributions in

---

[53] Co. Reply Br. at 8.
[54] *See* Co. Reply Br. at 8-16.
[55] Staff Reply Br. at 2.

DECISION NO.   **71854**

Aid of Construction ("CIAC").[56]   The Company argued that to ignore the necessary corresponding adjustments to AIAC or CIAC associated with disallowed plant would create a mismatch and result in an understatement of rate base to the detriment of the Company.[57]

Staff accepted the Company's adjustments to CIAC and AIAC associated with the disallowances for excess capacity, for plant found not used and useful, and for certain items of post test year plant, discussed further below.[58]   Staff stated that for inadequately supported plant, due its lack of confidence in the Company's records, it made no corresponding adjustments to CIAC and AIAC.[59]   We agree with Staff that it is inappropriate to make adjustments to CIAC or AIAC when plant has been disallowed due to inadequate documentation, and make no such adjustment in this case.

## 2.   Post-Test Year Plant

Staff disputed the Company's proposal to include $3,222,494 in plant in service related to post test year plant for the wastewater division.[60]   According to the Company, the plant additions were not invoiced and paid until 2008.[61]   The $3,222,494 total disputed amount consists of: (1) fourteen separate items, totaling $2,201,386, classified as post test year plant in the Company's application, but reclassified, in the Company's rebuttal testimony, to test year plant in service; and (2) $1,201,108 classified as post test year plant by the Company, comprised of $486,714 for the Parks lift station and $534,394 for the Queen Creek leach field.[62]

The disputed plant in service amount of $2,201,386 was originally presented in the rate application as $2,684,888 of post test year plant.[63]   In a data response, the Company indicated that

---

[56] Co. Br. at 7; Co. Reply Br. at 7, 18-19.

[57] Co. Br. at 7.

[58] *See* Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 3-4.

[59] Staff Reply Br. at 5; Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 12 and (Exh. S-45) at 15.

[60] Co. Final Schedules B-2 Page 3 and 3.4.

[61] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 34.

[62] Co. Br. at 21;Rebuttal Testimony of Company witness Bourrassa (Exh. A-2) Vol. III at 14-15; Company Final Schedules B-2, page 3 and 3.4.

[63] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-44) at 8.

DOCKET NO. WS-02987A-08-0180

1   the $2,684,888 was incurred for the Hunt Highway South force main project.[64]   According to the

2   Company's accounting witness, the plant items were recorded in construction work in progress

3   ("CWIP") at the end of the test year, and had not been transferred into plant in service when the

4   application was filed.[65]   The Company's witness testified that the Hunt Highway South force main,

5   which connects its Section 11 wastewater treatment plant ("Section 11 WWTP") to its Anthem

6   wastewater treatment plant ("Anthem WWTP"), was used during the test year to redirect flows from

7   the Anthem WWTP to the Section 11 WWTP when the Anthem WWTP was not yet ready for

8   operation.[66]

9

10      The Company presented the Parks lift station and the Queen Creek leach field as post test

11   year plant on its final schedules.[67]   The Parks lift station was constructed initially for a shopping

12   center that was started in 2007.[68]   The Company asserted that without its construction, the Company

13   would have had to implement a costly process of vaulting and hauling the shopping center's

14   wastewater to its Pecan wastewater treatment plant ("Pecan WWTP").[69]   In regard to the Queen

15   Creek leach field, the Company's witness testified that during the test year, all excess effluent flows

16   from the Pecan WWTP that required disposal were sent to the Trilogy Encanterra development, and

17   because the effluent flows were well in excess of the demands needed for the Encanterra golf course

18   in 2007, Johnson constructed the Queen Creek leach field to dispose of the excess effluent.[70]

19

20      RUCO did not oppose the inclusion of the disputed plant items from plant in service.[71]   Staff

21   recommended a disallowance of the entire disputed amount of $3,222,495 as post test year plant,

22

---

[64] *Id.*

[65] Rebuttal Testimony of Company witness Thomas Bourrassa (Exh. A-2) Vol. III at 14.

[66] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 34.

[67] Co. Final Schedules B-2 Page 3.4.

[68] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 34.

[69] *Id.*

[70] *Id.* at 35.

[71] Co. Br. at 24; RUCO Br. at 4; RUCO Reply Br. at 1; RUCO Final Schedules SURR RLM-3.  The Company claimed on brief that RUCO accepted the Company's post test year plant of $2,684,888 from the Company's direct filing plus RUCO's proposed increase based on the Company's rebuttal filing, and RUCO *did not refute the Company's claim in its reply brief*.  RUCO's final schedules show an adjustment increasing plant in service by $490,896 for post test year plant.

11          DECISION NO. **71854**

with an accompanying adjustment to reduce CIAC.[72]  Staff stated that the inclusion of post test year plant would result in a mismatch of that plant with the revenues, expenses, and rate base of the test year.[73]  Staff's witness testified that matching is one of the most fundamental principles of accounting and ratemaking, and the absence of matching distorts the meaning of operating income and rate of return for measuring the fairness and reasonableness of rates.[74]  Accordingly, Staff explained, post test year plant should be recognized in rate base only in special and unusual circumstances where failure to do so would create an inequity.[75]  Staff stated that it has traditionally recognized two scenarios in which recognition of post test year plant is appropriate:  (1) when the magnitude of the investment relative to the utility's total investment is such that not including the post test year plant in the cost of service would jeopardize the utility's financial health; and (2) when certain conditions exist as follows:  (a) the cost of the post test year plant is significant and substantial, (b) the net impact on revenue and expenses for the post test year plant is known and insignificant or is revenue-neutral, and (c) the post test year plant is prudent and necessary for the provision of services and reflects appropriate, efficient, effective, and timely decision-making.[76]

The Company stated that all the plant was necessary to serve the test year level of customers, and that Staff's engineering testimony noted that the Hunt Highway South force main was in use during the test year.[77]  The Company's accounting witness testified that the Company believes that the post test year Parks lift station and the Queen Creek leach field projects are revenue neutral and are necessary for reliability purposes, to serve the test year end level of customers.[78]  The Company argued that the Commission has allowed *pro forma* adjustments, including post-test year plant, in

---

[72] Staff Final Schedules JMM-WW3 Page 1 of 2; JMM-WW4; Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 3.
[73] Staff Br. at 10.
[74] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-44) at 8.
[75] *Id.*
[76] Staff Br. at 10, citing to Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-44) at 9.
[77] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 35, referring to Direct Testimony of Marlin Scott Jr. (Exh. S-36), Exhibit MSJ at 31.

DECISION NO.     **71854**

1   order to ensure a proper matching of plant to test year customers and to more accurately reflect

2   reality during the period the rates will be in effect.[79]

3   Staff argued that the Company's request to include post test year plant in rate base is

4   inconsistent with the Commission's normal treatment of post test year plant.[80] Staff acknowledged

5   that the Company, in rebuttal testimony, reclassified $2,201,386 of plant from post test year plant to

6   test year plant. Staff explained, however, that because Staff lacked confidence in the Company's

7   documentation, Staff continued to classify it as post test year plant.[81] While the Company charged

8   that "Staff failed to follow-up to determine whether such plant was in fact put into service in

9   2007,"[82] Staff responded that the burden of proof lies with the Company, and not with Staff.[83] Staff

10  stated that the invoices the Company provided for post test year plant were from a Company

11  affiliate, Central Pinal Contracting, LLC ("Central Pinal").[84] The Company, contending that Central

12  Pinal is no longer a Company affiliate, did not allow Staff to verify the underlying affiliate records.[85]

13  Staff therefore could not verify the invoices for the construction performed by the affiliate.[86] Staff

14  stated that it had little confidence in the integrity of some of the Company's records.[87] For example,

15  Staff stated that its confidence in the reliability of the Company's invoices was further diminished by

16  the disclosure of the invoice that was created to charge a Company employee for water that he

17  neither used nor was a guarantor for on the Swing First account.[88] In regard to the Company's

18  claims that the post test year plant was revenue neutral (i.e., will not add to test year revenues), Staff

19  asserted that the Company's claim is unsubstantiated, and that in the absence of reliable cost

---

[78] Rebuttal Testimony of Company witness Thomas Bourrassa (Exh. A-2) Vol. III at 15, citing to "Rebuttal Testimony of Brian Tompsett."
[79] Co. Br. at 23.
[80] Staff Br. at 9.
[81] Staff Reply Br. at 6.
[82] Co. Br. at 22.
[83] Staff Reply Br. at 6.
[84] Staff Reply Br. at 6, Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-45) at 6.
[85] *Id.*
[86] *Id.*
[87] Staff Reply Br. at 6.

1   documentation, it is difficult to determine whether any pro forma adjustments to rate base also

2   include known and measurable changes to revenues and expenses.[89]  Staff argued that the Company

3   provided no credible evidence that the Parks lift station was necessary to serve the test year end level

4   of customers, other than conclusory statements that it was necessary to resolve potential problems.[90]

5       It is undisputed that the Company did not incur the costs of the $3,222,494 of plant during

6   the test year.  The Company did not produce requested records necessary to verify the claimed plant

7   values, and in addition, failed to quantify the effects of the items of post test year plant on test year

8   revenues.  Aside from the Company's statements that the Parks lift station and the Queen Creek

9   leach field are revenue neutral, the Company presented no evidence demonstrating their claimed

10  revenue neutrality.  While Staff stated that the Parks lift station was used and useful during the test

11  

12  year, Staff also noted that the Company did not perform some of the tasks that are performed when

13  installing an upgrade to a lift station, such as retiring plant that was replaced with the upgraded

14  plant.[91]  It is the Company's burden to provide reliable, accurate documentation showing the cost of

15  

16  post test year plant and the Company did not meet that burden.  The Company also failed to present

17  evidence demonstrating that the post test year plant would not add to revenues.  The $3,222,494

18  should therefore not be included in test year plant in service.  The Company will have an opportunity

19  to request inclusion of this plant in its next rate case.

20          **3.     Plant Not Used and Useful**

21  

22      Staff stated that an inspection of the Company's water and wastewater systems revealed plant

23  that was not used and useful, and therefore recommended disallowance of $4,127,019 of plant in the

24  water division and $4,595,298 of plant in the wastewater division, with corresponding adjustments to

25  

26  

27  [88] Staff Reply Br. at 6.
    [89] Staff Br. at 10-11, citing to Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-44) at 9.
    [90] Staff Br. at 11, citing to Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 34.
28  [91] *See* Staff Reply Br. at 6, citing to Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-45) at 5.

DOCKET NO. WS-02987A-08-0180

1  CIAC and AIAC.[92]   RUCO accepted Staff's findings with respect to Staff's analysis of plant that is

2  not used and useful.[93]   Johnson accepted some of Staff's adjustments to remove plant Staff found not

3  used and useful, but disagreed with Staff and RUCO's recommended removal of $731,125 for 4

4  miles of 12-inch mains (the "Rickee Main") from its water division.[94]   For its wastewater division,

5  the Company disagreed with Staff and RUCO's recommended removal of $690,186 for

6  approximately 4 miles of 8-inch sewer force mains ("Magma Sewer Force Main") and $1,696,806

7  for the Precision Wastewater Treatment Plant ("Precision WWTP").[95]

8

9              a.   Rickee Main

10           The Company agreed that the Rickee Main is not being used to serve customers, but argued

11  that it should be included in rate base nonetheless, because the Company "acted prudently in order to

12  provide service."[96]   The Company stated that it was contractually obligated to construct the Rickee

13  Main pursuant to the Silverado Ranch Master Utility Agreement; that the plant was constructed

14  within a roadway already paved by the developer, and that the plant is in place, ready to provide

15  water to customers within Silverado Ranch, once homes are constructed.[97]   The Company claimed

16  that it would be "inappropriate and inequitable" to deny inclusion of the Rickee Main in rate base.[98]

17

18           Johnson has acknowledged that the $731,125 Rickee Main is not being used to serve

19  customers.[99]   It is therefore not used and useful, and should not be included in rate base.   Once the

20  plant is being used to serve customers, the Company can request its inclusion in rate base in a rate

21  proceeding.   Staff's adjustments to plant in service and the corresponding CIAC and AIAC

22  adjustments[100] are appropriate and will be adopted.

23

24  _____
[92] Staff Br. at 3; *See* Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 3-4.

25  [93] RUCO Br. at 4; RUCO Reply Br. at 1; Rebuttal Testimony of RUCO witness Rodney Moore (Exh. R-2) at 4-5.
[94] Co. Reply Br. at 2; Rebuttal Testimony of Company witness Thomas Bourassa (Exhibit A-2) Vol. II at 11-12.

26  [95] Co. Br. At 19; Rebuttal Testimony of Company witness Thomas Bourassa (Exhibit A-2) Vol. III at 12.
[96] Co. Br. at 8; Co. Reply Br. at 2-3.

27  [97] Co. Br. at 8; Rejoinder Testimony of Company witness Brian Tompsett (Exh. A-7) at 14.
[98] Co. Br. at 8.

28  [99] Tr. at 922-923.
[100]*See* Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 3-4.

DECISION NO.    **71854**

1

### b. Magma Sewer Force Main

2    Johnson disagreed with Staff's recommended removal of $690,186 for approximately 4 miles

3 of 8-inch sewer force mains to serve the Silverado Ranch development.[101]  Johnson acknowledged

4 that the Magma Sewer Force Main is not currently serving customers, but argued that it should be

5 included in plant in service because the Company was obligated to construct the plant and acted

6 prudently in order to provide service.[102]

7

8    Johnson has acknowledged that the $690,186 Magma Sewer Force Main is not being used to

9 serve customers.[103]  It is therefore not used and useful, and should not be included in rate base.  Once

10 the plant is being used to serve customers, the Company can request its inclusion in rate base in a

11 rate proceeding.  Staff's adjustments to plant in service and the corresponding CIAC and AIAC

12 adjustments[104] are appropriate and will be adopted.

13

### c. Precision WWTP

14

15    Johnson disagreed with Staff's recommended removal of a total of $1,696,806 for the cost of

16 the Precision WWTP.[105]  The Company argued that the Precision WWTP should be considered used

17 and useful because the Arizona Department of Environmental Quality ("ADEQ") required the plant

18 to be constructed as a condition of issuing subdivision approvals to developers within Johnson

19 Ranch and other developments.[106]

20    The Company also proffered the argument that because construction of the Precision WWTP

21 was a prerequisite to the issuance of additional subdivision approvals in Johnson Ranch, the plant

22

23

24 ---

[101] Co. Br. at 19; Co. Reply Br. at 3; Rebuttal Testimony of Company witness Thomas Bourassa (Exhibit A-2) Vol. III at

25 11.
[102] Co. Br. at 19-20; Rebuttal Testimony of Company witness Thomas Bourassa (Exhibit A-2) Vol. III at 12.
[103] Tr. at 922-923.
26 [104]*See* Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 3-4.
[105] Co. Br. at 19-20; Co. Reply Br. at 3; Rebuttal Testimony of Company witness Thomas Bourassa (Exhibit A-2) Vol. III
27 at 12.
[106] Co. Br. at 19-20; Co. Reply Br. at 3; Rebuttal Testimony of Company witness Thomas Bourassa (Exhibit A-2) Vol. III
28 at 12; Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 36.

DOCKET NO. WS-02987A-08-0180

1   was needed to serve the 2007 test year level of customers.[107]   We disagree.   Johnson acknowledged

2   that the Precision WWTP is not being used to serve customers.[108]   It is therefore not used and useful,

3   and should therefore be excluded from plant in service.   Once the plant is being used to serve

4   customers, the Company can request its inclusion in rate base in a rate proceeding.   Staff's

5   adjustments to plant in service and the corresponding CIAC and AIAC adjustments[109] are

6   appropriate and will be adopted.

7

8           **4.      Excess Capacity**

9           Staff recommended a disallowance of $1,127,065 for Johnson's water system, and

10  $5,443,062 for the wastewater system, due to excess plant capacity.[110]   RUCO accepted Staff's

11  findings with respect to Staff's analysis of plant that constitutes excess capacity.[111]   Staff's witness

12  testified that in evaluating capacity, Staff classifies plant which will be necessary within a five year

13  planning period using peak demand factors and growth projections to be "extra capacity," and plant

14  which will not be necessary within a five year planning period to be "excess capacity."[112]   The five

15  year planning period Staff used in this case began with the end of the Company's 2007 test year.[113]

16

17           a.      Anthem System Well and Storage Capacity

18           The Company's Anthem at Merrill Ranch ("Anthem") water system has two 600 gallon per

19  minute ("GPM") wells and one 300 GPM well, for a total of three wells with total production

20  capacity of 1500 GPM.   The Anthem water system has one 1.0 million gallon ("MG") and one 0.5

21  MG storage tank, for total storage capacity of 1.5 MG.[114]   At the end of the test year, the Anthem

22  system served 857 customer connections.[115]   In its analysis, Staff utilized peak demand factors from

23

24  ---

[107] Co. Reply Br. at 3-4.

25  [108] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 36.
    [109] *See* Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 3-4.

26  [110] Surrebuttal Testimony of Staff witness Marlin Scott, Jr. (Exh. S-37) at 3, 9.
    [111] RUCO Brief at 4; Rebuttal Testimony of RUCO witness Rodney Moore (Exh. R-2) at 4-5.

27  [112] Tr. at 1423.
    [113] Staff Br. at 5.

28  [114] Direct Testimony of Staff witness Marlin Scott, Jr. (Exh. S-36) at Exhibit MSJ, p. 9.
    [115] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5), Exhibit B.

DECISION NO.   **71854**

1   the Company's Johnson Ranch system of 400 GPD per service connection for storage capacity and

2   0.35 GPM per service connection for well capacity.[116]

3                           1)     Anthem System Well Capacity

4         Staff determined that pursuant to its peak demand and growth projections, the capacity of the

5   Anthem system's Rancho Sendero Well No. 1 will not be needed within five years from the 2007

6   test year, and therefore constitutes excess capacity that should be excluded from plant in service.[117]

7
8   Staff's recommended removal of the Anthem Rancho Sendero Well No. 1, a 600 GPM well, would

9   reduce plant in service by $693,827.[118]

10         Staff's recommendation to remove the 600 GPM Anthem Rancho Sendero Well No. 1 from

11   plant in service would leave the Anthem system with 900 GPM of well capacity in plant in service,

12   which would allow for 2,571 connections, equating to the addition of 342 new service connections

13   per year from 2008 through 2012.[119]   Johnson proposed to instead the use of a growth rate of 366

14   new service connections per year, which is the actual known increase in customers for the year 2008,

15
16   in order to calculate capacity needs.[120]   Use of Johnson's growth estimate would yield 2,687

17   customers at the end of 2012.[121]   Johnson's witness testified that use of the actual increase in

18   Anthem system customers in 2008 as the growth rate to calculate capacity needs through 2012 is

19   reasonable because "2008 was a disastrous year for the housing industry."[122]

20         Johnson also argued that the Rancho Sendero Well No. 1 is "necessary and integral to the

21   operation of the Anthem at Merrill Ranch water system," and that "[a]ll three wells . . . are necessary

22   to provide safe and reliable water service to Anthem at Merrill Ranch."[123]   Johnson stated that if

23

24   ---
[116] Direct Testimony of Staff witness Marlin Scott, Jr. (Exh. S-36), Exhibit MSJ at 9.
25   [117] Staff Br. at 5.
[118] Direct Testimony of Staff witness Marlin Scott, Jr. (Exh. S-36) at Exhibit MSJ, p. 12; Surrebuttal Testimony of Staff
26   witness Marlin Scott, Jr. (Exh. S-37) at 3; Tr. at 1464, 1468.
[119] Surrebuttal Testimony of Staff witness Marlin Scott, Jr. (Exh. S-37) at 4.
27   [120] Co. Reply Br. at 4, citing Rebuttal Testimony of Brian Tompsett (Exh. A-5) at 8.
[121] Rebuttal Testimony of Brian Tompsett (Exh. A-5) at 8.
[122] *Id.*
28   [123] Co. Br. at 9.

DOCKET NO. WS-02987A-08-0180

Staff's recommendation to "remove the 600 GPM Rancho Sendero Well No. 1 as excess capacity" were adopted, and the other 600 GPM well were out of service for any reason, it would "leave the Company with only the 300 GPM Rancho Sendero Well #2 to serve all of Anthem at Merrill Ranch."[124]   Johnson argued that because taking Anthem Rancho Sendero Well No. 1 out of service would create safety and reliability concerns for the Company and its customers, it should not be excluded from rate base as excess capacity.[125]   Staff disagreed with the Company's arguments that exclusion of the Rancho Sendero Well No. 1 from rate base due to excess capacity would cause reliability concerns.[126]   Staff also disagreed with the Company's arguments that it is inequitable to exclude excess capacity from rate base because the plant in question remains connected to the system.[127]   Staff stated that exclusion of plant in service due to excess capacity is not an uncommon occurrence,[128] and that it would be inequitable to include plant in rate base when the plant capacity exceeds what is needed to serve customers.[129]   We agree with Staff that excluding well capacity from plant in service does not require physical removal of the plant, and therefore does not cause reliability concerns.  We also agree with Staff that it is inequitable to require ratepayers to pay rates that include a return on more plant than is reasonably projected to be required to serve customers during a reasonable planning horizon.  The Company's arguments that the configuration of the Anthem system makes it "inequitable" to exclude plant from rate base are not convincing.  Ratepayers should not be made to pay for unnecessary plant capacity due to the Company's chosen plant configuration.

There was no dispute in this proceeding regarding either the daily peak demand or the five year planning period Staff used in its excess capacity analysis for the Anthem system.  In addition,

---

[124] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 9; Co. Br. at 10.
[125] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 7; Co. Br. at 11.
[126] Staff Reply Br. at 4-5.
[127] Staff Reply Br. at 5, citing Tr. at 1484.
[128] Tr. at 1472.
[129] Staff Reply Br. at 5.

DECISION NO. _____ **71854**

1    no arguments were raised in response to the Company's assertions that its proposed growth
2    projection of 366 new customers per year is reasonable.   As Staff pointed out, utilizing the
3    Company's proposed growth rate, under the Company's growth projection, the Anthem system's
4    300 GPM well constitutes excess capacity.[130]   Based on the evidence in this proceeding we find that
5    the 300 GPM Rancho Sendero Well No. 2 constitutes excess capacity, and that it is reasonable to
6    exclude its cost from plant in service, along with the corresponding CIAC and AIAC adjustments.
7
8    The actual cost of the 300 GPM Rancho Sendero Well No. 2 was not available in the record.   We
9    find it reasonable and appropriate to use half the documented cost of the 600 GPM Anthem Rancho
10   Sendero Well No. 1, as a means of calculating a reasonable estimate of the cost of the 300 GPM
11   Rancho Sendero Well No. 2 for purposes of excluding its excess capacity from plant in service.
12   Therefore, $346,914 will be excluded from the Company's water division plant in service as excess
13   capacity, along with the corresponding CIAC and AIAC adjustments.

14
                                  2)    Storage Capacity
15

16        Staff determined that pursuant to its peak demand and growth projections, the capacity of the
17   Anthem system's Rancho Sendero 0.5 MG storage tank will not be needed within five years from
18   the 2007 test year.[131]   Staff's recommended removal of the Anthem Ranchero Sendero 0.5 MG
19   storage tank would reduce plant in service by $433,238.[132]   Staff relied on A.A.C. R18-503(B)[133] in
20   making its excess storage capacity determinations for the Anthem water system.

21

22

23   [130] Staff Br. at 6, citing to Tr. at 1469.   Based on Staff's undisputed proposed peak load of 0.35 GPM per service
     connection, at Johnson's proposed growth rate of 366 new connections per year, the Anthem system would require 940
24   GPM well capacity by the end of 2012, instead of Staff's recommended well capacity of 900 GPM.
     [131] Staff Br. at 5.
25   [132] Direct Testimony of Staff witness Marlin Scott, Jr. (Exh. S-36) at Exhibit MSJ, p. 12; Surrebuttal Testimony of Staff
     witness Marlin Scott, Jr. (Exh. S-37) at 3; Tr. at 1464, 1468.
26   [133] A.A.C. R18-5-503 provides as follows:
          R18-5-503. Storage Requirements
27        A.   The minimum storage capacity for a CWS or a noncommunity water system that serves a residential
          population or a school shall be equal to the average daily demand during the peak month of the year.   Storage
28        capacity may be based on existing consumption and phased as the water system expands.

Johnson asserted that the Rancho Sendero 0.5 MG storage tank is "necessary and integral to the operation of the Anthem at Merrill Ranch water system," and that "both storage tanks are necessary to provide safe and reliable water service to Anthem at Merrill Ranch."[134]  The Company argued that because it is not possible to pump water from the Rancho Sendero Well No. 2 into the distribution system without first pumping it into the 0.5 MG storage tank, it would be inequitable to remove it from plant in service as excess capacity.[135]  The Company also argued that its storage requirement for the Anthem at Merrill Ranch subdivision is 1,397,240 gallons.[136]  The Company reached this figure based on a two-day storage capacity, using a customer usage amount of 260 gallons per customer per day, which the Company stated that it uses for system design and planning purposes, and multiplying that number by the Company's projected 2,687 customers at the end of 2012.[137]

Staff based its capacity allowance for the Anthem at Merrill Ranch subdivision on the requirements of A.A.C. R18-503(B), and determined that the necessary storage requirement for this system is 714,800 gallons per day for the five year planning period following the test year.[138]  Staff disagreed with the Company's arguments that it is inequitable to exclude excess capacity from rate base because the plant in question remains connected to the system.[139]  Staff argued that it is not an uncommon occurrence,[140] and that it would be inequitable to include plant in rate base when the plant capacity exceeds what is needed to serve customers.

The Company's arguments that the configuration of the Anthem system makes it "inequitable" to exclude plant from rate base are not convincing.  We agree with Staff that excluding

B.  The minimum storage capacity for a multiple-well system for a CWS or a noncommunity water system that serves a residential population or a school may be reduced by the amount of the total daily production capacity minus the production from the largest producing well.

[134] Co. Br. at 9.
[135] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 11; Co. Br. at 12.
[136] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 10-11; Co. Br. at 12.
[137] Id.
[138] Surrebuttal Testimony of Staff witness Marlin Scott, Jr. (Exh. S-37) at 5.
[139] Staff Reply Br. at 5, citing Tr. at 1484.

DECISION NO. _____ **71854**

storage capacity from plant in service does not require physical removal of the plant, and therefore does not cause reliability concerns. We also agree with Staff that it is inequitable to require ratepayers to pay rates that include a return on more plant than what is reasonably projected to be required to serve customers during a reasonable planning horizon. Ratepayers should not be made to pay for unnecessary plant capacity due to the Company's chosen plant configuration.

We find, based on the evidence presented, that the Anthem system's Rancho Sendero 0.5 MG storage tank constitutes excess capacity and will exclude its $433,238 cost from plant in service in this case, along with the corresponding CIAC and AIAC adjustments. [141]

### b.    San Tan WWTP

Staff stated that the Santan Water Reclamation Plant ("San Tan WWTP") contains excess capacity because according to information provided by the Company, the 1.0 MGD Phase II capacity, at a cost of $5,443,062, is not needed based upon growth projections for the five year planning period.[142] The Company asserted that "the Phase II capacity will be put to use by late 2009 to treat wastewater flow that will be redirected from Johnson Utilities' Pecan WWTP, which is currently nearing constructed capacity."[143] The Company's witness testified that the Company "is currently planning/engineering upgrades to the Morning Star Farms and Circle Cross lift stations, and planning/engineering the construction of one mile of new force main which will enable the Company to redirect flows from the Pecan WWTP to the Santan WWTP. By so doing, Johnson Utilities can delay the costly construction of an additional 2.0 MGD at the Pecan WWTP."[144] Johnson argued that its decision to redirect wastewater flows to the Santan WWTP was prudent, because it gives the Company greater operational flexibility in treating wastewater flows in its

---

[140] Tr. at 1472.

[141] *See* Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 3-4.

[142] Tr. at 1425; Direct Testimony of Staff witness Marlin Scott, Jr. (Exh. S-36) at Exhibit MSJ, p 35; Surrebuttal Testimony of Staff witness Marlin Scott, Jr. (Exh. S-37) at 9-10.

[143] Co. Br. at 24; citing to Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 38.

[144] Co. Br. at 24; Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 39.

DOCKET NO. WS-02987A-08-0180

1   service area, and it allows the Company to obtain the maximum benefit from its combined

2   wastewater treatment capacity.[145]

3       We make no determination at this time on whether Johnson's operational decisions regarding

4   the Pecan WWTP described in its witness' testimony are prudent.  As Staff's witness testified, the

5   construction proposed by the Company would occur almost two years beyond the end of the 2007

6   test year, and would result in completely new flow data which would not match the test year flow

7   data.[146]  It is undisputed that the Company's planned redirection of the wastewater flows from the

8   Pecan WWTP did not occur during the test year, and had yet to occur at the time of the hearing.[147]

9   The evidence demonstrates that Phase II of the Santan WWTP was excess capacity during the test

10  year.  Staff's adjustments to plant in service for the Phase II excess capacity and the corresponding

11  CIAC and AIAC adjustments[148] are appropriate and will be adopted.

12

13          **5.      Affiliate Profit**

14      This case presents us with the issue of a utility's transactions with its affiliates or related

15  parties and how their profit should be treated in a ratemaking context.  This Commission has

16  addressed the issue of affiliate profit by disallowing affiliate companies' profits, in the form of both

17  capitalized costs and expenses.[149]  As previously discussed, the Company was unable to provide

18  adequate documentation to clearly show its plant costs, and the Company did not provide adequate

19  documentation of the profit charged to the Company by affiliates or related parties.  The Company

20  did not dispute Staff's position that affiliate transactions require greater scrutiny than non-affiliate

---

[145] Co. Reply Br. at 5, citing to Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 38.
[146] *See* Surrebuttal Testimony of Staff witness Marlin Scott, Jr. (Exh. S-37) at 10.
[147] Staff Br. at 7.
[148] *See* Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 3-4.
[149] Staff Br. at 17, citing to Decision No. 69164 (December 5, 2006) (Black Mountain Sewer Corporation) and Decision No. 69664 (June 28, 2007) (Gold Canyon Sewer Company).

1  transactions,[150] and did not dispute the Commission's authority to exclude affiliate profit from plant
2  in service.[151]  RUCO did not brief this issue.

3      Two issues are in dispute in regard to an affiliate profit adjustment:  (1) the amount of plant
4  in service that should be subject to the adjustment; and (2) the appropriate percentage of the
5  adjustment.  Staff recommended that an affiliate profit adjustment of 7.5 percent should be applied
6  to the Company's entire plant in service balance.  The Company recommended that an affiliate profit
7
8  adjustment of 1.75 percent be applied only to the amount of plant that the Company acknowledges
9  was constructed by affiliates.

10      Staff's recommended adjustments to remove capitalized affiliate profit from plant in service
11  are $5,017,752 for the water division, and $7,352,364 for the wastewater division.[152]  Staff made the
12  adjustments to plant in service balances following its other recommended adjustments.  Staff's
13  proposed affiliate profit removal adjustment was applied to plant in service balances of $66,903,360
14  for the water division, and $98,031,517 for the wastewater division.[153]
15

16      Johnson proposed affiliate profit removal adjustments to plant in service of $469,832 for the
17  water division and $800,179 for the wastewater division.[154]   Johnson's proposal is based on the
18  amount of plant in service it acknowledged was constructed by affiliates:  $26,847,516 for the water
19  division, and $45,724,508 for the wastewater division.[155]

20                    a.    Affiliate/Related Party Constructed Plant in Service

21      In the course of analyzing the Company's application in regard to plant in service, Staff
22  determined that Company affiliates constructed substantially all the Company's plant.[156]   The
23

24  ---
[150] Co. Reply Br. at 23.
25  [151] *Id.*. at 24.
[152] Staff Final Schedules JMM-W3, page 1 of 2, JMM-W-8, JMM-WW3, page 1 of 2, JMM-WW8.
26  [153] Staff Final Schedules JMM-W-8, JMM-WW8.
[154] Co. Br. at 4, 17, citing to Rebuttal Testimony of Thomas Bourassa (Exh. A-2) Vol. II at 4, Vol. III at 5; Co.
27  Reply Br. at 24; Company Final Schedules Water B-2, page 3.1, Wastewater B-2, page 3.1.
[155] Company Final Schedules Water B-2, page 3.1, and Wastewater B-2, page 3.1.
[156] Staff Br. at 12; Direct Testimony of Staff witness Jeffrey Michlik (S-38) at 12; Surrebuttal Testimony of Staff
28  witness Jeffrey Michlik (Exh. S-45) at 12.

DOCKET NO. WS-02987A-08-0180

Company argued that Staff "improperly assumed that all plant recorded on the Company's books was constructed by affiliates" and that its lower percentage affiliate profit adjustment should be applied only to the plant the Company contends was constructed by affiliates.[157]   However, with the exception of contributed plant, which is excluded from rate base, the Company failed to demonstrate that any entity other than Company affiliates or related parties constructed the Company's water or wastewater plant between 1998 and 2007.

Staff stated that the canceled checks and bank statements provided by the Company for the purpose of supporting payments made for plant showed that payments were made to a Company affiliate, and to no other construction entity.[158]   The Company provided no documentation showing any major construction performed by any entity other than affiliates since 1998.[159]   Staff stated that its audit of the Company's bank records could not verify the amount that the Company claimed represented affiliate-constructed wastewater plant, and that documentation provided by the Company conflicted with some Company responses to data requests.[160]   The 2006 external audit report of the Company's financial statements, prepared by Henry & Horne, specified in Note 3 that "substantially all of the water and sewer construction for the Company" was affiliate contracted.[161]

The Company argued that there was a "lack of consistency" between a Staff witness' prefiled testimony that "[t]he Company used affiliates to construct approximately all plant after 1998" and the witness' negative response on cross-examination to a question regarding whether "100 percent of Johnson Utilities' plant was constructed by affiliates."[162]   We find that there was no inconsistency

---

[157] Co. Br. at 4, 15. 17, citing to Rebuttal Testimony of Thomas Bourassa (Exh. A-2) Vol. II at 4-5, Vol. III at 5; Co. Reply Br. at 24.
[158] Staff Br. at 15-16; Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-45) at 11-12; Staff Reply Br. at 2.
[159] Surrebuttal Testimony of Staff witness Jeffrey Michlik (S-45) at 12.
[160] Staff Br. at 15-16; Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-45) at 11-12; Staff Reply Br. at 2.
[161] Staff Reply Br. at 2; citing to Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-45) at 14.
[162] Co. Reply Br. at 25, citing to Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-45) at 12 and Tr. 1576.

DECISION NO.   **71854**

between the witness' response, which explained that some plant developer-contributed plant was not constructed by affiliates, and the prefiled testimony.[163]

### (1) Affiliate/Related Party Ownership

Johnson is organized as a limited liability corporation, and its membership is comprised of the George Johnson Revocable Trust, George and Jana Johnson, co-trustees,[164] and Connorg, LLC ("Connorg").[165] The members of Connorg are Brian Tompsett, Executive Vice President of Johnson Utilities, and his wife Susan Tompsett.[166]

During its analysis of the application, Staff requested information from the Company regarding the contracting companies that constructed plant for the Company's water and wastewater divisions for the years 1997-2007.[167]  Staff asked the Company to identify the owners of the contracting companies, and to indicate whether or not the contracting company or companies were affiliated with Johnson Utilities, and if so, how.[168]  The Company provided information for the years 1998 through 2007, and stated that no plant was constructed prior to 1998.[169]  For the years 1998 through 2003, Boulevard Contracting Company, Inc., which was owned by George Johnson, constructed water and wastewater plant for the Company.[170]  For the years 2004 through 2006, the Company identified Central Pinal as the contracting company that constructed plant for the Company's water and wastewater divisions.[171]  The Company identified the owners of Central Pinal from 2004 through 2006 as Crisbar, LLC, Connorg, Chris Johnson Family Trust, Barjo LLC, and

---

[163] Tr. at 1576.
[164] Jana Johnson is George Johnson's wife.  Tr. at 862.
[165] Hearing Exh. SF-1.
[166] Tr. at 867; Exh. S-20.
[167] Exh. S-20.
[168] *Id.*
[169] *Id.*
[170] Exh. S-20.  Corporations Division records show that Boulevard Contracting Company, Inc. was incorporated on December 18, 1998, with George Johnson and Jana Johnson as officers, and that it was administratively dissolved for failure to file its annual report.  Staff Br. at 12.
[171] Exh. S-20.

26                          DECISION NO. **71854**

DOCKET NO. WS-02987A-08-0180

1    Margarett Bullard.[172]   The members of Crisbar, LLC are Atlas Southwest, Inc. and the George H.

2    Johnson Revocable Trust.[173]   Atlas Southwest, Inc.'s officers and directors are George H. Johnson

3    and Jana S. Johnson.[174]   For the year 2007, the Company also identified Central Pinal as a

4    contracting company that constructed plant for the Company, but indicated that in 2007 Central

5    Pinal was owned by the Roadrunner Trust.[175]   Prior to January 2007, the manager of Central Pinal

6    was Atlas Southwest, Inc.,[176] and the member was Crisbar, LLC.[177]   In January of 2007, Barbara A.

7    Johnson and Christopher Johnson, the daughter and son of George Johnson,[178] became the managers

8    of Central Pinal, and the sole member of Central Pinal became the Roadrunner Trust, with Barbara

9    A. Johnson and Christopher Johnson, co-trustees.[179]

10

11       Other Johnson affiliates that have provided services to the Company are Specific

12   Engineering, LLC ("Specific") and Shea Utility Services, Inc. ("Shea").[180]   From 2004 through

13   2008, Specific's member and manager were Atlas Southwest, but in 2008, its membership was

14   changed to the Roadrunner Trust.[181]   Shea currently provides management services and operations

15   for the Company.[182]   In a 2004 annual report, George and Jana Johnson were listed as Shea's

16   president and secretary/treasurer, respectively, Brian Tompsett was listed as executive vice

17

18   president, and George and Jana Johnson were listed as directors.[183]   In January of 2007, however,

19   George Johnson's children, Christopher and Barbara Johnson, took office as president, secretary, and

20   treasurer, and as directors, of Shea.[184]

21

22   _____

23   [172] *Id.*
     [173] Exh. S-10.
     [174] Exh. S-9.
24   [175] Exh. S-20.
     [176] Atlas Southwest, Inc.'s officers and directors are George H. Johnson and Jana S. Johnson. Exh. S-9.
25   [177] Staff Br. at 12; citing to Exhs. S-3 and S-4.
     [178] Tr. at 856.
26   [179] Exh. S-4.
     [180] Exh. S-2.
27   [181] Staff Br. at 13; Exhs. S-5, S-6.
     [182] Tr. 864.
28   [183] Exh. S-12.
     [184] Exh. S-13.

DECISION NO. _____ **71854**

b.    Reasonableness of Affiliate/Related Party Transactions

Staff stated that it could not determine whether the transactions between Johnson and its affiliates were arm's length transactions.[185] Staff was concerned by the fact that Mr. Tompsett was both an executive of the Company and an owner of its affiliate Central Pinal while Central Pinal was building water and wastewater plant for the Company.[186] The fact that Mr. Tompsett was compensated for his roles both at Shea and the Company[187] also caused Staff to question the arm's length nature of transactions between the Company and its affiliates.[188] Staff was unable to conduct an audit on the Company's affiliate construction project bids to determine whether they were fair and protected ratepayers from being charged too much for plant, because while the Company claims that it competitively bid its construction projects, the Company did not retain any bids.[189]

The Company, contending that Central Pinal is no longer a Company affiliate, did not allow Staff to verify the underlying affiliate records associated with documentation regarding plant construction by Central Pinal.[190] The Company's witness testified that the change of membership and management of Central Pinal renders it no longer an affiliate of Johnson Utilities.[191] According to Staff, the Company also contended that it was not required to disclose any transactions with Specific, because in 2008, it ceased being an affiliate of Johnson.[192]

Staff argued that even accepting the Company's contention that Central Pinal, Shea and Specific are no longer Company affiliates due to the changes in ownership, family relationships make any transactions between the Company and these entities related party transactions, which should be subject to greater scrutiny.[193] Staff asserted that because the son and daughter of the

---

[185] Staff Br. at 15.
[186] Staff Br. at 15-16.
[187] Tr. at 864.
[188] . Staff Br. at 13.
[189] Staff Br. at 15, citing to Direct Testimony of Staff witness Jeffrey Michlik (S-38) at 12.
[190] Staff Reply Br. at 6, Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-45) at 6.
[191] Tr. at 857.
[192] Staff Br. at 13.
[193] Staff Br. at 15.

DOCKET NO. WS-02987A-08-0180

owner and founder of Johnson Utilities are owners of the entity that provides construction services to the Company, transactions between the Company and Central Pinal are related party transactions within the definition provided by the Financial Accounting Standards Board ("FASB") in its Statement of Financial Accounting Standards No. 57 ("FAS 57").[194]   Staff argued that although a transaction between related parties is not *per se* unreasonable, the Company has the burden of proving that resulting costs are reasonable.[195]

There is no dispute that the Company reported Central Pinal, Shea, and Specific Engineering, LLC as affiliates for the calendar year ending December 31, 2006.[196]   The Commission's Public Utility Holding Companies and Affiliated Interests Rules ("Affiliated Interests Rules") define "affiliate" as follows:

> "Affiliate," with respect to the public utility, shall mean any other entity directly or indirectly controlling or controlled by, or under direct or indirect common control with the public utility.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any entity, shall mean the power to direct the management policies of such entity, whether through ownership of voting securities, by contract, **or otherwise**.
> A.A.C. R14-2-801(1) (emphasis added).

The Company denied that it engaged in any related party transactions.[197]   The Company disagreed that "certain entities with which the Company has done business should be treated as affiliates based solely upon the familial relationships of members of these entities and members of Johnson Utilities."[198]   The Company argued, without citation, that "[o]nly an entity which can be directed is deemed to be an affiliate" and that "[a]bsent sufficient ownership of voting securities,

---

[194] Staff Br. at 15, citing to FAS 57, which provides guidance for accounting disclosure of related party transactions. FAS 57 provides examples of related party transactions, including transactions between (a) a parent company and its subsidiaries; (b) subsidiaries of a common parent; (c) an enterprise and trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of the enterprise's management; (d) an enterprise and its principal owners, management, or members of their immediate families; and (e) affiliates.
[195] Staff Br. at 15, citing to *Florida Power Corp. v. Cresse*, 413 So.2d 1187 (Fla. 1982) at 1191.
[196] Exh. S-2.
[197] Exh. S-18; Tr. at 897-900.
[198] Co. Reply Br. at 23.

DECISION NO. **71854**

contract or some other right to direct management policies, the other entity is not an affiliate."[199] The Company then argued that other than "alleged family relations," no evidence was provided that the Company has any control over "these separate entities."[200] For its proposition that control cannot be imputed through family attribution, the Company cited to two United States Court of Appeals opinions involving decedents' estates.[201]

The Company's arguments, including the cited cases, are not relevant to the issue in this case of the appropriate ratemaking treatment of profit provided by a utility company to an affiliate or related party, which has been brought to the fore by the Company's failure to produce adequate plant documentation. Although given the opportunity to do so, Johnson Utilities presented no evidence that the costs of the utility plant were determined as a result of arm's length transactions. Neither has the Company presented evidence demonstrating that Central Pinal, which it formerly reported as an affiliate,[202] and which currently shares common or familial ties with the owners and directors of Johnson Utilities,[203] is not subject to direct or indirect control by the Company's members.

c.       Affiliate/Related Party Profit Adjustment

As Staff pointed out, a regulated utility has a duty to serve its customers in a fair and equitable manner, and this includes the obligation to get the best price for services to its customers.[204] A regulated utility has an obligation not to promote profitability for itself or another interested company in a transaction that may not be at arm's length to the detriment of its customers.[205] Fair competitive bids protect ratepayers from being charged too much for plant. While the Company claimed that there was a competitive bidding process for construction of its

---

[199] Company Reply Br. at 23-24.
[200] Co. Reply Br. at 23.
[201] *Propstra v. U.S.,* 680 F.2d 1248 (9th Cir. 1981) (without an explicit directive from Congress, courts cannot require executors to make inquiries into the feelings, attitudes, and anticipated behavior of those holding undivided interests in property owned by estates, legatees, or heirs), and *Bright v. U.S.,* 658 F.2d 999 (5th Cir. 1981) (no element of control could be attributed to decedent in determining value of decedent's interest in stock).
[202] Exh. S-2.
[203] Exhs. S-4 (Central Pinal), S-6 (Specific Engineering, LLC), and S-13 (Shea).
[204] *See* Staff Br. at 15.

DOCKET NO. WS-02987A-08-0180

plant, which was subsequently all completed by entities who were either affiliates or related parties, the Company's claim cannot be verified, as the Company stated that it did not retain any bids. As Staff argued, the reasonableness of affiliate costs must be determined using some independent standard, and the Company could have done much more to gather sufficient, competent and reliable evidence to meet its burden of production.[206] Due to the Company's failure to present bids for regulatory inspection, no audit could be conducted to determine whether the transactions conducted by the Company with affiliates or related parties were at arm's length. The evidence presented shows that an executive of the Company was an owner of Central Pinal, which constructed the plant which the Company is requesting be put in plant in service at full cost. The fact that ownership of an affiliate changed after relevant costs were incurred does not release the Company from its obligation to provide the Commission with adequate information about its transactions, be they affiliate transactions, related party transactions, or otherwise, for ratemaking purposes. The Company failed to keep adequate records of its affiliate/related party transactions to demonstrate that the costs the Company paid for plant were reasonable and appropriate, and were not detrimental to ratepayers.

Because the Company failed to produce adequate documentation, the record in this case does not allow us to find that the amounts the Company paid to affiliates/related parties were competitive, fair and reasonable. In order to achieve just and reasonable rates for the Company's ratepayers, an adjustment must be made to remove the inflated cost associated with the profit the Company paid to affiliates/related parties for plant construction. Staff proposed adjustments subtracting affiliate profit from the Company's water and wastewater plant in service, after all other plant in service adjustments. After considering all the evidence presented, we find that the record is insufficient to support specific plant in service adjustments for the water division. Rather than estimating an

---

[205] *See id.*
[206] *See* Staff Br. at 16.

DECISION NO. **71854**

appropriate adjustment and excluding plant costs from the Company's rate base, we believe it is appropriate to make adjustments to the authorized operating margin.

### d.    Affiliate/Related Party Transactions

The Company, as a Class A Utility, is subject to the Commission's Affiliate Interests Rules. As set forth in the discussion above, the Company recently restructured several of its affiliates. In the course of this proceeding, no party made a recommendation regarding a finding whether the Company is in compliance or non-compliance with the Affiliate Interests Rules, and we make none at this time. We note, however, that evidence in this proceeding indicates that the Company used the fact that Central Pinal had been restructured as the basis for its refusal to provide documentation from Central Pinal to Staff upon Staff's request. The Company offered no explanation or argument regarding the reasons for any of the restructuring.

The affiliate profit adjustment is necessary in this case due to the Company's lack of adequate record keeping and its failure to document competitive bids. As a regulated utility, it is incumbent upon the Company to ensure that its dealings are arm's length, transparent, and well-documented. Based on the evidence in this proceeding, we find that it is reasonable and appropriate to require the Company to prepare an action plan that indicates the specific steps it will take to demonstrate, by means of its day to day record keeping regarding transactions between the Company and all entities with which it conducts business, including, but not limited to, its affiliates and related parties, that its dealings are arm's length, transparent, and well-documented. We will require the Company to file the plan for Staff's review, and will require Staff to assess the plan and its adequacy, and to file a report with Staff's findings and recommendations on the action plan accompanied by a Recommended Order for Commission approval or disapproval of the Company's action plan. In order to allow adequate time for the Company to retain a consultant to assist it in the

DOCKET NO. WS-02987A-08-0180

preparation of its action plan, we will allow the Company 90 days to prepare the plan and make the filing.

**B.    Contributions in Aid of Construction ("CIAC") - Unexpended Hook-Up Fees ("HUF")**

Johnson opposed the recommendation of Staff and RUCO to include unexpended hook-up fees ("HUFs") in rate base in the amount of $6,931,078 for the water division and $16,505 for the wastewater division.[207] Johnson collects HUFs in advance of the time the Company will be expected to provide service to the customers for whom the HUFs are credited, and the time between collection of the HUFs, the time the capital improvements to provide capacity are constructed, and the date the customer connects to the system can be one year or longer.[208] The Company argued that including unexpended HUFs in rate base creates a mismatch in rate base and gives existing ratepayers a windfall because they get credit for HUFs collected on behalf of future customers who have not yet connected to the system.[209] The Company argued that its advance collection of HUFs ensures that funds are available for new and needed capacity when construction begins.[210] The Company argued that the HUFs are restricted and can only be spent on new capacity; that the Company does not benefit from excluding unexpended HUF from rate base; and existing ratepayers are not harmed by it.[211] The Company argued that Staff's recommendation to exclude CIAC and AIAC related to excess capacity and not used and useful supports the Company's position that HUFs should be excluded from rate base.[212] The Company also argued that according to the NARUC Uniform System of Accounts, Section 271, contributions are not CIAC until they offset used and useful

---

[207] Co. Br. at 13-14, 26.
[208] Co. Br. at 14, citing to Rebuttal Testimony of Company witness Thomas Bourassa (Exh. A-2) Vol. II at 15.
[209] Co. Br. at 14, citing to Rebuttal Testimony of Company witness Thomas Bourassa (Exh. A-2) Vol. II at 15-16; Co. Reply Br. at 26.
[210] Co. Reply Br. at 26, citing to Rebuttal Testimony of Company witness Thomas Bourassa (Exh. A-2) Vol. II at 16.
[211] Co. Br. at 14, citing to Rebuttal Testimony of Company witness Thomas Bourassa (Exh. A-2) Vol. II at 16-17; Co. Reply Br. at 26.
[212] Co. Br. at 14-15, citing to Rebuttal Testimony of Company witness Thomas Bourassa (Exh. A-4) Vol. II at 11.

DECISION NO. _____ **71854**

plant.[213]   The Company argued that there is a transition period from the time a utility receives contributed money and the time the contributed money has been spent and is reflected as an offset to used and useful plant, and that because unexpended dollars and associated construction work in progress are not used and useful plant, the associated CIAC is technically in transition, and should therefore be excluded from rate base.[214]

RUCO argued that "advances represent customer-supplied funds that are properly deducted from the Company's rate base."[215]   RUCO recommended that the Company be afforded the same rate base treatment of CIAC as other Arizona utilities, with contributions being booked as CIAC when they are received, and treated as a deduction to rate base.[216]   RUCO framed the dispute as a timing argument as to when the HUFs should be treated as CIAC, noting that a utility typically builds infrastructure in advance and then collects HUFs for each new connection.[217]   RUCO stated that normal accounting procedure for HUFs should not be changed to accommodate the Company's choice to collect HUFs prior to providing service.[218]   RUCO stated that neither the NARUC definition of CIAC nor the Commission's rules differentiate when the contributions are received and when the contributions are expended.[219]

Staff stated that removal of unexpended CIAC from the Company's CIAC account is inconsistent with the NARUC USOA.[220]   Staff stated that this Commission recently rejected, in Decision No. 71414 (December 8, 2009), the very treatment of unexpended CIAC proposed by the

---

[213] Co. Reply Br. at 26.  The NARUC USOA provides as follows:
   271.  Contributions in Aid of Construction
   A.  This account shall include:
   1.  Any amount or item of money, services or property received by a utility from any person or governmental agency, any portion of which is provided at no cost to the utility, which represents and addition or transfer to the capital of the utility, and which is utilized to offset the acquisition, improvement to offset the utility's property, facilities or equipment used to provide utility services to the public.
[214] Co. Reply Br. at 26.
[215] RUCO Reply Br. at 2, citing to Decision No. 70011 (November 27, 2007) (UNS Gas, Inc.).
[216] RUCO Br. at 4-5.
[217] RUCO Reply Br. at 2-3.
[218] RUCO Reply Br. at 3.
[219] RUCO Reply Br. at 2.
[220] Direct Testimony of Staff witness Jeffrey Michlik (S-38) at 18.

DOCKET NO. WS-02987A-08-0180

Company.[221]   Staff stated that Decision No. 71414 also discontinued that utility's authority to collect HUFs, as Staff is recommending in this case.[222]

We are not persuaded by the Company's arguments in favor of departing from the normal ratemaking treatment of CIAC.   We agree with Staff that the NARUC USOA definition of CIAC does not hinge upon whether or not CIAC is expended or unexpended, as the Company argued, but on whether or not (1) the CIAC was provided by someone other than the owner, (2) the CIAC is non-refundable, and (3) the purpose of the CIAC is to fund plant.[223]   We recognize that the Company collects HUFs well in advance of providing service to customers for whom the HUF is credited, and that it is the Company's practice in regard to the timing of its HUF collection that is responsible in part for the resulting magnitude of CIAC balances in the test year.   As Staff and RUCO argued, the actual test year end balances of CIAC should be included in rate base, and Staff's adjustments for the water and wastewater divisions will therefore be adopted.

### C.   Fair Value Rate Base Summary

Based on the discussion of rate base issues set forth above, we find the Company's OCRB for its water division to be ($2,414,613) and for its wastewater division to be $136,562.   As the Company did not prepare RCND schedules, the OCRB for its water and wastewater divisions constitute its FVRB.

## IV.   OPERATING INCOME ISSUES

### A.   Central Arizona Groundwater Replenishment District ("CAGRD")

The CAGRD was established in 1993 by the Arizona legislature to serve as a groundwater replenishment entity for its members.[224]   The CAGRD is operated by the Central Arizona Water

---

[221] Staff Reply Br. at 5.
[222] Staff Br. at 5.
[223] Direct Testimony of Staff witness Jeffrey Michlik (S-38) at 18; citing to NARUC USOA 271, Contributions in Aid of Construction.
[224] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 17.

DECISION NO. _____ **71854**

Conservation District, which operates the Central Arizona Project.[225]   The CAGRD provides a mechanism for landowners and designated water supply providers such as Johnson Utilities to demonstrate a 100-year water supply under Arizona's assured water supply rules ("AWS Rules"), which became effective in 1995.[226]   Members of the CAGRD must pay the CAGRD to replenish (or recharge) any groundwater pumped by the member that exceeds the pumping limits imposed by the AWS rules.[227]   The CAGRD includes the Phoenix, Tucson and Pinal County active management areas ("AMAs").[228]   Johnson Utilities completed the process for becoming a Member Service Area of the CAGRD on or about June 9, 2000.[229]   Joining the CAGRD is one of the steps in the process of becoming a designated provider, which means a water provider that has demonstrated to the Arizona Department of Water Resources ("ADWR") that it has a 100-year water supply.[230]   The AWS Rules were designed to protect groundwater supplies within each AMA and to ensure that people purchasing or leasing subdivided land within an AMA have a water supply of adequate quality and quantity.[231]   The AWS Rules require new subdivisions to demonstrate to ADWR that a 100-year water supply is available to serve the subdivision before home sales can begin.[232]   An assured water supply can be demonstrated in one of two ways:  the subdivision owner can prove an assured water supply for the specific subdivision and receive a certificate of assured water supply (CAWS") from ADWR; or alternatively, a subdivision owner can receive service from a city, town, or private water company that has been designated by ADWR as having a designated water supply.[233]

---

[225] Co. Br. at 28.
[226] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 17.
[227] Id.
[228] Id.
[229] Id. at 18.
[230] Id.
[231] Id.
[232] Id.
[233] Id.

DECISION NO. _____ **71854**

The costs of the CAGRD are covered by a replenishment assessment levied on CAGRD members.[234]   Designated water supply providers such as Johnson Utilities that serve a Member Service Area pay a replenishment tax directly to the CAGRD according to the number of acre-feet of "excess groundwater" they deliver within their service areas during a year.[235]   The amount due the CAGRD is based on CAGRD's total cost per acre-foot of recharging groundwater, including the capital costs of constructing recharge facilities, water acquisition costs, operation and maintenance costs and administrative costs.[236]   By statute, the replenishment tax must be calculated separately for each AMA.[237]   Johnson Utilities is a designated provider in both the Phoenix and Pinal County AMAs.[238]   Johnson had a CAGRD assessment of $883,842 in the test year.[239]   Instead of recovery of the test year amount of CAGRD expense, Johnson requested approval of a CAGRD adjustor mechanism in this case.[240]

The Company, RUCO and Staff agreed that the CAGRD is an important tool in Arizona's groundwater conservation efforts, and that the Company should recover its CAGRD expenses.  The Company's ratepayers and the general public benefit from the Company having a designation of assured water supply, because such designations result in more efficient regional planning than the alternative of requiring individual developers within a certificated area to each obtain a CAWS.[241]

As RUCO stated, the issue before us is not whether to allow the Company to recover its CAGRD expense, but the manner of the expense recovery.[242]   Staff recommended that an adjustor mechanism be established, but with specific conditions that would require the Company to keep the Commission closely informed of the CAGRD fee calculation and would allow the Commission to

---

[234] Id.
[235] Id. at 18-19.
[236] Id. at 19.
[237] Id.
[238] Id
[239] Id.
[240] Id.
[241] Staff Br. at 20.
[242] RUCO Reply Br. at 5.

DECISION NO. _____ **71854**

closely monitor the Company's collection of CAGRD fees and the Company's treatment of monies collected to pay the CAGRD fees. The Company was in favor of the establishment of a CAGRD recovery mechanism, but was unwilling to agree to abide by the conditions that Staff argued are necessary to safeguard the Company's ratepayers.

### 1. Staff Proposed Adjustor and Conditions

Staff recommended that the Company recover its CAGRD tax assessment through the use of an adjustor mechanism, subject to specific enumerated conditions. Staff recommended that the CAGRD adjustor mechanism only be authorized with the following conditions attached:

1.  The initial adjuster fee shall apply to all water sold after the date new rates from this case become effective. In order to calculate this initial fee, the Company shall submit the 2008 data, as per condition No. 7 below, within 30 days of the date of the final order in this matter.

2.  The Company shall, on a monthly basis, place all CAGRD monies collected from customers in a separate, interest bearing account ("CAGRD Account").

3.  The only time the Company can withdraw money from the CAGRD Account is to pay the annual CAGRD fee to the CAGRD, which is due on October 15th of each year.

4.  The Company must provide to Staff a semi-annual report of the CAGRD Account and CAGRD use fees collected from customers and paid to the CAGRD, with reports due during the last week of October and the last week of April each year.

5.  The Company must provide to Staff, every even-numbered year (first year being 2010) by June 30th, the new firm rates set by the CAGRD for the next two years.

6.  The CAGRD adjustor fees shall be calculated as follows: The total CAGRD fees for the most current year in the Phoenix AMA shall be divided by the gallons sold in that year to determine a CAGRD fee per 1,000 gallons. Similarly, the total CAGRD fees for the most current year in the Pinal AMA shall be divided by the gallons sold in that year to determine a CAGRD fee per 1,000 gallons.

7.  By August 25th of each year, beginning in 2010, the Company shall submit for Commission consideration its proposed CAGRD adjustor fees for the Phoenix and Pinal AMAs, along with the calculations and

DOCKET NO. WS-02987A-08-0180

1      documentation from the relevant state agencies to support the data used
2      in the calculations. Failure to provide such documentation to Staff
     shall result in the immediate cessation of the CAGRD adjustor fee.
3      Commission-approved fees shall become effective on the following
     October 1st.

4    8.      If the CAGRD changes its current method of assessing fees (i.e. based
5          on the current volume of water used by customers) to some other
         method, such as, but not limited to, future projection of water usage, or
6          total water allocated to the Company, the Company's collection from
7          customers of CAGRD fees shall cease.

8    9.      As a compliance item, the Company shall submit a new tariff reflecting
         the initial adjustor fee as per Condition No. 1 above and shall annually
9          submit a new tariff reflecting the reset adjustor fee prior to the fee
10          becoming effective.[243]

### 2. Company Arguments Against Conditions

12      The Company opposed or requested modification of Staff's recommended Condition Nos. 3,

13 4,5, 7, and 8. Staff opposed the Company's requested modifications to Staff's recommended

14 conditions.[244]

15        a.     Condition No. 3

16      The Company stated that it is concerned that Condition No. 3 lacks sufficient flexibility to

17 allow for changes in CAGRD's payment policies and other policies with regard to the use of

18 CAGRD monies.[245] The Company submitted that it should be permitted to withdraw funds from the

19
20 CAGRD account as necessary to comply with the conditions of its membership in the CAGRD, as

21 those conditions exist now or as they may be modified in the future.[246]

22      Staff stated that the Company's requested modification of Condition No. 3 should be

23 disregarded, as the Company should not be allowed to spend funds in the CAGRD account for any

24
25
26

---

27 [243] Staff Br. at 20-21, citing to Revised Surrebuttal Testimony of Jeffrey Michlik (Exh. S-43) at 4.
[244] Staff Reply Br. at 21-23.
28 [245] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 20.
[246] *Id.*

DECISION NO. **71854**

1    purpose other than the CAGRD expense item than has been analyzed in this proceeding and that the

2    proposed adjustor is designed to recover.[247]

3              b.      Condition No. 4

4         The Company argued that a single annual report, instead of the semi-annual report required

5    by Condition No. 4, would be sufficient for Staff's verification of the accounting for CAGRD

6    monies collected and remitted.[248]  Staff opposed the Company's requested modification of Condition

7    No. 4 because Staff believes it is important for the Commission to have the ability closely monitor

8

9    the Company's collection of CAGRD fees and the state of the CAGRD Account.[249]

10             c.      Condition No. 5

11        The Company opposed Condition No. 5, arguing that the information it requires is publicly

12   available and it would be more efficient for Staff to obtain the information directly from CAGRD.[250]

13   The Company also argued that compliance with regulatory conditions adds costs that are ultimately

14   borne by the ratepayers and should only be imposed as necessary to achieve important regulatory

15   objectives.[251]

16

17        Staff opposed modification of Condition No. 5 because the rates established by the CAGRD

18   involve calculations with many variables that may or may not be accessible or publicly available on

19   the CAGRD's website now or in the future.[252]  Staff stated that because the Company will be in

20   possession of the information as part of its own record keeping and compliance requirements, it will

21   therefore be in the best position to provide the Commission and Staff with the information.[253]  Staff

22   indicated that as a result of this rate case, it lacks confidence in the Company's record keeping

23

24

25   _____

     [247] Staff Br. at 21.

26   [248] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 20.
     [249] Staff Br. at 22.

27   [250] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 20.
     [251] *Id.* at 20-21.

28   [252] Staff Br. at 22.
     [253] *Id.*

abilities, and the submittal required by Condition No. 5 is necessary to confirm that the Company is charging its customers the correct rates.[254]

### d.   Condition No. 7

The Company stated that it is not clear what consideration or approval the Commission would exercise with regard to the assessment, and therefore opposes Condition No. 7.[255]   The Company argued that this requirement is unnecessary as the CAGRD assessments are fixed by CAGRD and are not subject to interpretation.[256]

Staff stated that Condition No. 7 is important because it allows the Company to receive the required documentation first from CAGRD, and Staff and the Commission must have the ability to review the calculations and documentation, including the CAGRD invoice.[257]   Staff stated that the language "for Commission consideration" should not be changed because it is standard language that allows the Commission to monitor and ultimately approve the exact adjustor fee charged to customers.[258]   Staff stated that the Commission review and approval process each year would ensure that the Company is submitting data to ADWR that is consistent with annual reports filed with the Commission, that the Company is not misinterpreting the correct assessment rate, and that the Company is calculating the customer fee correctly.[259]

### e.   Condition No. 8

The Company opposed Condition No. 8's requirement that the collection of fees cease should the CAGRD change its current method of assessing fees.[260]   The Company argued that if the

---

[254] Staff Reply Br. at 8.
[255] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 21.
[256] Id.
[257] Staff Br. at 22; Tr. at 912.
[258] Staff Br. at 22.
[259] Staff Reply Br. at 8.
[260] Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 21.

CAGRD changes its method of assessing fees, that Johnson would likewise change the way it passes through the fee to its customers, consistent with the CAGRD changes.[261]

Staff stated that Condition No. 8 should be retained because it is unlikely that CAGRD would change the assessment methodology without notice, and if it were changed, the Company could request a modification of the approved methodology.

### 3. RUCO Proposed Expense Adjustment and Opposition to Adjustor

RUCO asserted that the use of an adjustor mechanism is not a necessary or appropriate means for the recovery of CAGRD expense.[262] RUCO argued that the circumstances of the CAGRD assessment do not warrant an adjustor mechanism because it is a routine yearly expense and because its progressive increase is not volatile.[263] RUCO stated that rate stability is important in today's economic environment, and because adjustors lead to changes in residential ratepayers' rates, they should be approved only in extraordinary circumstances.[264] RUCO also argued that oversight of Staff's proposed adjustor would unnecessarily and inappropriately increase the Staff's workload.[265]

RUCO recommended that the CAGRD be treated as an expense, and proposed a normalization adjustment to test year expenses based on the known and measurable costs of the Company's CAGRD assessments through 2010.[266] RUCO's proposed adjustment is based on the Company's test year water sold and a 2009-2010 composite of Phoenix AMA and Pinal AMA CAGRD fees per thousand gallons.[267] RUCO asserted that because the Company has stated an intention to file a new rate case every three years, RUCO's recommended adjustment would provide

---

[261] *Id.*
[262] RUCO Br. at 8-14; Reply Br. at 5.
[263] RUCO Br. at 12-13.
[264] *Id.*
[265] *Id.*
[266] RUCO Br. at 8; 14; Tr. at 205; Direct Testimony of RUCO witness Rodney Moore (Exh. R-1) at 16-17; RUCO Final Schedules RLM 7 and RLM-16.
[267] RUCO Final Schedule RLM-16.

1  the Company with complete recovery of the CAGRD expense without requiring extraordinary

2  ratemaking treatment for a routine cost.[268]

3      In support of its recommendation that a CAGRD adjustor mechanism be put in place for the

4  Company, Staff stated that the CAGRD assessment represents a significant annual expense for the

5  Company, which is anticipated to progressively increase, and that in order to keep its membership in

6  the CAGRD, the Company must pay the fee.[269]  Staff asserted that the CAGRD assessment is

7
8  amenable to an adjustor mechanism because the assessment, unlike a pass-through tax, is not easily

9  calculated and assigned.[270]  Staff noted that the Commission has approved adjustor mechanisms

10  where appropriate in order to advance important policy concerns that protect the public interest.[271]

11  Staff stated that the Commission has approved adjustors for expenses that are not extremely volatile

12  for Demand Side Management and the Renewable Energy Standards Tariff, based on a

13  determination that the advancement of energy conservation programs and the move to renewable

14  sources of energy were necessary policy considerations to advance the public interest.[272]  Staff

15
16  opined that it would be appropriate, in the Commission's support of groundwater conservation, to

17  adopt the Staff's recommendation regarding an adjustor for the Company's CAGRD assessment.

18      **4.  Conclusion**

19      We agree with Staff that this Commission has in the past approved adjustor mechanisms

20  where appropriate to advance important policy concerns that protect the public interest.  The

21  CAGRD adjustor mechanism that Staff designed, inclusive of all eight conditions without

22
23  modification, appears to be a just and reasonable means of dealing with the costs of the CAGRD.

24  Conservation and wise stewardship of increasingly stressed water supplies is a matter of paramount

25  concern in Arizona, and we believe that it is important to send appropriate signals to water

26  _____

27  [268] RUCO Br. at 14.
[269] Staff Br. at 20, citing to Revised Surrebuttal Testimony of Jeffrey Michlik (Exh. S-43) at 1.
[270] Id.

28  [271] Staff Reply Br. at 7-8.

companies regarding their duty to fully engage in conservation programs administered by the ADWR. The CAGRD assessment fee is not discretionary for Companies such as Johnson Utilities, and the Commission believes that the CAGRD participation represents the kind of investment that is appropriate for timely cost recovery. To not allow the Company to recover its CAGRD costs in real time may threaten the Company's ability to participate in the CAGRD program and would send a negative signal to water providers regarding this Commission's support for sound regional approaches to achieving safe yield in Active Management Areas. While we are not satisfied with the Company's past accounting methodologies, and are supportive of the steps taken in this Order to require Johnson Utilities to come into compliance with NARUC accounting standards, we believe Staff's adjustor mechanism proposal will accord the Commission maximum oversight over the application of the adjustor mechanism. We will therefore approve the CAGRD adjustor mechanism, inclusive of all eight conditions proposed by Staff.

## B.   Rate Case Expense

The Company requested recovery of $100,000 in rate case expense for each division.[273] There was no disagreement on the amount of expense. Staff recommended normalization of the expense over three years, and the Company agreed.[274] RUCO recommended an amortization of five years to reflect the Company's propensity for not timely filing rate applications.[275] The Company pointed out that RUCO's CAGRD expense normalization assumed that the Company would be filing a rate case in three years.[276] We find that the three year normalization period is appropriate, and will adopt it.

. . .

. . .

---

[272] *Id.*
[273] Rebuttal Testimony of Company witness Thomas Bourassa (Exh. A-2) Vol. II at 23.
[274] *Id.*
[275] RUCO Br. at 7.

44            DECISION NO.    **71854**

## C.    Income Tax Expense

The Company is seeking recovery of income tax expense in the amount of $1,185,679. As an LLC, the Company does not pay taxes at the corporate level.[277] Instead, its taxes are passed through to the owners of the Company and accounted for when its member owners file their tax returns. The Company reimburses its member owners for their tax liabilities.[278] The Company argued that because the income tax liability of its members "arises from the taxable income of Johnson and it is directly attributable to Johnson Utilities" that the Company should be allowed to collect the expense from ratepayers.[279]

The Company disagreed with the recommendations of RUCO and Staff to reject the Company's request to recover income tax expense. Johnson argued that denying recovery in rates of the members' pass through income tax liability results in inequities because Johnson will have a lower revenue requirement than a C-Corp, and ratepayers will "receive an unjustified windfall from the lower revenue requirement and operating income when income taxes are excluded."[280]

Staff and RUCO both asserted that the Company voluntarily chose to organize as an LLC, which is a pass through entity for purposes of income tax liability.[281] Staff argued that it would be unfair to award the Company an expense it does not pay.[282] RUCO emphasized that the Company's chosen corporate organization confers a tax benefit on its shareholder members not enjoyed by "C" corporation shareholders.[283] RUCO stated that while a "C" corporation must pay income taxes prior to the distribution of any profits to its shareholders as LLC shareholders, the tax liability of an LLC's shareholder members passes directly to the shareholders, such that they avoid double taxation.[284]

[276] Co. Br. at 31.
[277] Tr. at 9.
[278] Rebuttal Testimony of Company witness Thomas Bourassa (Exh. A-2) Vol. III at 28.
[279] Co. Br. at 32, citing to Rebuttal Testimony of Company witness Thomas Bourassa (Exh. A-2) Vol. II at 23.
[280] Id.
[281] RUCO Br. at 7; Staff Reply Br. at 9.
[282] Staff Br. at 19.
[283] RUCO Reply Br. at 7.
[284] RUCO Br. at 7.

Regarding the agreement between the Company and its members for the Company to reimburse their personal tax liability, as testified to by the Company's witness,[285] Staff argued that the ratepayers are not a party to the agreement,[286] and RUCO argued that just like the Company's corporate status election, the Company's election to reimburse its shareholders' tax liability is voluntary.[287]

The Company argued that its tax situation is analogous to a subsidiary of a "C" corporation utility of a parent holding company whose tax return is consolidated with the parent.[288] Staff and RUCO both disagreed. RUCO stated that the Company's situation is not analogous, because the Company is not a subsidiary of a parent company that files a consolidated return.[289] Staff stated that the Company's tax status is distinguishable from the case of a subsidiary "C" corporation utility of a parent holding company whose tax return is consolidated with the parent, because in that case, there is evidence of the tax rate, but in this case, there is no such evidence.[290] Staff argued that the Company provided no evidence regarding the tax rates of its members or that its members even paid any taxes.[291]

Johnson cited to several cases in which pass through taxes have been allowed rate recovery,[292] but acknowledged that state Commissions vary as to whether income taxes for pass-through entities are allowed in cost of service.[293] Johnson argued that inclusion or exclusion of income tax expense should not be affected by technical distinctions, but that the appropriate inquiry should consider whether the outcome is fair and non-discriminatory.[294] We agree that the tax liability issue should receive fair and non-discriminatory ratemaking treatment, but disagree with the Company that its chosen organizational form is a "technical distinction." As RUCO and Staff argue,

---

[285] Tr. at 1352.
[286] Staff Reply Br. at 9.
[287] RUCO Br. at 7.
[288] Co. Br. at 32, citing to Rebuttal Testimony of Company witness Thomas Bourassa (Exh. A-2) Vol. II at 24.
[289] RUCO Br. at 7-8.
[290] Staff Reply Br. at 9.
[291] Id.
[292] Co. Br. at 34-36.
[293] Co. Br. at 33.

46          DECISION NO.          **71854**

the Company freely chose to be organized as an LLC, and we must assume that its choice was an informed choice that imparts certain advantages to the Company. We do not share the Company's view that inclusion of the Company's members' pass-through tax liability in customers' rates would lead to a fair, equitable, and non-discriminatory result. As we determined in Decision No. 71445 (December 23, 2009), it is not appropriate or in the public interest to allow pass through entities such as the Company to recover income tax expenses through rates.[295] The Company's request is not reasonable and will be denied.

### D.  Operating Income Summary

Based on the discussion of operating income issues set forth above, we find the adjusted test year operating expenses and operating income for its water and wastewater divisions to be as follows:

|  | Water Division | Wastewater Division |
|---|---|---|
| Adjusted test year revenues | $13,172,899 | $11,354,014 |
| Test year operating expenses | $9,553,304 | $9,432,270 |
| Test year operating income | $3,619,595 | $1,921,744 |

## V.  COST OF CAPITAL/OPERATING MARGIN

### A.  Company's Position

The Company recommended that its proposed weighted average cost of capital ("WACC") of 11.89 percent be used as the Company's rate of return to be applied to its proposed fair value rate base ("FVRB") to compute the Company's required operating income.[296]

The Company proposed a cost of equity of 12.0 percent.[297] The Company's witness Thomas Bourassa reached this recommendation based on his discounted cash flow ("DCF") and capital asset pricing model ("CAPM") results using data from a sample of six water utilities selected from the

---

[294] Co. Br. at 32-33; Co. Reply Br. at 27.
[295] Decision No. 71445 at 29-37.
[296] Rebuttal Testimony of Company witness Thomas Bourrassa (Exh. A-2) Vol. I at 3.
[297] *Id.*

DOCKET NO. WS-02987A-08-0180

Value Line Investment Survey.[298]   The Company's proposed cost of debt is 8.0 percent.[299]   The Company used its actual capital structure to calculate its proposed WACC, and disagreed with RUCO's proposed hypothetical capital structure of 40 percent debt and 60 percent equity.[300]   The Company stated that at the end of the test year, the Company had adjusted total capital of $25,897,122, consisting of $722,000 long term debt and $25,175,122 common equity, for a capital structure of 2.8 percent debt and 97.2 percent common equity.[301]

## B.     RUCO's Position

RUCO recommended that its proposed WACC of 8.18 percent be applied to rate base to determine the required operating income for the Company's wastewater division.[302]   RUCO's recommended cost of equity for the Company's wastewater division is 8.31 percent, and is based on the analysis of its witness William Rigsby.  Mr. Rigsby used the average of his CAPM and DCF model results to reach his cost of equity estimate.[303]  Like the Company, RUCO recommended a cost of debt of 8.0 percent based on the Company's existing debt cost.[304]  RUCO stated that because the Company's actual capital structure consists of almost all equity, it used a hypothetical capital structure of 40 percent long term debt and 60 percent common equity to calculate its proposed WACC.[305]

For the Company's water division, RUCO recommended a negative rate base, and proposed an operating margin of 8.18 percent to determine its recommended revenue requirement for the water division.[306]

. . .

---

[298] Direct Testimony of Company witness Thomas Bourrassa (Exh. A-1) Exhibit F at 4.
[299] Rebuttal Testimony of Company witness Thomas Bourrassa (Exh. A-2) Vol. I at 3.
[300] Co. Br. at 47.
[301] Direct Testimony of Company witness Thomas Bourrassa (Exh. A-1) Exhibit F at 2; Rebuttal Testimony of Company witness Thomas Bourrassa (Exh. A-2) Vol. I at 3.
[302] Direct Testimony of RUCO witness William Rigsby (Exh. R-9) at 5.
[303] Id.
[304] Id.
[305] RUCO Br. at 15.

DOCKET NO. WS-02987A-08-0180

1

### C.   Staff's Position

2      Staff did not present a cost of capital analysis or recommendation for the Company.  Due to

3 the size of the rate base for the wastewater division and the negative rate base for the water division,

4 Staff recommended that an operating margin should be used to determine both revenue

5 requirements.   Staff recommended that an operating margin of 10 percent be used in order to

6 determine a revenue requirement for both the water and wastewater divisions.[307]

7

### D.   Conclusion

8

9      The Company's FVRB for its water division is negative and the FVRB for its wastewater

10 division is $136,562.  Due to the size of the rate bases for the Company's two divisions, there is

11 insufficient investment upon which to grant the Company a return.  Authorizing an operating margin

12 for a utility the size of the Company is problematic.[308]  Any part of an operating margin that is not

13 used to cover legitimate utility expenses would accrue to the utility as income.  Allowing a utility to

14 collect an operating margin in rates has the potential to allow the utility to accrue a net income

15 similar to the return earned by a utility that has made an investment in plant.   In other words,

16 authorizing an operating margin when there is no rate base investment has the potential of allowing

17 the utility to realize a profit without making any investment, creating a windfall for the utility,

18 without the utility having put any capital at risk.

19

20      We do not wish to reward the Company for having a negative or negligible rate base.

21 However, neither do we wish to have the Company's customers placed in jeopardy as they might be

22 if the Company is unable to meet its legitimate operating expenses.  We believe that an operating

23 margin of 10 percent is too generous and would be a windfall for the Company and result in

24 unreasonably higher rates for its customers.  On the other hand, no allowance for an operating

25

26

27 [306] Direct Testimony of RUCO witness William Rigsby (Exh. R-9) at 3.
[307] Staff Br. at 19; Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 31 and (Exh. S-44) at 29.

28 [308] In the absence of a FVRB, the Arizona Constitution does not require the Commission to authorize rates to allow the Company to collect any revenue in addition to its operating expenses.

margin (a margin set to zero) would reduce cash flow for contingencies, and could place the Company's customers in harm's way. Accordingly, in weighing the interests of the Company and its customers we consider the range of possible operating margins between 10 percent and zero that could be authorized based upon this record. In our consideration, we also note the absence of existing equity investment by the Company.

In light of these factors and the record, we believe something less than a midpoint within the range is warranted when balancing the interests of the Company and its customers, and find that an operating margin of 3 percent for both its water and wastewater divisions is reasonable. Therefore, we determine a 3 percent operating margin for the water and wastewater divisions is appropriate and in the public interest. The operating margin will allow the Company to meet its legitimate operating expenses while it works to build its equity investment.

The issue of whether an operating margin remains suitable, and whether the size of the operating margin is appropriate for a Class A Utility, will be re-evaluated in the Company's next rate filing.

## VI. AUTHORIZED INCREASE/DECREASE

### A. Water Division

The adjusted test year operating income for the water division was $3,619,595. A 3 percent operating margin for the Company's water division results in operating income of $293,218. Based on our findings herein, we determine that the Company's gross revenue for its water division should decrease by $3,398,960.

### B. Wastewater Division

The adjusted test year operating income for the wastewater division was $1,921,744. A 3 percent operating margin for the Company's wastewater division results in operating income of

DOCKET NO. WS-02987A-08-0180

$290,610. Based on our findings herein, we determine that the revenues for the Company's wastewater division should decrease by $1,667,019.

## VII. RATE DESIGN

Staff recommended an inverted three-tiered rate design for the Company's 3/4 and 5/8 inch meter residential water customers and an inverted two-tiered rate design for all other water customers.[309] For wastewater customers, Staff recommended a single monthly minimum charge based on meter size for all zones and classes of customers.[310] There was no dispute regarding rate design. Staff's recommendations regarding rate design are reasonable and will be adopted.

## VIII. OTHER ISSUES

### A. **Discontinuance of Hook-Up Fees**

Staff recommended that the Company's HUF tariffs be discontinued, due to the fact that there is comparatively little equity in the Company's capital structure.[311] Staff stated that according to the independent auditor's report, at the end of 2006, the percentage of members' capital in the Company was 9.65 percent.[312] Staff noted that while it is supportive of the use of HUFs, there should be a balance between the amount of equity the Company is investing in plant and what customers are investing in plant through HUFs.[313] For a utility the size of Johnson, Staff recommends an equity range of between 40 to 60 percent and debt between 40 to 60 percent, and in addition, that no more than 30 percent equity should be from AIAC and CIAC.[314] Staff further recommended that in the future, if the Company wishes to apply for a HUF tariff, that it have a Certified Public Accounting firm attest to the Company's membership equity level of 40 percent.[315]

---

[309] Staff Final Schedule JMM-W26.
[310] Staff Final Schedule JMM-WW24.
[311] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 35.
[312] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 34-35 and (Exh. S-44) at 32-34.
[313] Direct Testimony of Staff witness Jeffrey Michlik (Exh. S-38) at 34-35 and (Exh. S-44) at 32-34.
[314] Id.
[315] Surrebuttal Testimony of Staff witness Jeffrey Michlik (Exh. S-39) at 15 and (Exh. S-45) at 17.

DECISION NO.   **71854**

1    The Company opposed Staff's recommendation. The Company argued that in the coming
2  years it will fund plant capacities with equity, and that the $6,931,078 balance in the water HUF
3  account at the end of the test year was collected on developments where construction has stopped
4  due to current market conditions.[316] The Company also argued that in 2006, the Company was
5  informed that a Staff audit had not disclosed anything unusual or improper regarding the way the
6  Company was collecting, using and accounting for HUFs.[317]

7
8    We agree with Staff that under the circumstances of this case, in the interest of attaining a
9  balance for the Company between equity investment in plant and customer contributions to plant, it
10 is reasonable and in the public interest to discontinue the Company's authority to collect HUFs for
11 both its water and wastewater divisions. We further find it reasonable and in the public interest to
12 require, as a prerequisite to approval of a new hook up fee tariff for the Company in the future, that
13 the Company provide certification by a Certified Public Accounting firm that the Company has a
14 membership equity level of at least 40 percent.
15

16   **B.    Water Loss for Johnson Ranch System**

17   Staff recommended that the Company be ordered to conduct a twelve month water loss
18 monitoring exercise for the Johnson Ranch water system including monitoring and reporting water
19 gallons sold, gallons pumped, and gallons purchased per month.[318] The information the Company
20 initially provided to Staff showed that this system's 2007 water loss was 19.4 percent.[319] The
21 Company subsequently indicated that the number of gallons sold that it initially reported was
22 inaccurate because it did not include construction water and irrigation water sales.[320] Staff further
23 recommended that the Company docket the results of the system monitoring as a compliance item in
24

25 ---
[316] Co. Reply Br. at 59, citing to Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 31.
26 [317] Co. Reply Br. at 59, citing to Rejoinder Testimony of Company witness Brian Tompsett (Exh. A-7) at 7.
[318] Tr. 1425-1426; Direct Testimony of Staff witness Marlin Scott, Jr. (Exh. S-36) Exhibit MSJ at 8-9; Tr. at 1419; Reply
27 Br. at 24.
[319] Staff Br. at 23, citing to Direct Testimony of Staff witness Marlin Scott, Jr. (Exh. S-36) at 8, Surrebuttal Testimony of
28 Staff witness Marlin Scott, Jr. (Exh. S-37) at 6, and Tr. at 1456.

52            DECISION NO.    **71854**

1  this case. Staff recommended that if the reported water loss for a one year period is greater than 10

2  percent, the Company be required to prepare a report containing detailed analysis and plan to reduce

3  water loss to 10 percent or less. Staff recommended that if the Company believes it is not cost

4  effective to reduce water loss to less than 10 percent, it should submit a detailed cost benefit analysis

5  to support its opinion. Staff recommended that such report be docketed as a compliance item for this

6
7  proceeding for review and certification by Staff. Staff recommended that in no case should water

8  loss be greater than 15 percent, and that Staff be authorized to initiate an Order to Show Cause

9  against the Company if water loss is not reduced to less than 15 percent.[321]

10  The Company argued that the actual percentage of non-account water for the Johnson Ranch

11  system for 2007 was under 10 percent, and that it addressed the issue in its 2008 water use data sheet

12  submitted with its 2008 annual report.[322] Staff responded that because the Company did not provide

13  sufficient support for its claim, including a breakdown of the gallons sold per month, that Staff's

14  recommendation remains the same following the Company's submission of the 2008 water use data

15
16  sheet.[323] Staff's recommendations are reasonable and will be adopted.

17  **C.    ADEQ Compliance**

18  Swing First presented evidence in this proceeding concerning fourteen Notices of Violation

19  ("NOVs") issued to the Company by ADEQ, dating back to September 2004.[324] Five of the NOVs

20  were issued in 2008 and two were issued in 2009.[325] Some of the NOVs remain open.[326]

21
22  Staff recommended that any increases in rates and charges authorized in this matter not go

23  into effect until the Company comes into full compliance with ADEQ by resolving all outstanding

24  NOVs including, but not limited to, the outstanding NOV associated with the Pecan, San Tan, and

25  [320] Surrebuttal Testimony of Staff witness Marlin Scott, Jr. (Exh. S-37) at 6.
26  [321] Direct Testimony of Staff witness Marlin Scott, Jr. (Exh. S-36) at 8-9; Tr. at 1419.
[322] Co. Br. at 60, citing to Rebuttal Testimony of Company witness Brian Tompsett (Exh. A-5) at 32 and Rejoinder
27  Testimony of Company witness Brian Tompsett (Exh. A-7) at 15.
[323] Staff Br. at 24, citing to Tr. at 1457 and Surrebuttal Testimony of Staff witness Marlin Scott, Jr. (Exh. S-37) at 7.
28  [324] RUCO Br. at 22, citing to Exh. SF-9.

53          DECISION NO. **71854**

1   Section 11 Wastewater Treatment plants.[327]  Staff recommended, however, that if rate decreases are

2   authorized, as recommended by Staff, that such decreases should not be postponed until the

3   Company comes into full compliance with ADEQ.[328]

4       RUCO stated that it is very concerned about the public's health and safety and the

5   Company's attitude toward the subject, and believes it is necessary for the Commission to take

6   action to assure the public's safety.[329]  RUCO recommended that the Company be required to

7   provide the Commission twice a month or monthly confirmation that it is in compliance with all

8   rules and regulations of ADEQ and notice of any new alleged violations whether written or oral.[330]

9

10  RUCO recommended that its proposed filing include all correspondence, oral and written, that the

11  Company has with ADEQ during the time period.[331]  RUCO recommended that the Company be

12  ordered to report any leaks, overflows or any other incidents no matter how minor to the

13  Commission immediately after they occur.[332]  Finally, RUCO recommended that the Commission

14  should, resources permitting, put into place both scheduled and unannounced visits by its Staff to the

15  Company's service area for the purpose of on-site inspections, and require Staff to file with the

16

17  Commission, with copies to the parties, reports of any inspection made.[333]  RUCO recommended

18  that its proposed requirements remain in place for a minimum of six months but not be removed

19  until the Company can prove that all open NOVs are closed.[334]

20      Staff stated that it shares the concerns of RUCO, but that it does not have the resources

21  available to commit to additional inspections of Johnson's facilities.[335]  Staff noted that it receives

22

23  _____
    [325] *Id.*

24  [326] RUCO Br. at 22, citing to Tr. at 85-117.
    [327] Tr. at 1430.

25  [328] Tr. at 1520-21.
    [329] RUCO Br. at 29.

26  [330] *Id.*
    [331] *Id.*

27  [332] *Id.*
    [333] *Id.* at 29-30.

28  [334] RUCO Br. at 30.
    [335] Staff Reply Br. at 12.

54          DECISION NO.    **71854**

1   notification from the Company when spills occur, and that any additional inspection and reporting

2   requirements would be duplicative of the work performed by ADEQ.[336]

3       We agree with Staff and RUCO that the evidence presented in this case regarding both the

4   quantity of NOVs and the nature and character of the NOVs, especially the NOV designated by

5   ADEQ as Case ID #103357 involving the Company's Section 11 WWTP, are cause for concern.  As

6   RUCO argued, if the Commission finds, based on the preponderance of the evidence, that the

7   Company's manner of providing service jeopardizes the public's safety and health, this

8   Commission's remedies cannot be punitive as might be the case with ADEQ, but rather must focus

9   on remedying the situation.[337]  The evidence presented this proceeding regarding the NOVs issued

10  by ADEQ is of great concern to this Commission.  However, the evidence was not first-hand

11

12  investigative evidence such as would be required for a Commission finding by the preponderance of

13  the evidence, as urged by RUCO in its closing brief, that the Company's operations are jeopardizing

14  the public's safety and health.  ADEQ is the state agency in Arizona charged with the responsibility

15  to, and provided with the resources and expertise required to, investigate and prosecute entities who

16  violate Arizona's environmental laws.  The evidence elicited by Swing First was of the nature of

17  reporting on the investigative and enforcement activities of ADEQ.  We are in agreement with

18

19  RUCO that the roles of ADEQ and the Commission should not be duplicative,[338] but unlike RUCO,

20  we believe that implementing RUCO's recommendations would lead to just such a result.

21       Staff's recommendation to require that any increases in rates and charges authorized in this

22  matter not go into effect until the Company comes into full compliance with ADEQ by resolving all

23

24  outstanding NOVs including, but not limited to, the outstanding NOV associated with the Pecan, San

25  Tan, and Section 11 Wastewater Treatment plants is reasonable.  However, the rates approved herein

26  constitute a rate reduction for the Company's water and wastewater divisions.  We will require

27

28  [336] *Id.*
[337] *See* RUCO Br. at 23.

55       DECISION NO.   **71854**

instead that the Company file, within 30 days, a list of outstanding NOVs issued against it by ADEQ, and to list (1) the procedural status of each NOV; and (2) steps the Company is taking to come into compliance with ADEQ requirements.  We will also require the Company to notify the Commission at such time that the Company comes into full compliance with all ADEQ requirements, including resolving all outstanding NOVs.  We will require that Staff, within 60 days of receipt of such filing, review the filing, verify the Company's compliance, and file a status report in this docket indicating that the Company has come into full compliance with all ADEQ requirements.

## D.   **Swing First Golf's Recommendations**

Swing First, a customer of Johnson, owns and operates The Golf Club at Johnson Ranch.  On January 25, 2008, Swing First filed a complaint against Johnson in Docket No. WS-02987A-08-0049 ("Complaint Docket").  The Complaint Case is currently pending.

Swing First's witness Sonn Rowell made nine recommendations in her testimony, as follows:

1.   Utility should not be allowed to increase its rates until its management and financial practices are investigated.

2.   Utility should be required to immediately reduce its water rates and make refunds.

3.   The Company should be required to refund – in cash, not credits – its illegal superfund tax collections.

4.   Utility's Pecan Wastewater Treatment Plant should not be included in rate base.

5.   Utility should be required to dismiss all pending defamation lawsuits against its customers, and pay all of their court costs and legal fees.

6.   Utility should be fined for its blatant disregard of its public service obligations, environmental laws, and explicit commission orders.

7.   Utility should be penalized with a reduced rate of return on equity.

---

[338] *See id.*

1

2

8.    Following the completion of the independent management and financial audits, the Commission should require Utility to demonstrate why it should not surrender its certificate of convenience and necessity.

3

4

9.    The Commission should bifurcate this case into two phases.[339]

5

6

7

The Company responded to Swing First's recommendations in its closing brief. In its reply brief, the Company responded to arguments Swing First made on brief in support of its recommendations.[340]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Staff stated that it does not support the recommendations made by Swing First in this docket,[341] and noted that a number of actions Swing First recommended are beyond the constitutional and statutory authority of the Commission to implement.[342] Staff stated that the Company has been charging rates authorized in Decision No. 60223, and thus has charged its customers rates that were deemed just and reasonable, until further determination by the Commission.[343] Staff stated that to require the Company to refund its customers from 2007 forward, as recommended by Swing First, raises issues of retroactive ratemaking, and that generally, the rule against retroactive ratemaking prohibits the retroactive adjustment of rates to account for unexpected expenses or revenues.[344] Staff also commented that the Commission does not have authority to order the Company to dismiss all pending defamation lawsuits against its customers and to pay all of their court costs and legal fees.[345] Staff noted, however, that Swing First's intervention in this matter helped bring to Staff's attention certain irregular billing practices and other customer service

22

23

24

25

26

27

28

[339] Direct Testimony of Swing First witness Sonn Rowell (Exh. SF-40) at 15.
[340] Co. Reply Br. at 30-46.
[341] Staff Br. at 24.
[342] Staff Reply Br. at 12.
[343] *Id.*
[344] *Id.*
[345] *Id.*

DECISION NO.    **71854**

issues.[346] Staff stated that because it was made aware of the Company's practice of under-billing Oasis Golf Course, Staff was able to make an adjustment to correct it.[347]

Staff recommended that the remaining customer service issues that Swing First has alleged be adjudicated and resolved in the pending Complaint Case.[348] RUCO stated that it believes Swing First's billing dispute would be better addressed in the Complaint Docket.[349] The Company agreed that the appropriate forum for the billing dispute is the Complaint Docket.[350]

We agree with RUCO, the Company, and Staff that the customer service and billing issues raised by Swing First in this docket are best addressed in the pending Complaint Docket. We further agree with Staff that it would not be appropriate to adopt Swing First's other recommendations in this proceeding.

\* \* \* \* \* \* \* \* \* \*

Having considered the entire record herein and being fully advised in the premises, the Commission finds, concludes, and orders that:

## FINDINGS OF FACT

1. On March 31, 2008, Johnson filed a rate increase application for water and wastewater with a 2007 test year.

2. Johnson is a public service corporation that provides water and wastewater service in Pinal County, Arizona pursuant to a CC&N originally granted in Decision No. 60223 (May 2, 1997), which authorized its current rates and charges. Johnson is organized as an Arizona limited liability company and is in good standing. Its principal place of business is 5230 East Shea Blvd., Suite 200, Scottsdale, Arizona 85254.

3. In Decision Nos. 68235 (October 25, 2005), 68236 (October 25, 2005), and 68237 (October 25, 2005), Johnson was ordered to file a rate application for both water and wastewater by May 1, 2007, based on a 2006 test year. Prior to May 1, 2007, Johnson filed a request to extend

---

[346] Staff Br. at 24, citing to (Exh. SF-40) at 9, Tr. at 584-590, and (Exh. A-6) at 16.
[347] Staff Br. at 24-25, citing to (Exh. SF-38) at 15, and Tr. at 473 and 1704.
[348] Staff Br. at 25.
[349] RUCO Reply Br. at 10.
[350] Co. Reply Br. at 46.

DOCKET NO. WS-02987A-08-0180

1   that filing date.  On September 18, 2007, Staff recommended that the Company be required to file

2   the rate application by March 31, 2008, using a 2007 test year.

3       4.      On April 29, 2008, Staff filed a Letter of Deficiency stating that the rate application

4   did not meet the sufficiency requirements as outlined in A.A.C. R14-2-103, and listing the items

5   Staff required to deem the application sufficient for processing.

6       5.      On May 13, 2008, existing Counsel for the Company filed a Motion Requesting

7   Permission to Withdraw as Counsel, and new Counsel for the Company filed a Notice of

8   Substitution of Counsel.

9       6.      On May 14, 2008, the Company filed revised schedules and other documents to

10  address the items identified in Staff's April 29, 2008, Letter of Deficiency.

11      7.      On May 16, 2008, a Procedural Order was issued granting the May 13, 2008, Motion

12  Requesting Permission to Withdraw as Counsel.

13      8.      On June 11, 2008, a letter from Commissioner Mundell to the Commission was

14  docketed.

15      9.      On June 11, 2008, Swing First filed a Motion to Intervene.  By Procedural Order

16  issued June 23, 2008, Swing First's Motion to Intervene was granted.

17      10.     On June 13, 2008, Staff filed a Second Letter of Deficiency.

18      11.     On June 23, 2008, a letter from Commissioner Mundell to the Company was

19  docketed, indicating that Commissioner Mundell docketed all the material that Johnson provided to

20  the Commissioners regarding the sanitary sewer overflows from the Pecan WWTP during the

21  weekend of May 17-18, 2008.

22      12.     On June 24, 2008, a letter from Commissioner Mundell to the Commission was

23  docketed.

24      13.     On July 3, 2008, Johnson filed responses to the data requests contained in Staff's

25  Second Letter of Deficiency.

26      14.     On August 1, 2008, Staff filed a Letter of Sufficiency informing the Company that the

27  application had met the Commission's sufficiency requirements and classifying the Company as a

28  Class A utility.

DECISION NO.    **71854**

1    15.    On August 15, 2008, a Rate Case Procedural Order was issued setting a hearing on
2    the rate application to commence on April 23, 2009, and setting associated procedural deadlines,
3    including public notice requirements.

4    16.    On September 25, 2008, Johnson filed a Motion to Revise Procedural Schedule.

5    17.    On November 21, 2008, Swing First filed a Motion to Compel.

6    18.    On November 25, 2008, Johnson filed a Request for Extension of Time to Respond to
7    Motion to Compel.

8    19.    On December 2, 2008, Johnson filed a Notice of Filing Affidavit of Publication.

9    20.    A total of 159 public comments concerning the rate application were filed in this
10   docket.

11   21.    On December 2, 2008, Johnson filed a Response to Swing First's Motion to Compel.

12   22.    On December 4, 2008, RUCO filed an Application to Intervene.  RUCO was granted
13   intervention by Procedural Order issued December 16, 2008.

14   23.    On December 5, 2008, Swing First filed a Reply to Johnson's Response to Motion to
15   Compel.

16   24.    On December 17, 2008, Florence filed a Motion for Leave to Intervene.  Florence
17   was granted intervention by Procedural Order issued December 31, 2008.

18   25.    On December 17, 2008, Staff filed a copy of a letter to the Company indicating
19   Staff's concerns with late or incomplete Company responses to Staff's data requests.  The letter
20   stated that "Staff must now insist that the Company file all responses to all outstanding and current
21   data requests by January 8, 2009.  Staff will make adjustments according to the information
22   received as of January 8, 2009.  Staff reserves the right to disregard any responses to current and
23   outstanding data requests received after January 8, 2009.  Staff further reserves the right to issue
24   more data requests as needed." The letter included a listing of all data requests to which Staff stated
25   Company responses were incomplete.

26   26.    On January 21, 2009, a Procedural Order was issued setting a Procedural Conference
27   for January 27, 2009, for the purpose of allowing the parties to present their arguments regarding
28   Swing First's Motion to Compel Discovery.

27.     On January 27, 2009, the Procedural Conference was held as scheduled.  Swing First and Johnson presented their arguments regarding Swing First's Motion to Compel, and during the Procedural Conference, Johnson was directed to provide some of the requested information to Swing First.

28.     On January 29, 2009, Florence filed a Motion for Extension of Time to File Testimony.

29.     On February 3, 2009, Staff filed a Response to Florence's Motion for Extension of Time to File Testimony.

30.     On February 3, 2009, Swing First filed direct testimony of David Ashton.

31.     On February 4, 2009, RUCO filed direct testimony of William A. Rigsby and Rodney L. Moore.

32.     On February 4, 2009, Staff filed direct testimony of Jeffrey M. Michlik and Marlin Scott, Jr.

33.     On February 5, 2009, a Procedural Order was issued extending the deadline for Florence to file its direct testimony to February 17, 2009.

34.     On February 6, 2009, Swing First filed a Motion for Date Certain requesting that a date and time certain be set for the testimony of its witness David Ashton.

35.     On February 17, 2009, a Procedural Order was issued scheduling Mr. Ashton to appear on April 17, 2009, at 9:30 a.m. to testify.

36.     On February 17, 2009, Swing First filed its Motion for Leave to File Supplemental Direct Testimony and Emergency Motion to Prohibit Inappropriate Contact.

37.     On February 19, 2009, a Procedural Order was issued ordering Johnson to file, by February 24, 2009, a response to Swing First's Emergency Motion to Prohibit Inappropriate Contact, and setting a Procedural Conference for February 26, 2009 for the purpose of allowing the parties to present their arguments regarding Swing First's Emergency Motion to Prohibit Inappropriate Contact.

38.     On February 19, 2009, Johnson made two filings:  a Motion to Strike Pre-Filed Direct Testimony of David Ashton on Behalf of Intervenor Swing First Golf and Response to Swing First

DECISION NO. **71854**

1 Golf's Motion for Leave to File Supplemental Direct Testimony, and a Motion to Compel
2 Discovery.

3     39.    On February 20, 2009, a Procedural Order was issued stating that the Procedural
4 Conference set for February 26, 2009 would be expanded to allow the parties to address all
5 outstanding motions and responses.

6     40.    On February 20, 2009, Johnson filed a Notice of Inappropriate Discovery and
7 Litigation Tactics.

8     41.    On February 24, 2009, Johnson filed its Response to Emergency Motion to Prohibit
9 Inappropriate Contact.

10     42.    On February 25, 2009, Swing First filed its Response to Johnson's Motion to Compel.

11     43.    On February 25, 2009, Swing First filed its Notice of Partial Witness Substitution;
12 Response to Johnson's Motion to Strike; and Reply to Johnson's Response to Swing First's Motion
13 for Leave to File Supplemental Direct Testimony.

14     44.    On February 26, 2009, Johnson filed its Response and Motion to Strike Intervenor
15 Swing First's Notice of Inappropriate Discovery and Litigation Tactics.

16     45.    On February 26, 2009, a Procedural Conference was held as scheduled.

17     46.    On February 27, 2009, Johnson filed its Request Regarding Deadline for Filing
18 Rebuttal Testimony to Swing First's Direct Testimony.

19     47.    On March 2, 2009, Swing First filed its revised direct testimonies of Swing First
20 witnesses David Ashton and Sonn S. Rowell.

21     48.    On March 5, 2009, a Procedural Order was issued granting Johnson's request for an
22 extension of time, to March 23, 2009, to file rebuttal to the revised direct testimonies of Swing First
23 witnesses David Ashton and Sonn S. Rowell.

24     49.    On March 5, 2009, Johnson filed a Motion for Extension of Time to File Rebuttal
25 Testimony.

26     50.    On March 10, 2009, Johnson filed rebuttal testimony of Thomas J. Bourassa
27 (Volumes I, II, and III) and Brian Tompsett.

28     51.    On March 23, 2009, Johnson filed supplemental rebuttal testimony of Brian

DOCKET NO. WS-02987A-08-0180

1   Tompsett.

2   52.    On March 24, 2009, Johnson filed supplemental rebuttal testimony of Thomas J.

3   Bourassa.

4   53.    On March 31, 2009, RUCO filed surrebuttal testimony of William A. Rigsby and

5   Rodney L. Moore.

6   54.    On March 31, 2009, Staff filed surrebuttal testimony of Jeffrey M. Michlik and

7   Marlin Scott Jr.

8   55.    On April 15, 2009, Staff filed a Motion to Compel. Staff requested an order directing

9   that Johnson and/or Florence be directed to immediately make arrangements for Staff's review of

10  the workpapers associated with an audit previously provided to Staff by Johnson in response to a

11  Data Request. A copy of the audit was attached to the Motion as an exhibit.

12  56.    On April 16, 2009, a Procedural Order was issued directing Johnson and Florence to

13  be prepared to discuss Staff's Motion to Compel at the prehearing conference, if they had not, by

14  the time the scheduled prehearing conference commenced, made the arrangements requested by

15  Staff for its review of the workpapers associated with the Henry and Horne, LLP audit dated June

16  26, 2007, that had previously been provided to Staff.

17  57.    On April 20, 2009, the prehearing conference was held as scheduled. At the

18  prehearing conference, Staff withdrew its Motion to Compel.

19  58.    On April 17, 2009, Johnson filed the rejoinder testimony of Thomas J. Bourassa

20  (Volumes I, II and III) and Brian Tompsett.

21  59.    On April 20, 2009, Swing First filed testimony summaries of its witnesses.

22  60.    On April 21, 2009, Swing First filed testimony summaries of its witnesses.

23  61.    On April 22, 2009, RUCO filed testimony summaries of its witnesses.

24  62.    On April 24, 2009, Staff filed testimony summaries of its witnesses.

25  63.    On April 23, 2009, the hearing commenced as scheduled. Appearances were entered

26  by Johnson, intervenors Swing First, Florence, RUCO, and Staff. No members of the public

27  appeared to provide public comment.

28  64.    On Monday, April 27, 2009, at the commencement of the third day of hearing,

63        DECISION NO.  **71854**

1   counsel for Johnson informed the Commission that Swing First had informed counsel for Johnson
2   over the weekend of the existence of a transcript of a recorded conversation between Swing First
3   witness Mr. David Ashton and Johnson employee Mr. Gary Larson ("Ashton Transcript"). Counsel
4   for Johnson indicated that counsel for Swing First intended to offer the transcript into evidence, and
5   requested that it be excluded. Counsel for Swing First had marked a copy of the Ashton Transcript
6   as an exhibit.

7   65.     The Administrative Law Judge conducted an in camera review of the Ashton
8   Transcript, and subsequently ordered briefing on its admissibility. Discovery was reopened to
9   allow additional discovery prior to the briefing deadline. The parties were informed that the Ashton
10  Transcript would be treated as confidential and kept under seal pending a ruling on its admissibility,
11  and that parties who wished to submit briefs on the transcript's admissibility could accomplish
12  access to the Ashton Transcript by entering into a confidentiality agreement with Johnson. The
13  timeclock for processing this matter was suspended pending a ruling on the admissibility of the
14  Ashton Transcript.

15  66.     On May 8, 2009, Pulte Homes filed a letter in the docket.

16  67.     On May 11, 2009, RUCO filed its opening brief of the admissibility of the Ashton
17  Transcript.

18  68.     On May 22, 2009, Johnson, Swing First, and Staff filed opening briefs regarding the
19  admissibility of the Ashton Transcript.

20  69.     On May 29, 2009, Johnson, RUCO, and Swing First filed reply briefs regarding the
21  admissibility of the Ashton Transcript.

22  70.     On May 29, 2009, Swing First filed a Notice of Availability of Witness and Counsel,
23  indicating that counsel for Swing First would be unavailable from June 8 through June 19, 2009,
24  and that Swing First's witness David Ashton would be available to testify on July 9-10, 2009.

25  71.     On June 1, 2009, Johnson docketed a filing in reply to issues raised in Swing First's
26  May 29, 2009 reply brief.

27  72.     On June 30, 2009, a Procedural Order was issued setting a procedural conference to
28  commence on July 17, 2009, at 1:30 p.m., for the purpose of taking oral argument on the issues

1    raised in the parties' briefings on the admissibility of the Ashton Transcript.

2        73.    On the morning of July 17, 2009, counsel for Swing First contacted the Hearing

3    Division to request authority to participate telephonically in the oral argument due to an unforeseen

4    medical issue.  Counsel for Swing First also informed the Hearing Division that counsel for the

5    Town of Florence would not be in attendance for the scheduled oral argument.  Subsequently, on

6    July 17, 2009, at 10:30 a.m., a telephonic procedural conference was held to address the issue.

7    Counsel for Johnson, Swing First, RUCO, and Staff attended.   At the telephonic procedural

8    conference, counsel for the parties were informed that under the circumstances, the oral argument

9    would be continued to a later date.

10        74.    On July 20, 2009, a Procedural Order was issued setting a date of July 23, 2009 for

11    the continuance of the procedural conference originally set for July 17, 2009.

12        75.    On July 23, 2009, a procedural conference was convened as scheduled.  Johnson,

13    Swing First, RUCO and Staff appeared through counsel and provided oral argument regarding the

14    admissibility of the Ashton Transcript.  After oral argument was taken, the Administrative Law

15    Judge issued a preliminary ruling on admissibility of the Ashton Transcript, which had not yet been

16    moved into evidence.  It was ruled that portions of the Ashton Transcript might be admitted if

17    offered for the purpose of impeachment; and that portions of the Ashton Transcript might be

18    admitted as direct evidence in regard to (1) customer service issues, (2) billing issues, and (3)

19    revenue issues.  It was ruled that because allegations that Johnson attempted to drive Swing First

20    out of business are not relevant to this rate case proceeding, the transcript would not be admissible

21    in this proceeding for the purpose of supporting those allegations.

22        76.    On July 24, 2009, a Procedural Order was issued setting a date of September 21,

23    2009, for the continuance of the hearing, and setting deadlines for Staff's filing of revised

24    surrebuttal testimony on the CAGWD assessment issue as requested by Staff, and for the Company

25    to file rejoinder testimony in response.  On July 27, 2009, a Procedural Order was issued correcting

26    an incorrectly stated deadline in the July 24, 2009 Procedural Order.

27        77.    On July 28, 2009, Staff filed revised surrebuttal testimony on the CAGWD

28    assessment issue.

DECISION NO. ____**71854**____

78.    On August 17, 2009, Swing First filed a Motion for Date Certain requesting that Mr. Ashton's testimony be confined to Thursday, September 24 and Friday, September 25, 2009.

79.    On August 27, 2009, a Procedural Order was issued denying the August 17, 2009 Motion for Date Certain due to the possibility that Mr. Ashton's testimony might be required beyond Friday, September 25, 2009, in order to allow sufficient time for his cross-examination.

80.    On September 8, 2009, Johnson filed supplemental rejoinder testimony on the issue of the CAGWD assessment issue.

81.    The hearing resumed as scheduled on September 21, 2009, and concluded on October 1, 2009.

82.    On October 26, 2009, Swing First filed a Motion to Admit Late-Filed Exhibits.

83.    On October 29, 2009, RUCO filed a response to Swing First's October 26, 2009 motion, and stated that RUCO had no objection to the admission of the proposed late-filed exhibits.

84.    On October 30, 2009, the Company, RUCO, and Staff filed their final post-hearing schedules.

85.    On October 30, 2009, Johnson filed a Response and Objection to Swing First's October 26, 2009 motion. Johnson objected to the admission of the proposed late-filed exhibits, and stated that if they are admitted, Johnson wishes to have the opportunity to provide additional testimony and documentary evidence to supplement the evidentiary record and to rebut certain statements in the October 26, 2009 motion.

86.    On November 3, 3009, a Procedural Order was issued denying Swing First's October 26, 2009 motion. The Procedural Order stated that the record in this proceeding is closed; that both Swing First and Johnson are parties to Docket No. WS-02987A-08-0049, which is a complaint filed by Swing First against Johnson; and that Swing First may wish to pursue the subject matter of its proposed late-filed exhibits in that docket.

87.    On November 20, 2009, the Company, Florence, Swing First, RUCO, and Staff filed opening post-hearing briefs.

88.    On December 11, 2009, the Company, Swing First, RUCO, and Staff filed reply post-hearing briefs.

DOCKET NO. WS-02987A-08-0180

**Water Rates**

89.     The Company's FVRB for its water division is ($2,414,613).

90.     The Company's present rates and charges for its water division produced adjusted test year operating revenues of $13,172,899 and adjusted test year operating expenses of $9,553,304, for a test year operating income of $3,619,595.

91.     For its water division, the Company requested rates that would result in total revenues of $10,293,877, a revenue decrease of $2,879,022, or 21.86 percent.  RUCO recommended rates that would yield total revenues of $13,099,181, a decrease of $73,718, or 0.56 percent.  Staff recommended total revenues of $10,156,009, a decrease of $3,016,800, or 22.90 percent.

92.     Because the Company's adjusted FVRB for its water division is negative, a rate of return calculation is not meaningful.  Based on the unique circumstances of this case, it is appropriate to use an operating margin to set fair and reasonable rates, and to allow a 3 percent operating margin, for revenues of $9,773,939.  This represents a $3,398,960, or 25.80 percent, revenue decrease from $13,172,899 to $9,773,939.

93.     The Company's gross revenue for its water division should decrease by $3,398,960.

94.     Average and median usage during the test year for the Company's 3/4 inch meter residential water customers were 6,931 and 6,000 gallons per month, respectively.

95.     Under the Company's proposed rates, an average usage (6,931 gallons/month) residential water customer on a 3/4-inch meter would experience a decrease of $8.51, approximately 19.99 percent, from $42.59 per month to $34.08 per month.  The Company's proposed rates do not include its requested adjustor for CAGRD expenses and thus do not show the total amount customers would pay if the Company's requested CAGRD adjustor mechanism were implemented.

96.     Under the rates adopted herein, an average usage (6,931 gallons/month) residential water customer on a 3/4-inch meter would experience a monthly rate decrease of $12.78, approximately 30.01 percent, from $42.59 per month to $29.81 per month.

**Wastewater Rates**

97.     The Company's FVRB for its wastewater division is $136,562.

1    98.     The Company's present rates and charges for its wastewater division produced
2    adjusted test year operating revenues of $11,354,014 and adjusted test year operating expenses of
3    $9,432,270, for a test year operating income of $1,921,744.

4    99.     For its wastewater division, the Company requested rates that would result in total
5    revenues of $13,680,546, a revenue increase of $2,326,532, or 20.49 percent. RUCO recommended
6    rates that would yield total revenues of $10,838,617, a decrease of $515,397 or 4.54 percent. Staff
7    recommended total revenues of $10,458,914, a decrease of $895,100, or 7.88 percent.

8    100.    Because the Company's adjusted FVRB for its wastewater division is so small, a rate
9    of return calculation is not meaningful. Based on the unique circumstances of this case, it is
10   appropriate to use an operating margin to set fair and reasonable rates, and to allow a 3 percent
11   operating margin, for operating income of $290,610. This represents a $1,667,019, or 14.68
12   percent, revenue decrease, from $11,354,014 to $9,686,995.

13   101.    Under the Company's proposed rates, a residential wastewater customer on a 3/4 inch
14   water meter would experience an increase of $8.33, approximately 21.64 percent, from $38.50 per
15   month to $46.83 per month.

16   102.    Under the rates adopted herein, a residential wastewater customer on a 3/4 inch water
17   meter would experience a decrease of $5.71, approximately 14.83 percent, from $38.50 per month
18   to $32.79 per month.

19   103.    It is reasonable and in the public interest to approve the depreciation rates set forth in
20   Exhibit B attached hereto and to require their use by the Company on a going-forward basis.

21   104.    It is reasonable and in the public interest to discontinue the Company's authority to
22   collect additional HUFs for both its water and wastewater divisions, and to require, as a prerequisite
23   to approval of a new hook up fee tariff for the Company in the future, a certification by a Certified
24   Public Accounting firm that the Company has a membership equity level of at least 40 percent.

25   105.    It is reasonable and in the public interest to require the Company to begin a 12-month
26   monitoring exercise of the Johnson Ranch water system, to comply with the Staff recommendations
27   regarding the docketing of the system monitoring results as a compliance item in this case, and to
28   prepare and file a report as recommended by Staff if the reported water loss for the period from

1    September 1, 2010 through September 1, 2011, is greater than 10 percent.  In no case should water

2    loss be allowed to remain at 15 percent or greater.  If for any reason the water loss for the Johnson

3    Ranch water system is not reduced to less than 15 percent by October 1, 2011, Staff should be

4    required to initiate an Order to Show Cause against the Company.

5         106.    It is reasonable and in the public interest to require the Company to keep its records in

6    accordance with the NARUC USOA and Commission rules in a manner that will support its filings

7    with the Commission.

8         107.    It is reasonable, appropriate, and in the public interest to require the Company to

9    prepare an action plan that indicates the specific steps it will take to demonstrate, by means of its

10   day to day record keeping regarding transactions between the Company and all entities with which

11   it conducts business, including, but not limited to, its affiliates and related parties, that its dealings

12   are arm's length, transparent, and well-documented; to require the Company to file the plan within

13   90 days for Staff's review; and to require Staff to assess the plan and its adequacy, and file a report

14   with Staff's findings and recommendations on the action plan accompanied by a Recommended

15   Order for Commission approval or disapproval of the Company's action plan, within 60 days of

16   receipt of the Company's action plan.

17        108.    It is reasonable and in the public interest to require the Company to file, within 30

18   days, a list of outstanding NOVs issued by ADEQ, and to list (1) the procedural status of each

19   NOV; and (2) steps the Company is taking to come into compliance with ADEQ requirements.

20        109.    It is reasonable and in the public interest to require the Company to notify the

21   Commission at such time that the Company comes into full compliance with all ADEQ

22   requirements, including resolving all outstanding NOVs.  We will require that Staff, within 60 days

23   of receipt of such filing, review the filing, verify the Company's compliance, and file a status report

24   in this docket indicating that the Company has come into full compliance with all ADEQ

25   requirements.

26        110.    In light of the need to conserve groundwater in Arizona, we believe it is reasonable to

27   require Johnson Utilities to address conservation and submit for Commission approval, within 120

28   days of the effective date of this Decision, at least ten Best Management Practices ("BMPs") (as

DECISION NO. _____ **71854**

1  outlined in ADWR's Modified Non-Per Capita Conservation Program). A maximum of two of
2  these BMPs may come from the "Public Awareness/PR or Education and Training" categories of
3  the BMPs. Johnson Utilities may request cost recovery of actual costs associated with BMPs
4  implemented.

## CONCLUSIONS OF LAW

6  1.    Johnson Utilities, LLC, dba Johnson Utilities Company is a public service corporation
7  pursuant to Article XV of the Arizona Constitution and A.R.S. §§ 40-203, 40-204, 40-250 and 40-
8  251.

9  2.    The Commission has jurisdiction over the Company and the subject matter of the
10  application.

11  3.    Notice of the proceeding was provided in conformance with law.

12  4.    The fair value of the Company's water division rate base is ($2,414,613), and
13  therefore a rate of return analysis is not reasonable. Authorizing an operating margin of 3 percent
14  produces rates and charges that are just and reasonable.

15  5.    The fair value of the Company's wastewater division rate base is $136,562, and
16  therefore a rate of return analysis is not reasonable. Authorizing an operating margin of 3 percent
17  produces rates and charges that are just and reasonable.

18  6.    The rates and charges approved herein are reasonable.

19  7.    The Company should be required to file, within 30 days, a list of outstanding NOVs
20  issued by ADEQ, and to list (1) the procedural status of each NOV; and (2) steps the Company is
21  taking to come into compliance with ADEQ requirements.

22  8.    It is reasonable and in the public interest to require the Company to notify the
23  Commission at such time that the Company comes into full compliance with all ADEQ
24  requirements, including resolving all outstanding NOVs, and to require that Staff, within 60 days of
25  receipt of such filing, review the filing, verify the Company's compliance, and file a status report in
26  this docket indicating that the Company has come into full compliance with all ADEQ requirements.

27  9.    It is reasonable and in the public interest to discontinue the Company's authority to
28  collect additional hook up fees for both its water and wastewater divisions.

1        10.     It is reasonable and in the public interest to require, as a prerequisite to approval of a

2 new hook up fee tariff for the Company in the future, certification by a Certified Public Accounting

3 firm that the Company has a membership equity level of at least 40 percent.

4        11.     It is reasonable and in the public interest to require the Company to begin a 12-month

5 monitoring exercise of the Johnson Ranch water system; to comply with the Staff recommendations

6 regarding the docketing of the system monitoring results as a compliance item in this case; to

7 prepare and file a report as recommended by Staff if the reported water loss for the period from

8 September 1, 2010 through September 1, 2011, is greater than 10 percent; but in no case to allow

9 water loss to remain at 15 percent or greater.

10       12.     It is reasonable and in the public interest to require Staff to initiate an Order to Show

11 Cause against the Company if for any reason the water loss for the Johnson Ranch water system is

12 not reduced to less than 15 percent by October 1, 2011.

13       13.     It is reasonable and in the public interest to require the Company to keep its records in

14 accordance with the NARUC USOA and Commission rules in a manner that will support its filings

15 with the Commission.

16       14.     It is reasonable, appropriate, and in the public interest to require the Company to

17 prepare an action plan that indicates the specific steps it will take to demonstrate, by means of its

18 day to day record keeping regarding transactions between the Company and all entities with which it

19 conducts business, including, but not limited to, its affiliates and related parties, that its dealings are

20 arm's length, transparent, and well-documented; to require the Company to file the plan within 90

21 days for Staff's review; and to require Staff to assess the plan and its adequacy, and file a report with

22 Staff's findings and recommendations on the action plan accompanied by a Recommended Order for

23 Commission approval or disapproval of the Company's action plan, within 60 days of receipt of the

24 Company's action plan.

25       15.     It is reasonable and in the public interest to approve the depreciation rates set forth in

26 Exhibit A attached hereto and to require their use by the Company on a going-forward basis.

27 **ORDER**

28       IT IS THEREFORE ORDERED that Johnson Utilities, LLC, dba Johnson Utilities Company

1 shall file with the Commission, on or before August 20, 2010, the schedules of rates and charges
2 attached hereto and incorporated herein as Exhibit A, which shall be effective for all service rendered
3 on and after June 1, 2010.

4       IT IS FURTHER ORDERED that Johnson Utilities, LLC, dba Johnson Utilities Company
5 shall notify its water and wastewater division customers of the revised schedules of rates and charges
6 authorized herein by means of an insert, in a form acceptable to Staff, included in its next regularly
7 scheduled billing.

8       IT IS FURTHER ORDERED that Johnson Utilities, LLC, dba Johnson Utilities Company
9 shall file, with docket control as a compliance item in this docket, within 30 days, a list of
10 outstanding NOVs issued by ADEQ, and to list (1) the procedural status of each NOV; and (2) steps
11 the Company is taking to come into compliance with ADEQ requirements.

12       IT IS FURTHER ORDERED that Johnson Utilities, LLC, dba Johnson Utilities Company
13 shall notify the Commission at such time that the Company comes into full compliance with all
14 ADEQ requirements, including resolving all outstanding NOVs. Upon receipt of such filing, the
15 Commission's Utilities Division shall, within 60 days, review the filing, verify the Company's
16 compliance, and file a status report, as a compliance item in this docket, indicating that the Company
17 has come into full compliance with all ADEQ requirements.

18       IT IS FURTHER ORDERED that the authority previously granted to Johnson Utilities, LLC,
19 dba Johnson Utilities Company to collect hook-up fees is hereby discontinued for both its water and
20 wastewater divisions.

21       IT IS FURTHER ORDERED that in order to receive approval of a new hook up fee tariff for
22 either its water or wastewater division, Johnson Utilities, LLC, dba Johnson Utilities Company shall
23 demonstrate, by means of a certification by a Certified Public Accounting firm, that it has attained a
24 membership equity level of at least 40 percent.

25       IT IS FURTHER ORDERED that Johnson Utilities, LLC, dba Johnson Utilities Company
26 shall begin a 12-month monitoring exercise of its Johnson Ranch water system, and shall docket the
27 results of the system monitoring as a compliance item in this case by October 1, 2011. If the reported
28 water loss for the period from September 1, 2010 through September 1, 2011, is greater than 10

DOCKET NO. WS-02987A-08-0180

1  percent, Johnson Utilities, LLC, dba Johnson Utilities Company shall prepare a report containing a

2  detailed analysis and a plan to reduce water loss to 10 percent or less, and if it believes it is not cost

3  effective to reduce water loss to less than 10 percent, the report shall include a detailed cost benefit

4  analysis to support its opinion.   This report shall be docketed as a compliance item for this

5  proceeding for review and certification by Staff.  The report or cost benefit analysis, if required, shall

6  be docketed by November 30, 2011.  In no case shall the Company allow water loss to remain at

7  greater than 15 percent.  If water loss is not reduced to less than 15 percent by October 1, 2011, Staff

8  shall initiate an Order to Show Cause against the Company.

9      IT IS FURTHER ORDERED that Johnson Utilities, LLC, dba Johnson Utilities Company

10  shall keep its records in accordance with the National Association of Regulatory Utility

11  Commissioners Uniform System of Accounts and Commission rules in a manner that will support its

12  filings with the Commission.

13      IT IS FURTHER ORDERED that Johnson Utilities, LLC, dba Johnson Utilities Company

14  shall prepare an action plan that indicates the specific steps it will take to demonstrate, by means of

15  its day to day record keeping regarding transactions between the Company and all entities with which

16  it conducts business, including, but not limited to, its affiliates and related parties, that its dealings are

17  arm's length, transparent, and well-documented.   The Company shall file the plan with the

18  Commission's Docket Control Center as a compliance item in this case within 90 days for Staff's

19  review.  Staff shall assess the plan and its adequacy, and shall file, with the Commission's Docket

20  Control Center as a compliance item in this case, within 60 days of Staff's receipt of the Company's

21  action plan, a report with Staff's findings and recommendations on the action plan accompanied by a

22  Recommended Order for Commission approval or disapproval of the Company's action plan.

23      IT IS FURTHER ORDERED that Johnson Utilities, LLC, dba Johnson Utilities Company

24  shall, on a going-forward basis, use the depreciation rates set forth in Exhibit B attached hereto.

25      IT IS FURTHER ORDERD that Johnson Utilities, LLC dba Johnson Utilities Company, shall

26  implement a CAGRD adjustor mechanism as proposed by Staff, inclusive of all eight conditions

27  proposed by Staff.

28  . . .

DECISION NO. **71854**

DOCKET NO. WS-02987A-08-0180

1    IT IS FURTHER ORDERED that Johnson Utilities, LLC, dba Johnson Utilities Company

2   shall submit for Commission consideration within 120 days of the effective date of this Decision, at

3   least ten Best Management Practices (as outlined in Arizona Department of Water Resource's

4   Modified Non-Per Capita Conservation Program). A maximum of two of these BMPs may come

5   from the "Public Awareness/PR" or "Education and Training" categories of the BMPs. Johnson

6   Utilities, LLC, dba Johnson Utilities Company may request cost recovery of actual costs associated

7   with the BMPs implemented.

8        IT IS FURTHER ORDERED that this Decision shall become effective immediately.

9        BY ORDER OF THE ARIZONA CORPORATION COMMISSION.

10

11

12   CHAIRMAN                                                    COMMISSIONER

13

14   COMMISSIONER               COMMISSIONER              COMMISSIONER

15

16        IN WITNESS WHEREOF, I, ERNEST G. JOHNSON,
          Executive Director of the Arizona Corporation Commission,

17        have hereunto set my hand and caused the official seal of the
          Commission to be affixed at the Capitol, in the City of Phoenix,

18        this 24th day of August, 2010.

19

20        ERNEST G. JOHNSON
          EXECUTIVE DIRECTOR

21

22   DISSENT _____

23

24   DISSENT _____

25

26

27

28

                        74              DECISION NO. __**71854**__

1   SERVICE LIST FOR:                  JOHNSON   UTILITIES,   L.L.C.,   DBA   JOHNSON
2                                      UTILITIES COMPANY

3   DOCKET NO.:                        WS-02987A-08-0180

4   Jeffrey W. Crockett
5   Bradley S. Carroll
    Kristoffer P. Kiefer
6   SNELL & WILMER LLP
    One Arizona Center
7   400 East Van Buren Street
    Phoenix, AZ  85004
8   Attorneys for Johnson Utilities, LLC

9   Craig A. Marks
    CRAIG A. MARKS, PLC
10  10645 North Tatum Blvd., Suite 200-676
    Phoenix, AZ  85028
11  Attorney for Swing First Golf, LLC

12  Daniel Pozefsky, Chief Counsel
    RESIDENTIAL UTILITY
13  CONSUMER OFFICE
    1110 West Washington Street, Suite 220
14  Phoenix, AZ  85007-2958

15  James E. Mannato, Town Attorney
    TOWN OF FLORENCE
16  P.O. Box 2670
    775 North Main Street
17  Florence, AZ  85232-2670

18  Janice Alward, Chief Counsel
    Ayesha Vohra, Staff Attorney
19  Legal Division
    ARIZONA CORPORATION COMMISSION
20  1200 West Washington Street
    Phoenix, AZ  85007-2927

21
    Steve Olea, Director
22  Utilities Division
    ARIZONA CORPORATION COMMISSION
23  1200 West Washington Street
    Phoenix, AZ  85007-2927

24

25

26

27

28

DECISION NO.   **71854**

## EXHIBIT A
## WATER DIVISION

**MONTHLY USAGE CHARGE**:

| | |
|---|---|
| 5/8" x 3/4" Meter | $11.00 |
| 3/4" Meter | 16.50 |
| 1" Meter | 27.50 |
| 1-1/2" Meter | 55.00 |
| 2" Meter | 88.00 |
| 3" Meter | 176.00 |
| 4" Meter | 275.00 |
| 6" Meter | 550.00 |
| 8" Meter | 880.00 |
| 10" Meter | 1,265.00 |

**COMMODITY CHARGES**
(Residential, Commercial, Industrial)
All Meter Sizes

| | |
|---|---|
| Gallons Included in Minimum | 0 |

**5/8-Inch Meter (Residential)**

| | |
|---|---|
| 0 to 4,000 Gallons | $1.7600 |
| 4,001 to 10,000 Gallons | 2.1400 |
| Over 10,000 Gallons | 2.4960 |

**¾-Inch Meter Commercial, Industrial, Irrigation**
**and Public Authority**
0 to 10,000 Gallons
Over 10,000 Gallons

**1-Inch Meter**

| | |
|---|---|
| From 1 to 32,000 Gallons | 2.1400 |
| Over 32,000 Gallons | 2.4960 |

**1-1/2-Inch Meter**

| | |
|---|---|
| From 1 to 88,000 Gallons | 2.1400 |
| Over 88,000 Gallons | 2.4960 |

**2-Inch Meter**

| | |
|---|---|
| From 1 to 156,000 Gallons | 2.1400 |
| Over 156,000 Gallons | 2.4960 |

**3-Inch Meter**

| | |
|---|---|
| From 1 to 339,000 Gallons | 2.1400 |
| Over 339,000 Gallons | 2.4960 |

**4-Inch Meter**

| | |
|---|---|
| From 1 to 545,000 Gallons | 2.1400 |
| Over 545,000 Gallons | 2.4960 |

**6-Inch Meter**

| | |
|---|---|
| From 1 to 1,120,000 Gallons | 2.1400 |
| Over 1,1200,000 Gallons | 2.4960 |

**8-Inch Meter**

| | |
|---|---|
| From 1 to 1,800,000 Gallons | 2.1400 |
| Over 1,800,000 Gallons | 2.4960 |

**10-Inch Meter**

| | |
|---|---|
| From 1 to 2,600,000 Gallons | 2.1400 |
| Over 2,600,000 Gallons | 2.4960 |
| **Construction Water** | 2.4960 |
| **Central Arizona Water** | See Tariff |

DECISION NO.  **71854**

## WASTEWATER DIVISION

### MONTHLY USAGE CHARGE:

|  |  |
|---|---|
| 5/8" Meter | $ 29.8100 |
| 3/4" Meter | 32.7900 |
| 1" Meter | 41.7300 |
| 1-1/2" Meter | 53.6508 |
| 2" Meter | 86.4400 |
| 3" Meter | 327.8700 |
| 4" Meter | 625.9300 |
| 6" Meter | 864.3700 |
| 8" Meter | 1,092.6000 |
| 10" Meter | 1,748.3300 |

| Effluent: | per 1,000 gallons | $ 0.5280 |
|---|---|---|
|  | Per acre foot | 170.3200 |

### SERVICE CHARGES

|  | **Staff** |
|---|---|
| Establishment | $ 25.00 |
| Establishment (After Hours) | 40.00 |
| Deposit (Residential) | (a) |
| Deposit (None-Residential) | (a) |
| Deposit Interest (b) | (b) |
| Re-establishment (Within 12 Months) | (c) |
| Re-establishment (After Hours) | (c) |
| NSF Check | 15.00 |
| Deferred Payment, Per Month | 1.50% |
| After-hours Service, Per Rule R14-2-403D | Refer to Above Charges |
| Service Line Connection Charge | 350.00 |
| Late Charge, Per Month | 40.00 |
| Main Extension Tariff, per rule R14-2-606B except refunds shall be based upon 5% of gross revenues from bonafide customers, until all advances are fully refunded to the Developer. | Cost |

(a)   Residential: two times the average bill.
      Non-Residential: two and one-half times the maximum monthly bill.
(b)   Interest per Rule R14-2-403(B)
(c)   Minimum charge times number of months off the system, per rule R14-2-103(D).

IN ADDITION TO THE COLLECTION OF REGULAR RATES, THE UTILITY WILL COLLECT FROM ITS CUSTOMERS A PROPORTIONATE SHARE OF ANY PRIVILEGE, SALES, USE AND FRANCHISE TAX, PER RULE 14-2-409(D)(5

## EXHIBIT "B"

### Water Depreciation Rates

| NARUC Acct. No. | Depreciable Plant | Average Service Life (Years) | Annual Accrual Rate (%) |
|---|---|---|---|
| 304 | Structures & Improvements | 30 | 3.33 |
| 305 | Collecting & Impounding Reservoirs | 40 | 2.50 |
| 306 | Lake, River, Canal Intakes | 40 | 2.50 |
| 307 | Wells & Springs | 30 | 3.33 |
| 308 | Infiltration Galleries | 15 | 6.67 |
| 309 | Raw Water Supply Mains | 50 | 2.00 |
| 310 | Power Generation Equipment | 20 | 5.00 |
| 311 | Pumping Equipment | 8 | 12.5 |
| 320 | Water Treatment Equipment | | |
| 320.1 | Water Treatment Plants | 30 | 3.33 |
| 320.2 | Solution Chemical Feeders | 5 | 20.0 |
| 330 | Distribution Reservoirs & Standpipes | | |
| 330.1 | Storage Tanks | 45 | 2.22 |
| 330.2 | Pressure Tanks | 20 | 5.00 |
| 331 | Transmission & Distribution Mains | 50 | 2.00 |
| 333 | Services | 30 | 3.33 |
| 334 | Meters | 12 | 8.33 |
| 335 | Hydrants | 50 | 2.00 |
| 336 | Backflow Prevention Devices | 15 | 6.67 |
| 339 | Other Plant & Misc Equipment | 15 | 6.67 |
| 340 | Office Furniture & Equipment | 15 | 6.67 |
| 340.1 | Computers & Software | 5 | 20.00 |
| 341 | Transportation Equipment | 5 | 20.00 |
| 342 | Stores Equipment | 25 | 4.00 |
| 343 | Tools, Shop & Garage Equipment | 20 | 5.00 |
| 344 | Laboratory Equipment | 10 | 10.00 |
| 345 | Power Operated Equipment | 20 | 5.00 |
| 346 | Communication Equipment | 10 | 10.00 |
| 347 | Miscellaneous Equipment | 10 | 10.00 |
| 348 | Other Tangible Plant | 10 | --- |

DOCKET NO. WS-02987A-08-0180

## EXHIBIT "B"

Wastewater Depreciation Rates

| NARUC Acct. No. | Depreciable Plant | Average Service Life (Years) | Annual Accrual Rate (%) |
|---|---|---|---|
| 354 | Structures & Improvements | 30 | 3.33 |
| 355 | Power Generation Equipment | 20 | 5.00 |
| 360 | Collection Sewers – Force | 50 | 2.0 |
| 361 | Collection Sewers- Gravity | 50 | 2.0 |
| 362 | Special Collecting Structures | 50 | 2.0 |
| 363 | Services to Customers | 50 | 2.0 |
| 364 | Flow Measuring Devices | 10 | 10.00 |
| 365 | Flow Measuring Installations | 10 | 10.00 |
| 366 | Reuse Services | 50 | 2.00 |
| 367 | Reuse Meters & Meter Installations | 12 | 8.33 |
| 370 | Receiving Wells | 30 | 3.33 |
| 371 | Pumping Equipment | 8 | 12.50 |
| 374 | Reuse Distribution Reservoirs | 40 | 2.50 |
| 375 | Reuse Transmission & Distribution System | 40 | 2.50 |
| 380 | Treatment & Disposal Equipment | 20 | 5.0 |
| 381 | Plant Sewers | 20 | 5.0 |
| 382 | Outfall Sewer Lines | 30 | 3.33 |
| 389 | Other Plant & Miscellaneous Equipment | 15 | 6.67 |
| 390 | Office Furniture & Equipment | 15 | 6.67 |
| 390.1 | Computers & Software | 5 | 20.0 |
| 391 | Transportation Equipment | 5 | 20.0 |
| 392 | Stores Equipment | 25 | 4.0 |
| 393 | Tools, Shop & Garage Equipment | 20 | 5.0 |
| 394 | Laboratory Equipment | 10 | 10.0 |
| 395 | Power Operated Equipment | 20 | 5.0 |
| 396 | Communication Equipment | 10 | 10.0 |
| 397 | Miscellaneous Equipment | 10 | 10.0 |
| 398 | Other Tangible Plant | ---- | ---- |

DECISION NO. __71854__

# EXHIBIT 2

**EXHIBIT 2**

0000129725

1    BEFORE THE ARIZONA CORPORATION C̲_̲_̲_̲_̲_̲_̲_̲_̲_̲_̲_̲

2    **COMMISSIONERS**

Arizona Corporation Commission

3    GARY PIERCE, CHAIRMAN              **DOCKETED**
     BOB STUMP
4    PAUL NEWMAN                         SEP 1 5 2011
     SANDRA D. KENNEDY
5    BRENDA BURNS
                                   ┌─────────────────────────┐
6                                  │ DOCKETED BY             │
                                   │              in̲e̲      │
                                   └─────────────────────────┘

7    IN THE MATTER OF THE APPLICATION OF        DOCKET NO.  WS-02987A-08-0180
     JOHNSON UTILITIES, LLC, DBA JOHNSON
8    UTILITIES COMPANY FOR AN INCREASE IN       **DECISION NO.  72579**
     ITS WATER AND WASTEWATER RATES FOR
9    CUSTOMERS WITHIN PINAL COUNTY,
     ARIZONA.
10                                               **ORDER AMENDING**
                                                 **DECISION NO. 71854**
11

12
     **Open Meeting**
13   **September 6, 2011**
     **Phoenix, Arizona**
14

15   **BY THE COMMISSION:**

16                          **FINDINGS OF FACT**

17       1.      Johnson Utilities LLC ("Johnson Utilities" or "Company") is engaged in providing

18   water and waste water service within Pinal County, Arizona.

19       2.      Johnson Utilities current rates were approved in Decision No. 71854 entered August

20   25, 2010.

21       3.      On February 28, 2011, Johnson Utilities filed with the Arizona Corporation

22   Commission ("Commission") a Petition to Amend Decision No. 71854 pursuant to A.R.S § 40-252.

23       4.      Johnson Utilities' Petition to Amend requested that the Commission modify Decision

24   No. 71854 in the following manner:

25               a.      Change the $40 per month late fee in the Company's wastewater division tariff

26                       to a late fee of 1.5% per month on the unpaid account balance, consistent with

27                       the Company's water division tariff.

28               b.      Add back into rate base wastewater division plant of $18,244,755 which was

                                          1                    Decision No. _____

Docket No. WS-2987A-08-0180

1                  disallowed in the rate case. This sum includes the addition back into rate base

2                  the $10,892,391 disallowance for inadequately supported plant cost and the

3                  $7,352,364 disallowance related to affiliate profit.

4           c.     Remove from the water division rate base $6,931,078 in unexpended test year

5                  hook-up fees.

6           d.     Reinstate the Company's previously authorized hook-up fees for new water and

7                  wastewater divisions' connections.

8           e.     Establish a rate of return for the Company based upon its weighted average

9                  cost of capital in the range of 8.18% to 11.89%.

10          f.     Reclassify $2,201,386 of wastewater plant identified as post test year plant to

11                 test year plant-in-service.

12          g.     Include in plant-in-service post test-year wastewater plant at $1,021,108,

13                 which the Company alleges is necessary to serve the test year-end level of

14                 customers.

15          h.     Include explicit language for Johnson Utilities to request income tax expense

16                 prospectively in a future A.R.S. § 40-252 Petition if the Commission changes

17                 its policy on imputed income tax expense.

18      5.     At its July 12, 2011 Open Meeting, the Commission voted to reopen Decision No.

19 71854, and directed the Company to notice its customers concerning: (a) the rate impacts of granting

20 the relief requested, (b) a public comment session in Pinal County, and (c) the August 11, 2011 Open

21 Meeting at which the Commission would consider the Company's request for relief.

22     6.     Johnson Utilities noticed its customers as directed by the Commission and filed proof

23 of notice in the docket.

24     7.     On July 26, 2011, Johnson Utilities filed an Amendment to Petition to Amend

25 Decision No. 71854. The amendment modified its Petition to Amend to request a rate of return based

26 upon a weighted average cost of capital of 8.0%.

27     8.     On August 4, 2011, Chairman Pierce mailed and docketed a letter to the parties

28 requesting proposed amendments to aid in the Commission's consideration of the Petition.

Docket No. WS-2987A-08-0180

1    9.    On August 9, 2011, Johnson Utilities filed a proposed amendment modifying Decision

2    No. 71854 concerning the relief requested.  The amendment was adopted by Chairman Pierce for

3    purposes of discussion and consideration at the August 11, 2011 Open Meeting.

4    10.    At the August 11, 2011 Open Meeting, the Commission discussed and considered the

5    proposed amendment to Decision No. 71854 in accordance with A.R.S. § 40-252, and provided all

6    parties an opportunity to be heard concerning the requested relief.

7    11.    The Commission determined that certain of the Company's requested modifications

8    to Decision No. 71854 did not warrant further Commission consideration, but voted to direct the

9    Utilities Division ("Staff") to prepare and docket an order incorporating the following requested

10   modifications to be considered at September, 2011 Open Meeting:

11   a.    The change of the wastewater late fee from $40 per month to 1.5% per month.

12   b.    The addition back of $ 18,244,755 in disallowed wastewater plant, which

13   includes the $10,892,391 disallowance for inadequately supported plant and

14   the $7,352,364 disallowance related to affiliate profit.

15   c.    The reinstatement of hook-up fee tariffs for water and wastewater divisions.

16   d.    The determination of a rate of return of 8.0% for the wastewater division.

17   e.    The inclusion of language permitting the Company to request income tax

18   expense prospectively in a future A.R.S. § 40-252 Petition if the Commission

19   changes its policy relating to imputed income tax expense.

20   12.    The Commission also determined that if the relief requested was granted, that new

21   rates should go into effect October 1, 2011, and that the Company could not a file a rate case with a

22   test year ending earlier than December 31, 2012.

23   13.    The Commission directed Staff and the Company to meet, discuss and analyze the rate

24   impacts concerning the remaining requested modifications to Decision No. 71854, and thereafter for

25   Staff to docket a report concerning the resulting revenue and rate design analysis.

26   14.    On August 26, 2011, Staff docketed its report as directed by the Commission.

27   15.    Upon due consideration of these matters pursuant to A.R.S. § 40-252, and in balancing

28   the implicated public interest concerning the certainty of Commission orders with the opportunity to

3                                  Decision No.  **72579**

1  take appropriate regulatory ratemaking measures presented by the circumstances herein, we find and
2  conclude that it is in the public interest to modify Decision No. 71854 as determined in this decision.

3     16.     The Company's hook up fee tariffs for its water and wastewater in effect prior to
4  Decision No. 71854 are reinstated, with the condition that new tariffs be filed with wording in
5  conformance with the hook-up fee templates on the Commission's website.

6     17.     The Company is permitted to request income tax expense prospectively in a future
7  A.R.S. § 40-252 Petition if the Commission changes its policy relating to imputed income tax
8  expense.

9     18.     The Company's wastewater division current tariff for a $40 late payment fee is
10  modified to a late fee of 1.5% on the unpaid account balance, consistent with the similar tariff for the
11  Company's water division.

12     19.     The Company's wastewater rate base shall be increased to allow the additional
13  inclusion of plant in the amount of $18,244,755. As a result, the Company's adjusted fair value rate
14  base ("FVRB") for its wastewater division is modified, and is determined to be $17,270,554, an
15  increase of $17,133,992 over $136,562 authorized in Decision No. 71854.

16     20.     The rate of return on the Company's wastewater division adjusted FVRB shall be 8.0
17  percent.   This rate of return applied to the Company's adjusted wastewater division FVRB results in
18  an increase to the Company's Required Operating Income in the amount of $1,091,034 over the
19  $290,610 authorized in Decision No. 71854. The new Required Operating Income is determined to
20  be $1,381,644.

21     21.     Because we make these modifications in this decision, the new revenue requirement is
22  determined to be 11,591,861, which is an increase of $1,904,866 over the $9,686,995 authorized in
23  Decision No. 71854.

24     22.     In Staff's August 26, 2011 filing, Staff sets out an analysis with a revised rate design
25  with new rates intended to provide the Company the opportunity to earn the return authorized herein.
26  We approve the new rates as set out by Staff and attached to this decision as Exhibit A, and shall
27  require the Company to file new tariffs reflecting these approved rates.

28     23.     Under the new rates approved by this decision, a residential wastewater customer on a

4          Decision No.   **72579**

1 ¾ inch meter would experience an increase of $6.56 or approximately 20% over the rates approved in

2 Decision No. 71854, from $32.79 to $39.35 per month.

3      24.     We find and conclude that the modifications made herein to Decision No. 71854 result

4 in just and reasonable rates for the Company and its ratepayers.

5      25.     We further find and conclude that the modifications made herein to Decision No.

6 71854 shall be effective prospectively, and all other provisions, terms and rates in Decision No.

7 71854 remain in full force and effect except where inconsistent with this Decision on rehearing.

8      26.     We further find and conclude that because we make these modifications to Decision

9 No. 71854, the public interest requires a stay out provision that prohibits the Company from filing a

10 future rate increase application that uses a test year ending earlier than December 31, 2012.

11      27.     We further find and conclude that it is in the public interest that new rates and tariffs

12 resulting from this Decision shall be effective for all service rendered on and after October 1, 2011.

13 **CONCLUSIONS OF LAW**

14      1.     Johnson Utilities is a public service corporation within the meaning of Article XV of

15 the Arizona Constitution and A.R.S. §§ 40-250, 40-251, 40-367, 40-202, 40-321, and 40-361.

16      2.     The Commission has jurisdiction over Johnson Utilities and the subject matter set

17 forth in the Company's rate application  and in the Company's Petition to Amend Decision No.

18 71854 pursuant to  A.R.S. § 40-252.

19      3.     Pursuant to A.R.S. § 40-252, the Commission, having reviewed the Petition and the

20 Staff's Memorandum dated August 26, 2011, concludes that it is in the public interest to approve the

21 modification to Decision No. 71854 as discussed herein.

22 **ORDER**

23      IT IS THEREFORE ORDERED that Decision No. 71854 is modified by the Commission in

24 the manner determined by this Decision.

25      IT IS FURTHER ORDERED that Johnson Utilities shall not file for an increase in rates using

26 a test year ending earlier than December 31, 2012.

27      IT IS FURTHER ORDERED that all other matters set forth in Decision No. 71854 continue

28 to be in full force and effect except where inconsistent with the Decision.

5

Decision No.   **72579**

1    IT IS FURTHER ORDERED that Johnson Utilities shall file a tariff in conformance with this

2  Decision for rates as shown in Exhibit A to go into effect for all service rendered on and after

3  October 1, 2011, and notice its customers of the new rates on or before September 23, 2011.

4    IT IS FURTHER ORDERED that in the event the Commission alters its policy to allow S-

5  corporation and LLC entities to impute a hypothetical income tax expense for ratemaking purposes,

6  Johnson Utilities may file a motion to amend this Order prospectively, and Johnson Utilities'

7  authorized revenue requirement hereunder, pursuant to A.R.S. § 40-252, to reflect the change in

8  Commission policy.

9    IT IS FURTHER ORDERED that Johnson Utilities shall file new hook-up fee tariffs for both

10  water and sewer with wording conforming to the wording on the Commission's hook-up fee

11  templates on its website and the charges shall be the same as those on Johnson Utilities' former hook-

12  up fee tariffs.

13    IT IS FURTHER ORDERED that this Decision shall be effective immediately.

14  . . .

15  . . .

16  . . .

17  . . .

18  . . .

19  . . .

20  . . .

21  . . .

22  . . .

23  . . .

24  . . .

25  . . .

26  . . .

27  . . .

28  . . .

6

Decision No. **72579**

1

**BY ORDER OF THE ARIZONA CORPORATION COMMISSION**

2

3

4  CHAIRMAN                                    COMMISSIONER

5
                                                        Commissioner Burns
6                                                         Abstained

7  COMMISSIONER            COMMISSIONER            COMMISSIONER

8
                    IN WITNESS WHEREOF, I, ERNEST G. JOHNSON,
9           Executive Director of the Arizona Corporation Commission,
            have hereunto, set my hand and caused the official seal of this
10          Commission to be affixed at the Capital, in the City of Phoenix,
            this _15th_ day of _September_ 2011.
11

12

13

14          ERNEST G. JOHNSON
            Executive Director
15

16

17

18
    DISSENT:
19

20
    DISSENT: _____
21

22

23

24

25

26

27

28

                            7                    Decision No. __72579__

Johnson Utilities L.L.C. - Wastewater Division
Docket No. WS-02987A-08-0180
Test Year Ended December 31, 2007

EXHIBIT A
Page 1 of 2

## EXHIBIT A
## WASTEWATER DIVISION

| Monthly Minimum Charge | PER DECISION NO. 71854 | NEW RATES PER ARS 40-262 |
|---|---|---|
| Meter Sizes (All Zones and Classes) | | |
| 5/8 Inch | $ 29.8100 | $ 35.7700 |
| 3/4 Inch | $ 32.7900 | $ 39.3500 |
| 1 Inch | $ 41.7300 | $ 50.0800 |
| 1 1/2 Inch | $ 53.6508 | $ 64.3900 |
| 2 Inch | $ 86.4400 | $ 103.7300 |
| 3 Inch | $ 327.8700 | $ 393.4700 |
| 4 Inch | $ 625.9300 | $ 751.1700 |
| 6 Inch | $ 864.3700 | $ 1,037.3300 |
| 8 Inch | $ 1,092.6000 | $ 1,430.8000 |
| 10 inch | $ 1,748.3300 | $ 2,056.7800 |
| | | |
| Effluent       per 1,000 gallons | $ 0.5280 | $ 0.6300 |
|                     per acre foot | $ 170.3200 | $ 205.2900 |
| Service Charges | | |
| | | |
| Establishment | $ 25.00 | $ 25.00 |
| Establishment (After hours) | $ 40.00 | $ 40.00 |
| Deposit Requirement (Residential) | (a) | (a) |
| Deposit Requirement (Non Residential Meter) | (a) | (a) |
| Deposit Interest | (b) | (b) |
| Re-Establishment (With-in 12 months) | (c) | (c) |
| Re-Establishment (After Hours) | (c) | (c) |
| NSF Check | 15.00 | 15.00 |
| Deffered Payment, Per Month | 1.50% | 1.50% |
| After Hours service charge, per Rule R14-2-603D | Refer to Above Charges | Refer to Above Charges |
| | | |
| Late Charge per month | 40.00 | 1.50% |
| Service Line Connection Charge | 350.00 | 350.00 |
| Main Extension Tariff, per Rule R14-2-606B | | |
| except refunds shall be based upon five percent (5%) of | | |
| gross revenues from bonafide customers, | Cost | Cost |
| until all advances are fully refunded to Developer. | N/A | (d) |
| Off-site Facilities Hook-up Fee | | |

(a) <u>Residential</u> - two times the estimated average monthly bill. <u>Non-residential</u> - two and one-half times the estimated
    maximum monthly bill.
(b) Interest per Rule R14-2-603(B).
(c) Minimum charge times number of full months off the system. per Rule R14-2-603(B).
(d) New wastewater installations. May be assessed only once per parcel, service connection, or lot within a sub-
    division.

Decision No. **72579**

Johnson Utilities - Wastewater Division
Docket No. W-02987A-08-0180
Test Year Ended December 31, 2007

EXHIBIT A
Page 2 of 2

**COMPARISON OF RATE BASE AND REVENUE REQUIREMENT PER DECISION NO 71854 AND ARS 40-252**

| | [A] DECISION NO. 71854 | [B] ARS 40-252 | [C] CHANGE |
|---|---|---|---|
| Gross Plant-in-Service | $ 95,566,588 | $ 113,811,344 | $ 18,244,756 |
| Accumulated Depreciation | (6,375,814) | (7,486,577) | (1,110,763) |
| Net Plant in Service | $ 89,190,774 | $ 106,324,766 | $ 17,133,992 |
| | | | |
| Advances in Aid of Construction | (52,231,631) | (52,231,631) | - |
| Net Contribution in Aid of Construction | (36,822,582) | (36,822,582) | - |
| Rate Base | $ 136,562 | $ 17,270,554 | $ 17,133,992 |
| | Operating Margin | Rate of Return | |
| Required Operating Margin/Rate of Return | 3.00% | 8.00% | |
| | | | |
| Required Operating Income | $ 290,610 | $ 1,381,644 | $ 1,091,034 |
| | | | |
| Operating Income Deficiency | $ (1,631,136) | $ 232,727 | $ 1,863,863 |
| | | | |
| Tax Gross-up Factor | 1.0220 | 1.0220 | |
| | | | |
| **Gross Revenue Increase (Decrease)** | $ (1,667,020) | $ 237,847 | $ 1,904,867 |
| | | | |
| Adjusted Test Year Revenue | $ 11,354,014 | $ 11,354,014 | $ - |
| | | | |
| **Revenue Requirement** | $ 9,686,995 | $ 11,591,861 | $ 1,904,866 |
| | | | |
| Percentage Increase in Revenue Requirement(Decrease) | -14.68% | 2.09% | 19.66% |
| | | | |
| Impact on 3/4 Inch Residential Bill | | | |
| **Average 3/4 Inch Residential Bill** | $ 32.79 | $ 39.35 | $ 6.56 |

Decision No. **72579**



**COMMISSIONERS**
GARY PIERCE - Chairman
BOB STUMP
SANDRA D. KENNEDY
PAUL NEWMAN
BRENDA BURNS

**ARIZONA CORPORATION COMMISSION**

SANDRA D. KENNEDY
COMMISSIONER

Direct Line:  (602) 542-3625
Fax:  (602) 542-3669
E-mail:  skennedy@azcc.gov

September 14, 2011

Arizona Corporation Commission
Docket Control
WS02987A-08-0180

Re:     **Johnson Utilities; Dissent Letter**
         **WS-02987A-08-0180**

To all Interested Parties;

I am submitting my dissent letter explaining my No vote of September 6, 2011 on the rehearing of Johnson Utilities Company's (Company) application for an increase in its Water and Wastewater Rates for Customers within Pinal County, AZ.

The case and record before the Commission posed many concerns on how the company was operating and keeping vital business records.  Due to those issues and concerns, in my opinion, the original order issued on August 2010 (Decision No. 71854) was the correct one.

While having said that, when the company petitioned the Commission for a rehearing, I voted to give the company another opportunity to present new evidence that was not part of the previous record.  However, that did not occur.

With no additional evidence or an amended recommended opinion and order presented to the Commissioners, there was nothing new to persuade me that we erred in Decision No.71854. Given the lack of new evidence or information, I do not believe the record supports the vote to amend Decision No. 71854 and the resulting increases in rates for Johnson Utilities' customers.

I am concerned that the manner in which the Commission reversed several key ratemaking components will lead to a precedent that may be used or referenced by other companies when they do not support their rate cases with proper documentation.  As I mentioned earlier, the record was very clear on the fact the company was not maintaining appropriate day-to-day record keeping, and raised with concerns that transactions with affiliates and related parties may lack needed transparency and were not conducted at arms length.  For me, the Commission's Decision based on the record presented did not support a finding that amending Decision No. 71854 is in the public interest.

Decision No. **72579**

**Page 2**
**Johnson Utilities WS02987A-08-0180**

I know this rate case has been a learning process for Johnson Utilities. The company seems committed from this point on to conduct their business in a professional manner. I believe this is evident by the Company's statements that they have made reorganizational changes. However, that was not the record before us and I could not vote for a decision that will increase the wastewater rates that lack the proper documentation.

Our job as Commissioners is to find just and reasonable rates that are in the public interest, to allow investors the opportunity to get a reasonable return on their investments. However, the utility that holds a monopoly has a responsibility to show that it indeed made those investments. Without adequate documentation, it is unfair to make the ratepayers bear that burden.

It is because of these facts I voted against increasing the rates.

Sincerely,

Corporation Commissioner
Sandra D. Kennedy

Decision No. **72579**

# EXHIBIT 3

**EXHIBIT 3**



0000146924

1  **BEFORE THE ARIZONA CORPORATION COMMISSION**

2  BOB STUMP
   Chairman

3  GARY PIERCE
   Commissioner

4  BRENDA BURNS
   Commissioner

5  BOB BURNS
   Commissioner

6  SUSAN BITTER SMITH
   Commissioner

7

Arizona Corporation Commission
DOCKETED

JUL 1 6 2013

DOCKETED BY   n e

8  STAFF REPORT FOR THE PETITION TO      )   DOCKET NO. WS-02987A-08-0180
9  AMEND DECISION NOS. 71854 AND         )
   72579 PURSUANT TO ARS § 40-252        )   DECISION NO. **73992**
10 REGARDING THE MATTER OF THE           )
   APPLICATION OF JOHNSON UTILITIES,     )   ORDER
11 LLC, DBA JOHNSON UTILITIES            )
   COMPANY, FOR AN INCREASE IN ITS       )
12 WATER AND WASTEWATER RATES FOR)
   CUSTOMERS WITHIN PINAL COUNTY,        )
13 ARIZONA                               )

14

15 Open Meeting
   June 27, 2013
16 Phoenix, Arizona

17 BY THE COMMISSION:

18                          FINDINGS OF FACT

19       1.      Johnson Utilities, LLC, dba Johnson Utilities Company ("Johnson" or "Company")

20 is a Class A water and wastewater public service corporation. The Company is headquartered in

21 Scottsdale, Arizona, but its service area encompasses various areas of Pinal County, Arizona. In

22 the test year, ending December 31, 2007, the Company served an average of 17,541 water

23 customers and 21,596 wastewater customers.

24       2.      The Company has filed a petition as described below arising from the Arizona

25 Corporation Commission's ("Commission") recent policy change regarding income taxes.

26 **Background**

27       3.      On September 15, 2011, the Commission issued Decision No. 72579, which

28 established the current rates for Johnson. This Decision amended the rates that had been set for

1    Johnson in Decision No. 71854, issued August 25, 2010.  Decision No. 72579 also provided that

2    Johnson could seek an allowance for income taxes generated as a result of its operations if the

3    Commission changed its policy regarding the treatment of income taxes for subchapter S

4    corporations.

5         4.    On February 21, 2013, in Decision No. 73739, the Commission adopted a policy

6    allowing every utility entity, other than subchapter C corporations and tax-exempt entities, to seek

7    to include in its cost of service an income tax allowance based on the lower of comparable

8    subchapter C corporate income tax expense, or the combined personal income tax obligation

9    created by the distribution of the utility's profits.

10        5.    On March 8, 2013, the Company filed a petition to amend Decision No. 71854

11   pursuant to Arizona Revised Statutes ("A.R.S.") § 40-252.  The Company has included full

12   schedules that appropriately fulfill the new income tax policy requirements and the resulting

13   recognition of an income tax allowance.  Staff has confirmed that the amount that the Company is

14   seeking to collect for income taxes is less than it would be if the Company had elected to be taxed

15   as a stand-alone C corporation.  The increase to the revenue requirement for water customers is

16   $125,071, or an   increase of 0.95 percent, and the increase to the revenue requirement for

17   wastewater customers is $747,274, or an increase of 6.58 percent.  Staff concurs with these

18   amounts because they comply with the Commission's new policy and will therefore result in just

19   and reasonable rates.

20        6.    In its filing, the Company is not proposing any changes to its fair value rate base,

21   which is negative $2,414,613 for its water division and $17,270,553 for its wastewater division.

22   Adopting the increases proposed by the Company would increase the Company's revenue

23   requirements to $9,899,013 and $12,339,134 for its water and wastewater divisions, respectively.

24        7.    For the water division, there is no impact to the fair value rate of return ("FVROR")

25   because the fair value rate base is negative, i.e., the revenue requirement is based on an operating

26   margin.  The impact to rates is *de minimis* because the amount of the increase is so small.

27   . . .

28   . . .

Decision No.   **73992**

Docket No. WS-02987A-08-0180

1        8.    For the wastewater division, the FVROR remains at 8.0 percent, or may become

2  12.33 percent, depending on the ratemaking classification for the income tax issue, as discussed

3  in Finding of Fact Nos. 14 – 16 below.

4        9.    The Company's current rates, based on a 2007 test year, were approved in Decision

5  No. 71854, as amended by Decision No. 72579.  In that case, the Company requested recognition

6  of income tax expense in its application, but it was disallowed as the Commission's policy at that

7  time did not recognize income tax for pass-through entities that had no income tax liability.

8  However, also at that time, the Commission was in the process of evaluating changes to this

9  policy, which ultimately resulted in Decision No. 73739.

10       10.   In its petition, the Company stated that, if its application is approved, the Company

11  would not need new rates to be effective prior to July 1, 2019.

12       11.   Staff notes that the new Commission income tax policy has no stay-out

13  requirements.   Further, Decision No. 71854 (amended by Decision No. 72579) was the

14  Company's first rate case since the granting of its Certificate of Convenience and Necessity by

15  Decision No. 60223 (May 27, 1997).

16       12.   Because of the length of time between rate cases that would occur if the Company

17  did not file a new rate application for several years, Staff recommends that the Company be

18  ordered to file a full rate case application for its water and wastewater divisions by no later than

19  June 30, 2015, using a 2014 calendar year test year.

20  **Notice**

21       13.   Staff asked the Company to provide the notice attached as Attachment 1 to the Staff

22  Memorandum in a special direct mailing to all of its customers by May 8, 2013.   Staff also asked

23  the Company to provide the attached notice to all parties to this case by May 8, 2013.

24  **Terminology**

25       14.   The Commission's new policy on the income tax issue for pass-through entities

26  refers in the body of the policy to an "imputed income tax expense"; however, in items 5, 6, and 7

27  listed on page 3 of the policy statement, it refers to an "income tax allowance."   Although this

28  . . .

Decision No.  **73992**

1   terminology may appear insignificant, the classification of this adjustment impacts the

2   calculation of the FVROR.

3       15.   If the income taxes were classified as an imputed expense, the FVROR for this case

4   would not be impacted (will remain 8.0 percent) for the Johnson wastewater division.   If the

5   income taxes were classified as an allowance, the resulting FVROR could be 12.33 percent.

6   Within the context of this case, however, the actual rate impact to customers is the same under

7   either classification.

8       16.   Staff believes that, for the purposes of accounting, auditing, bookkeeping, and other

9   associated activities, the Commission was correct on page 3 of its policy statement in classifying

10   the income taxes for pass-through entities as an "allowance."  This classification is also consistent

11   with that used in Texas (referred to on page 2 of the Commission's policy statement) and with

12   that used by the Federal Energy Regulatory Commission.  However, for ratemaking purposes, the

13   Commission will classify this adjustment as an imputed expense, which is the intent of the

14   Commission's policy.

15   **Rate Design**

16       17.   The Company has proposed a rate design that includes both an increase to the

17   monthly minimum charge and an increase to the commodity charge for its water division, and an

18   increase to its monthly minimum charge for its wastewater division as there is no commodity

19   charge (except for the purchase of effluent) for wastewater service.

20       18.   Staff concurs with the Company on its proposed rate design.  For informational

21   purposes, the typical bill impact analysis for a ¾-inch meter residential customer using the

22   average of 6,931 gallons per month is as follows:

23           Water        current bill is $29.81
                          proposed bill would be $30.28

24                             increase would be $0.47 or 1.58%.

25

26           Wastewater:    current bill is $39.35
                          proposed bill would be $42.00

27                             increase would be $2.65 or 6.73%.

28

Page 5                                                    Docket No. WS-02987A-08-0180

**Staff Recommendations**

19.    Staff recommends approval of the rate increases requested by the Company in the amounts of $125,071 for its water division and $747,274 for its wastewater division.

20.    Staff further recommends approval of the associated rate design proposed by the Company in its application.

21.    Staff further recommends that the Company be ordered to file a full rate case application for both its water and wastewater divisions by no later than June 30, 2015, using a 2014 calendar year test year.

CONCLUSIONS OF LAW

1.    Johnson Utilities, LLC, dba Johnson Utilities Company, is a public service corporation within the meaning of Article XV of the Arizona Constitution and A.R.S. §§40-250 and -252.

2.    The Commission has jurisdiction over the Company and over the subject matter of the application.

3.    Notice of the proceeding and an opportunity to be heard have been afforded in the manner prescribed by law.

4.    For the purposes of evaluating this application, the information set forth in Finding of Fact Nos. 6 – 8 serve as appropriate fair value information for the Commission's consideration.

5.    The Commission may determine appropriate ratemaking classifications pursuant to Article XV, Section 3 of the Arizona Constitution, and the rates proposed herein are just and reasonable.

6.    Decision Nos. 71854 and 72579 are hereby modified to provide for recovery of income taxes through rates.

7.    Staff's recommendations are reasonable and hereby approved.

ORDER

IT IS THEREFORE ORDERED that Decision Nos. 71854 and 72579 are hereby modified to permit Johnson Utilities, LLC, DBA Johnson Utilities Company, to recover income taxes as requested in its March 8, 2013 petition.

Decision No. __**73992**__

Page 6                                                        Docket No. WS-02987A-08-0180

1      IT IS FURTHER ORDERED that the recommendations of Staff discussed in Findings of

2   Fact 19 through 21 are reasonable and are hereby adopted.

3      IT IS FURTHER ORDERED that this decision shall become effective immediately.

4

5                  **BY THE ORDER OF THE ARIZONA CORPORATION COMMISSION**

6

7   _____                    _____
            CHAIRMAN                                        COMMISSIONER

8

9

10  _____    _____    _____
    COMMISSIONER                         COMMISSIONER                         COMMISSIONER

11

12                                          IN WITNESS WHEREOF, I, JODI JERICH, Executive
                                            Director of the Arizona Corporation Commission, have
13                                          hereunto, set my hand and caused the official seal of this
                                            Commission to be affixed at the Capitol, in the City of
14                                          Phoenix, this 16th day of _____July_____, 2013.

15

16

17  _____
    JODI JERICH
    EXECUTIVE DIRECTOR
18

19  DISSENT: _____

20

21  DISSENT: _____

22  SMO:DWC:lhm\JFW

23

24

25

26

27

28

                                                        Decision No. __**73992**__

Page 7                                    Docket No. WS-02987A-08-0180

1  Service List for: Johnson Utilities, LLC, dba Johnson Utilities Company
   Docket No. WS-02987A-08-0180
2

3  Mr. Jeffrey W. Crockett, Esq.
   Brownstein Hyatt Farber Schreck, LLP
4  One East Washington Street, Suite 2400
   Phoenix, Arizona 85004
5
   Mr. George H. Johnson
6  Johnson Utilities, LLC
   5320 East Shea Boulevard
7  Scottsdale, Arizona 85254
8
   Mr. Craig A. Marks
9  Craig A. Marks, PLC
   10645 North Tatum Boulevard, Suite 200-676
10 Phoenix, Arizona 85028
11
   Mr. James E. Mannato, Town Attorney
12 Town of Florence
   P.O. Box 2670
13 775 North Main Street
   Florence, Arizona 85232-2670
14
15 Mr. Daniel Pozefsky, Esq.
   RUCO
16 1110 West Washington Street, Suite 220
   Phoenix, Arizona 85007
17
   Mr. Steven M. Olea
18 Director, Utilities Division
19 Arizona Corporation Commission
   1200 West Washington Street
20 Phoenix, Arizona 85007

21 Ms. Janice M. Alward
   Chief Counsel, Legal Division
22 Arizona Corporation Commission
23 1200 West Washington Street
   Phoenix, Arizona 85007
24
25
26
27
28

Decision No. **73992**

# EXHIBIT 4

**EXHIBIT 4**

ORIGINAL   FORMAL COMPLAINT



0000180125

RECEIVED

BEFORE THE ARIZONA CORPORATION COMMISSION

COMMISSIONERS

TOM FORESE, Chairman
BOYD DUNN
DOUG LITTLE
ANDY TOBIN
BOB BURNS

FORMAL COMPLAINT OF DELTON
MUNDAY AND THOSE SIMILARLY
SITUATED AGAINST THE ARIZONA
CORPORATION COMMISSION, JOHNSON
UTILITIES LLC AND NON PUBLIC
SERVICE COMPANIES R&R PARTNERS
INC., JOHNSON INTERNATIONAL INC.

NO.  WS-02987A-17-0192

Arizona Corporation Commission

**FORMAL COMPLAINT**   DOCKETED

JUN 1 9 2017

DOCKETED BY

Pursuant to the provisions of A.R.S. §§ 40-246 and 40-248 and A.A.C. R14-3-106(L),

Delton Munday and those similarly situated who have signed below ("Munday Group") hereby

files its formal Complaint against Johnson Utilities LLC, the Arizona Corporation Commission

("ACC") and non public service companies R&R Partners Inc. and Johnson International Inc.

and request that the ACC issue an order for the relief requested at the end of this complaint.

**PARTIES**

1. Delton Munday and those signed below are users and consumers of water and

wastewater products provided by Johnson.  They bring this Complaint on behalf of themselves

and all those similarly situated and seek class designation pursuant to AAC 14-3-104© and

Rule 23, ARCP.

2. Defendant R&R Partners Inc. is an Arizona corporation with its headquarters in

Maricopa County, Arizona and constituted under the laws of the State of Arizona.  It is not a

public service company regulated by the ACC and at all times material, employed James

Norton.

3. Defendant Johnson Utilities L.L.C. is an Arizona limited liability corporation with its

headquarters in Maricopa County, Arizona and constituted under the laws of the State of

Page 1 of  8

1   Arizona.  At all times material hereto, it was a public service company regulated by the ACC

2   and employed George Johnson, who was also an owner.

3       4. Defendant Johnson International Inc. is an Arizona corporation with its headquarters

4   in Maricopa County, Arizona and constituted under the laws of the State of Arizona.  At all

5   times material hereto, it employed George Johnson, who was also an owner and it is also not a

6   public service company regulated by the ACC.

7       5. The Arizona Corporation Commission is a governmental body created by the

8   Arizona Constitution, Article 15.

9   **JURISDICTION AND VENUE**

10       6. Jurisdiction and venue are proper in this forum under A.R.S. § 40-246 et. seq.

11   **GENERAL ALLEGATIONS**

12       **BACKGROUND**

13          **A.**    **The Rate Case**

14       7. Garry Pierce ("Pierce") was a member of the ACC from 2007 to 2015.  The

15   Commission regulates utilities in Arizona, including water utilities and consists of five elected

16   members.

17       8. One of the water utilities regulated by the Commission is Johnson Utilities, which

18   was owned and controlled by George Johnson.

19       9. Prior to August, 2010, Johnson Utilities requested a fair value rate base increase for

20   its wastewater division in the amount of $17,479,735. See ACC Decision #71854 at p. 4.

21   Johnson also requested recovery of George Johnson's personal income taxes in the amount of

22   $1,185,679. Id. at p. 45.

23       10. The ACC staff and Arizona's Residential Utility Consumer Office both opposed the

24   requested increases and other requested increases, citing numerous concerns with a lack of

25   documentation, facilities not actually being in use and Johnson Utilities doing extensive

26   business with other entities owned by George Johnson.  Pierce and all other Commissioners

27   rejected these requested increases on August 24, 2010. Id. at pp. 72-74.

28       11. The standard for a grand jury indictment is "probable cause."  Probable cause is

defined as "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt."  US v. Infante, 782 F.Supp.2d 815, 817-18 (D. Ariz. 2010).  According to an indictment issued May 23, 2017, a grand jury reasonably concluded that between August 25, 2010 and September, 2011, Pierce, R&R Partners Inc. ("R&R") and Johnson Utilities conspired together for Johnson Utilities to bribe Pierce, through its agent Johnson International, in exchange for his vote to allow Johnson Utilities to raise their residential rates for both water and wastewater.  According to the indictment, R&R arranged for and facilitated the bribe and Johnson International, which shares common ownership with Johnson Utilities, paid the bribe as an agent of Johnson Utilities.

12. On February 28, 2011, Johnson Utilities petitioned to amend ACC Decision 71854. See ACC Decision #72579 at p. 1.  On July 12, 2011, Pierce and a majority of the ACC voted to reopen ACC Decision #71854. Id. at p. 2.

13. On August 9, 2011, Johnson Utilities filed a proposed amendment modifying ACC Decision #71854 concerning the relief requested. The amendment was adopted by Pierce for purposes of discussion and consideration at the August 11, 2011 Open Meeting. Id. at p. 3.

14. On September 6, 2011, Pierce voted to increase the fair value rate base of Johnson Utilities' wastewater division by $17,133,992.  He also voted to allow Johnson Utilities to request future reimbursement of George Johnson's income tax.  He also voted to change the late fee from $40 to 1.5% of unpaid account balances, for an 8% rate of return on the fair value rate base of Johnson Utilities' wastewater division (which was higher than the previously approved 3%) and for the reinstatement of hook up tariffs for both the water and wastewater divisions. Id. at pp. 3-6.  These new measures were projected to increase Johnson Utilities' annual revenue requirement by $1,904,866 and have now been in place for six years. Id. at pp. 3-6.

15. ACC Decision #72579 passed with three votes on a five member Commission and would not have passed without Pierce's vote.  Commissioner Sandra Kennedy, dissenting, wrote: "The case and record before the Commission posed many concerns on how the company was operating and keeping vital business records. Due to those issues and concerns, in my

1    opinion, the original order issued on August 2010 (Decision No. 71854) was the correct one.

2    While having said that, when the company petitioned the Commission for a rehearing, I voted

3    to give the company another opportunity to present new evidence that was not part of the

4    previous record. However, that did not occur. With no additional evidence or an amended

5    recommended opinion and order presented to the Commissioners, there was nothing new to

6    persuade me that we erred in Decision No.71854. Given the lack of new evidence or

7    information, I do not believe the record supports the vote to amend Decision No. 71854 and the

8    resulting increases in rates for Johnson Utilities' customers."

9                  **B.**     **Payments**

10            16. According to the indictment, on September 28, 2011, Pierce and his wife met with

11   James Norton, an employee of R&R and a third party and formalized an agreement that had

12   been reached previously, as follows: a) Johnson International would send $6,000 per month to

13   the third party, who would then disburse $3500 of the money to Pierce's wife; b) Pierce's wife

14   would sign a confidentiality agreement, to act as a shield against any inquiry into the source of

15   the money; and c) Johnson Utilities, Johnson International or an affiliated entity acting as agent

16   of Johnson Utilities would also purchase property worth $350,000 for the Pierces, in a manner

17   that would withstand scrutiny at a later time.

18            17. According to the indictment, Johnson International, acting for and on behalf of

19   Johnson Utilities, made payments to the Pierces in the above described fashion on November 9,

20   2011, December 8, 2011, January 13, 2012, February 9, 2012, March 20, 2012, April 11, 2012,

21   May 1, 2012, June 5, 2012 and August 3, 2012 and the Pierces cashed and deposited all checks

22   received from the third party.

23            18. According to the indictment, on December 27, 2011 and December 29, 2011, Pierce

24   communicated with the third party and with Norton, the employee of R&R, in order to move

25   forward with the purchase of a $350,000 property, the funds for which would ultimately come

26   from Johnson Utilities or its agent.  Pierce and Norton also discussed structuring the

27   transaction in a way which would hide the fact that the Pierces actually owned the property.

28                  **C.**     **Further Proceedings at the Commission**

Page 4 of  8

19. On June 15, 2012, Pierce docketed a draft policy which would allow Johnson Utilities to recover George Johnson's income tax expenses through rates charged to customers. ACC Docket No. W-00000C-06-0149.  ACC staff recommended against this change on June 27, 2012.  ACC Docket No. W-00000C-06-0149.  Pierce, along with three other Commissioners, voted this policy through over staff objections and that of a dissenting Commissioner, on February 12, 2013. ACC Decision #73739.

**CLASS ALLEGATIONS**

20. The Munday Group asks that this body designate a class pursuant to AAC 14-3-104© and Rule 23, ARCP, consisting of individuals who have actually paid an increased sum of money to Johnson Utilities as a direct and proximate result of the passage of ACC Decision #72579.  They further ask that Delton Munday be appointed class representative.

**CAUSES OF ACTION**

**COUNT ONE - A.R.S. § 12-248 (JOHNSON UTILITIES)**

21. The Munday Group repeats the allegations as if fully stated herein.

22. The Munday Group and those similarly situated are entitled to total rescission of ACC Decision #72579, which obtained its third vote for passage only by means of an illegal agreement, culminating in bribery and fraud.

23. The Munday Group and those similarly situated request full reparations of all charges which would not have been passed through, but for ACC Decision #72579 and interest thereon, pursuant to A.R.S. § 12-248.

**COUNT TWO - CIVIL RICO - A.R.S. § 23-1404 (ALL PARTIES)**

24. The Munday Group repeats the allegations as if fully stated herein.

25. The Munday Group and those similarly situated have sustained reasonably foreseeable financial damages from a pattern of unlawful activity for financial gain consisting of an illegal agreement that culminated in nine continuous and related acts of bribery (A.R.S. § 13-2601) as described herein and the acts undertaken by Pierce necessary to pass ACC Decision #72579.  Said bribes were taken by Pierce while he was a member of the ACC, agreed to and arranged by Johnson Utilities prior to that time, actually paid by Johnson International as

1  an agent of Johnson Utilities and arranged and aided and abetted by R&R.

2       26. The Munday Group and those similarly situated have been financially damaged by

3  ACC Decision #72579, which would not have passed but for Pierce's vote, that was obtained

4  only by means of an illegal agreement culminating in bribery, in light of Pierce's vote the

5  previous year and the communications described in the indictment.

6       27. All actions described herein were actually performed by directors and high

7  managerial agents of Johnson Utilities, Johnson International, the ACC and R&R.

8  **COUNT THREE - CONSPIRACY (ALL PARTIES)**

9       25. The Munday Group repeats the allegations as if fully stated herein.

10       26. Pierce, acting as a Commissioner of the ACC, George Johnson, acting as a high

11  managerial agent and director of Johnson Utilities and Johnson International and Norton, acting

12  as a director and high managerial agent of R&R agreed and conspired to engage in bribery,

13  proximately causing damages to the Munday Group and those similarly situated.

14  **COUNT FOUR - CONSTRUCTIVE FRAUD (ACC and JOHNSON UTILITIES)**

15       27. The Munday Group repeats the allegations as if fully stated herein.

16       28. Pierce, as a Commissioner of the ACC and Johnson Utilities, as a public service

17  company, had fiduciary obligations to the Munday Group and those similarly situated.  They

18  breached those duties by conduct that was fraudulent and intended to and did deceive others

19  and that violated public confidence and injured public interests, proximately causing damages

20  to the Munday Group and those similarly situated.

21  **COUNT FIVE - AIDING AND ABETTING (R&R and JOHNSON INTERNATIONAL)**

22       29. The Munday Group repeats the allegations as if fully stated herein.

23       30. The ACC and Johnson had duties toward the Munday Group and those similarly

24  situated and breached said duties, as described herein.

25       31. R&R and Johnson International knew the ACC and Johnson Utilities' conduct

26  constituted a breach of duty and substantially assisted and encouraged said breach, causing

27  damages.

28  **COUNT SIX - BREACH OF CONTRACT (JOHNSON UTILITIES)**

32. The Munday Group repeats the allegations as if fully stated herein.

33. The Munday Group and those similarly situated had an enforceable contract with Johnson Utilities, with offer, acceptance, mutual consideration and capacity well established. Johnson Utilities' acts constitute a breach of said contract, with damages resulting to the Munday Group and those similarly situated.

**COUNT SEVEN - BAD FAITH (JOHNSON UTILITIES)**

34. The Munday Group repeats the allegations as if fully stated herein.

35. The Munday Group and those similarly situated had an enforceable contract with Johnson Utilities, with offer, acceptance, mutual consideration and capacity well established. Said contract has an implied covenant of good faith and fair dealing. Johnson Utilities' acts constitute bad faith breach of said contract, with damages resulting to the Munday Group and those similarly situated.

36. Johnson Utilities and the Munday Group and those similarly situated enjoy a "special relationship" akin to that which exists between common carrier and passenger.

**COUNT EIGHT - JOINT AND SEVERAL LIABILITY (ALL)**

37. The Munday Group repeats the allegations as if fully stated herein.

38. All parties were acting as agents of one another and were acting in concert, as described in A.R.S. § 12-2506(d).

Complainants pray for the following:

a) refund of all monies which would not have been paid but for ACC Decision #72579;

b) interest on said sum, pursuant to the Arizona Civil RICO Act and A.R.S. § 12-248;

c) treble damages and attorneys fees, pursuant to the Arizona Civil RICO Act;

d) attorneys fees, pursuant to the private attorney general doctrine, the common fund doctrine and A.R.S. § 12-341.01;

e) punitive damages, pursuant to constructive fraud, bad faith and conspiracy;

f) that all parties be held jointly and severally liable on all sums, pursuant to A.R.S. § 12-2506(d); and

g) rescission of ACC Decision #72579.

DATED this 19th day of June, 2017.

THE ENTREKIN LAW FIRM

By: _____
B. Lance Entrekin, Esq.
The Entrekin Law Firm
5343 North 16th Street
Suite 200
Phoenix, Arizona 85016

ORIGINAL AND FOUR COPIES
FILED THIS 19TH DAY OF JUNE,
2017 AT:

The Arizona Corporation Commission
1200 West Washington
Phoenix, Arizona 85007-2996

PURSUANT TO A.R.S. § 40-246(a), THIRTY
THREE ACTUAL CONSUMERS OF JOHNSON
UTILITIES' WATER AND WASTEWATER
SERVICES HAVE AGREED TO ACT AS COMPLAINANTS
AND SIGNED THEIR NAMES AND ADDRESSES HERETO,
ALONG WITH A CERTIFICATION THAT THEY ACTUALLY
PAY THE WASTEWATER AND WATER BILLS, WHETHER
THEY OWN OR RENT AND FOR HOW LONG THEY HAVE
DONE SO.  EACH HAS BEEN PROVIDED WITH A COPY
OF THE COMPLAINT AND HAD IT EXPLAINED TO THEM.

Lance Entrekin

# EXHIBIT 5

**EXHIBIT 5**



ORIGINAL

RECEIVED
AZ CORP COMMISSION
DOCKET CONTROL

2017 JUL 10  P 4: 17

Arizona Corporation Commission
DOCKETED

JUL 1 0 2017

DOCKETED BY

0000181234

1 | **FREDENBERG BEAMS**
Daniel E. Fredenberg – 020158
2 | Christian C. M. Beams – 019672
Catherine S. Adams – 023463
3 | 4747 N. 7th Street, Suite 402
Phoenix, Arizona  85014
4 | Telephone:  602/595-9299
Email: dfredenberg@fblegalgroup.com
5 | Email: cbeams@fblegalgroup.com
Email: cadams@fblegalgroup.com
6 |
7 | Attorneys for Johnson Utilities, LLC,
and Johnson International, Inc.
8 |
9 |          **BEFORE THE ARIZONA CORPORATION COMMISSION**
10 |
11 | COMMISSIONERS
TOM FORESE, Chairman
12 | BOB BURNS
DOUG LITTLE
13 | ANDY TOBIN
BOYD W. DUNN
14 |
15 | FORMAL COMPLAINT OF DELTON
MUNDAY AND THOSE SIMILARLY | No.  WS-02987A-17-0192
16 | SITUATED AGAINST THE ARIZONA
17 | CORPORATION COMMISSION,
JOHNSON UTILITIES LLC AND NON | **MOTION TO DISMISS**
18 | PUBLIC SERVICE COMPANIES R&R
PARTNERS INC., JOHNSON
19 | INTERNATIONAL, INC.
20 |
21 |
22 |          Respondents Johnson Utilities, LLC and Johnson International Inc. (collectively,
"Johnson") hereby move to dismiss the Complaint filed herein pursuant to A.A.C. R14-3-
23 | 106(H) and Rules 12(b)(1) and (6), Ariz.R.Civ.P.  This Motion is supported by the following
24 | Memorandum of Law.
25 |          ///
26 |          ///
27 |          ///
28 |

**MEMORANDUM OF LAW**

## I.    Introduction

When stripped of hyperbole, the Complaint is a baseless smear campaign arising solely from false allegations which seek to impermissibly vacate a valid Decision entered pursuant to law by this administrative body (hereinafter, the "ACC" or "Commission") nearly six years ago. The Complaint also impermissibly seeks rescission of ACC Decision #72579 (the "Decision"), in addition to claims for monetary relief under Arizona common law and statutes.[1]   The Complaint, however, must be dismissed because:  1) jurisdiction over the unsupported claims lies exclusively in the Superior Courts of Arizona pursuant to A.R.S. §40-254(a); 2) the Complaint is time barred under A.R.S. § 40-254(A); 3) the ACC is constitutionally constrained from adjudicating civil claims pursuant to its limited grant of authority conferred by AZ Const. art. XIV, § 3; cl. 3.;  and as a corollary, A.R.S. §12-122 limits the power to adjudicate civil claims to the superior courts; 4)  the civil claims fail on a substantive level as they are not recognized under Arizona law and fail to state claims upon which *any* court may grant relief.

## II.    Background.

### A.    The Decision was amply supported by the record and properly entered by the Commission. It is not subject to review or collateral attack through the belated filing of the Complaint.

On February 28, 2011, Johnson Utilities, LLC ("Company") filed with the Commission a Petition to Amend Decision No. 71854 pursuant to A.R.S §40-252.  *See* Decision (Exhibit A), at ¶ 3.  Specifically, the Petition to Amend sought the following:

- Amend the $40 per month late fee in the Company's wastewater division tariff to a late fee of 1.5% per month on the unpaid account balance, consistent with the Company's water division tariff;
- Addition into the rate base wastewater division plant of $18,244,755. Such sum includes the addition back into rate base the $10,892,391 disallowance for inadequately supported plant cost and the $7,352,364 disallowance related to affiliate profit;

---

[1] The Decision for the Commission's ease of reference, is attached hereto as Exhibit A.

- Remove from the water division rate base $6,931,078 in unexpended test year hook-up fees;
- Reinstate the Company's previously authorized hook-up fees for new water and wastewater divisions' connections;
- Establish a rate of return for the Company based upon its weighted average cost of capital in the range of 8.18% to 11.89%;
- Reclassify $2,201,386 of wastewater plant identified as post-test year plant to test year plant-in-service;
- Include in plant-in-service post-test-year wastewater plant at $1,021,108, which the Company alleges is necessary to serve the test year-end level of customers; and
- Include explicit language for Johnson Utilities to request income tax expense prospectively in a future A.R.S. § 40-252 Petition if the Commission changes its policy on imputed income tax expense.

Notably, the Commission voted to reopen Decision No. 71854 at its July 12, 2011 Open Meeting and directed Johnson to provide notice to its customers concerning: (a) the rate impacts of granting the relief requested, (b) a public comment session in Pinal County, and (c) the August 11, 2011 Open Meeting at which the Commission would consider the Company's request for relief. Decision at 5. Pursuant to Order from the Commission, Johnson filed a proposed amendment modifying Decision No. 71854 concerning the relief requested. The amendment was adopted by Chairman Pierce for purposes of discussion and consideration at the August 11, 2011 Open Meeting. Decision at 9.

Contrary to the allegations of the Complaint, the Petition was not rubber-stamped. In fact, the Commission determined that certain of the Company's requested modifications to Decision No. 71854 did not warrant further Commission consideration. Decision at 11. Specifically, following a duly noticed proceeding, the Commission decided as follows:

> Upon due consideration of these matters pursuant to A.R.S. § 40-252, and in balancing the implicated public interest concerning the certainty of Commission orders with the opportunity to take appropriate regulatory ratemaking measures presented by the circumstances herein, we find and conclude that it is in the public interest to modify Decision No. 71854 as determined in this decision.

Decision at 15.

Simply put, the Commission made its decision after full notice and an open hearing, and the baseless insinuation otherwise is simply false.

3

## B.    The Relief Sought.

The Complaint seeks to vacate the Decision and alleges claims for civil monetary damages under Arizona statutory and common law.  Rather than even attempt to make the necessary showing that the Decision is somehow unlawful – a showing that the Munday Group cannot make – the Complaint is entirely premised on irrelevant innuendo and editorial concerning ***mere allegations*** in a completely unrelated matter.  Even a cursory review of the scurrilous allegations reveals their flimsy nature.  The purported *facts* that the Munday Group seek to establish could not support the requested relief-even assuming the Complaint was timely filed *and* the ACC had jurisdiction:

- Commissioner Kennedy wrote in dissent: "in my opinion, the original order issued on August 10 (Decision No. 71854) was the correct one." (Complaint at 15)
- Paragraphs 15-18 are based on an editorial version of an indictment in an unrelated proceeding.

As revealed by the allegations themselves, the Complaint is a mere editorial piece and does not meet the required showing under either A.R.S. §§40-246, or 40-248, or A.A.C. R14-3-106(L).  As set forth more fully herein, the ACC doesn't reach the allegations because it lacks jurisdiction and the Complaint itself is time barred in any event.

## III.    This action is time barred by the applicable statutes of limitation and is an unlawful collateral attack on a final and conclusive order of the Commission.

Arizona law provides that to the extent a party in interest is dissatisfied with an order of the ACC, that party has thirty days, and no more, to commence an action in Superior Court or Court of Appeals (in the case of a claim pertaining to rate-making or rate-designing) *after* exhausting the party's administrative remedies.  A.R.S. §§ 40-254(A) and 40-254.01(A).  The Complainants have at least three fatal problems here which cannot be overcome.  First, Complainants were not parties to the original proceeding in Docket WS-02987A-08-0180 and therefore lack standing to challenge Decision 72579 at this late date.  Second, Decision 72579 was issued on September 15, 2011, and no party in the docket filed for rehearing of that decision within the 20-day period set forth in A.R.S. § 40-253(A).[2]  Thus, with no request

---

[2]  A.R.S. § 40-253(A) states as follows:

4

1  for rehearing, Decision 72579 became final (and non-appealable) on October 5, 2011.  A.R.S.

2  § 40-254(A) states in relevant part as follows:

3      Except as provided in section 40-254.01, any party in interest, or the attorney
    general on behalf of the state, being dissatisfied with an order or decision of

4      the commission, **may within thirty days after a rehearing is denied or**
    **granted, and not afterwards**, commence an action in the superior court in

5      the county in which the commission has its office, against the commission as

6      defendant, to vacate, set aside, affirm in part, reverse in part or remand with
    instructions to the commission such order or decision on the ground that the

7      valuation, rate, joint rate, toll, fare, charge or finding, rule, classification or

8      schedule, practice, demand, requirement, act or service provided in the order
    or decision is unlawful, or that any rule, practice, act or service provided in

9      the order is unreasonable. (emphasis added)

10      Similarly, A.R.S. § 40-254.01(A) states as follows:

11      The attorney general on behalf of the state or any party to a proceeding before

12      the commission who is dissatisfied with any order of the commission
    involving public service corporations and relating to rate making or rate

13      design pursuant to sections 40-243, 40-246, 40-250 and 40-251 **may file**

14      within **thirty days after a rehearing is denied or granted, and not**
    **afterwards**, a notice of appeal in the court of appeals to vacate, set aside,

15      affirm in part, reverse in part or remand with instructions to the commission

16      the order if the court of appeals determines upon a clear and satisfactory
    showing that the order is unlawful or unreasonable. (emphasis added)[3]

17

18      Nearly six years have passed since Decision 72579 became final.  Thus, even if the

19  Complainants' action *were* properly before the ACC, the limitations period ran years ago and

20  the Complaint must be dismissed.

21      After any final order or decision is made by the commission, any party to the action

22      or proceeding or the attorney general on behalf of the state **may apply for a rehearing**
    **of any matter determined in the action or proceeding and specified in the**

23      **application for rehearing within twenty days of entry of the order or decision**.
    Unless otherwise ordered, the filing of such an application does not stay the decision

24      or order of the commission. If the commission does not grant the application within

25      twenty days, it is deemed denied. If the commission grants the application, the
    commission shall promptly hear the matter and determine it within twenty days after

26      final submission. (emphasis added)

27  [3] Complainants assert at page 1, line 13 of their Formal Complaint that they are filing under
A.R.S. § 40-246 (among other statutes) which is one of the statutes specifically listed as a

28  basis for appeal under A.R.S. § 40-254.01(A).

Finally, Decision 72579 remains a valid and final order of the Commission today. A.R.S. § 40-252 provides that "[i]n all collateral actions or proceedings, the orders and decisions of the commission which have become final shall be conclusive."   Thus, the Complainants' action is an unlawful collateral attack on a final and conclusive order of the Commission, and the action should be dismissed.

## IV.   Jurisdiction over the Complainants' claims regarding rates and charges lies *exclusively* with the Superior Court or Court of Appeals.

Even if the Complainants could somehow overcome the fatal defects described in the preceding section, as a matter of clear and unequivocal Arizona law, appeals alleging that a requirement in a Commission order relating to rates and charges is unlawful must be brought in  either the Superior Court or the Court of Appeals.  *See* A.R.S. §§ 40-254(A) and 40-254.01(A) and *Arizona-American Water Co. v. Arizona Corp. Comm'n,* 98 P.3d 624, 209 Ariz. 189 (Ariz. App., 2004)(Appeals brought from Commission orders alleging "the valuation, rate, joint rate, toll, fare, charge or finding, rule, classification or schedule, practice, demand, requirement, act or service provided in the order... is unlawful, or that any rule, practice, act or service provided in the order is unreasonable" must be brought in Superior Court or in the Court of Appeals if the appeal "arise[s] from a process in which the Commission is involved in rate-making or rate-designing").   In sum, an order – precisely like the one the Munday Group challenges six years after the fact – cannot be directly appealed to the Commission. It simply lacks the authority of the legislature to hear them.

## V.   Jurisdiction over the Complainants' remaining civil claims lies *exclusively* with the Superior Court.

The legislature has conferred upon the Superior Court the sole authority to adjudicate disputes pursuant to statute and common law. A.R.S. §12-122.  Concordantly, the Arizona Constitution confers upon the ACC the power to "make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the state.   AZ Const. art. XIV, § 3; cl. 3.  Also consistent with the separation of powers doctrine, the Constitution confers the exclusive right of appeals from orders entered by the commission "to the courts of the state." AZ Const. art. XIV, § 17.

**VI.     Setting aside the jurisdictional and statute of limitations issues, the Complaint fails to state claims upon which relief can be granted.**

**A.     Count One must be dismissed; no cause of action.**

Count One is entitled "A.R.S § 12-248" and is brought against the Company. However, there is no provision located at A.R.S. § 12-248. It is axiomatic that no cause of action can be maintained on a statute that does not exist. Accordingly, based on notions of common sense if nothing else, this cause of action must be dismissed.

**B.     Count Two must be dismissed; no cause of action.**

Count Two is entitled "Civil RICO - A.R.S. § 23-1404" and brought against all parties. Like with Count One, there is no provision located at A.R.S. §23-1404, thus dismissal is warranted for the same reason as exists with regard to Count One.

Further, to the extent it was intended to reference A.R.S. § 13-2314.04 – the proper Arizona statute governing such claims – the Commission lacks jurisdiction as such is within the exclusive jurisdiction of the Superior Court. A.R.S. 13-2314.04(B).

**C.     Count Three must be dismissed; no cause of action for civil conspiracy in Arizona.**

The Arizona Supreme Court has long settled that "in Arizona, there is no civil action for conspiracy." *Estate of Hernandez by Hernandez-Wheeler v. Flavio*, 930 P.2d 1309, 1313, 187 Ariz. 506, 510 (Ariz., 1997) Even assuming the propriety of jurisdiction here, Count Three should be dismissed as a matter of Arizona law. Moreover, the Commission lacks jurisdiction to award damages or provide a remedy for so-called civil conspiracy.

**D.     Count Four fails to meet heightened pleading standard required by Rule 9(b), Ariz.R.Civ.P.**

The Complaint merely states that Johnson "breached those duties by conduct that was fraudulent and intended to deceive others. . ." All allegations of fraud must state the circumstances constituting fraud with particularity. Ariz. R. Civ. P. 9(b). While no "magic language" is required, a claimant must plead all the essential elements of fraud in the complaint. Green v. Lisa Frank, Inc., 221 Ariz. 138, 155-56 ¶ 53, 211 P.3d 16, 33-34 (App. 2009). A showing of actual fraud requires: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that the information should be acted upon by the hearer and in a manner

7

1  reasonably contemplated, (6) the hearer's ignorance of the information's falsity, (7) the

2  hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's

3  consequent and proximate injury." *Taeger v. Catholic Family & Cmty. Servs.*, 196 Ariz. 285,

4  294, 995 P.2d 721, 730 (App. 1999).  Dismissal of Count Four is therefore warranted.

5        **E.    Count 5 must be dismissed as the Commission lacks jurisdiction
              over R&R Partners and Johnson International, Inc.**

6        Count 5 pertains to R&R Partners, Inc., and Johnson International, Inc.  Neither R&R

7  Partners, Inc., nor Johnson International, Inc., are "public service corporations" as defined in

8  Article 15, Section 2 of the Arizona Constitution and the Commission lacks jurisdiction over

9  both entities.  Thus, Count 5 must be dismissed.  For the same reason, Counts 2, 3 and 8 must

10  also be dismissed against R&R Partners, Inc., and Johnson International, Inc.

11       **F.    Counts Six, Seven and Eight are based upon common law contract
              claims and the Uniform Contribution Among Tortfeasors Act.
12            They must be adjudicated by the Superior Court.**

13       As set forth in Section IV, *supra*, the legislature has conscribed to the superior courts

14  the sole power to adjudicate claims pursuant to statute and common law.  *See*, A.R.S. §12-

15  122.  These final claims should therefore be dismissed.

16  **V.    Conclusion.**

17       For the foregoing reasons, the Complaint must be dismissed in its entirety, and

18  because there is no ability to correct through an amended pleading, such dismissal must be

19  with prejudice.

20       RESPECTFULLY SUBMITTED this 10th day of July, 2017.

21                              **FREDENBERG BEAMS**

22

23                      By: _____

24                              Daniel E. Fredenberg
                             Christian C. M. Beams
25                              Catherine S. Adams
                             Attorneys for Johnson Utilities, LLC,
26                              and Johnson International, Inc.

27

28

8

1

2   **ORIGINAL** and 13 copies of the foregoing filed
    This 10th day of July, 2017, with:

3

4   Docket Control
    Arizona Corporation Commission
5   1200 West Washington
    Phoenix, Arizona 85007-2996
6

7   COPY of the forgoing sent by mail this
    10th day of July, 2017 to the following:
8

9   B. Lance Entrekin, Esq.
    The Entrekin Law Firm
10  5343 North 16'" Street, Suite 200
    Phoenix, AZ 85016
11

12  _____

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

0000129725

BEFORE THE ARIZONA CORPORATION C~~~~~~~~~~

**COMMISSIONERS**

GARY PIERCE, CHAIRMAN
BOB STUMP
PAUL NEWMAN
SANDRA D. KENNEDY
BRENDA BURNS

Arizona Corporation Commission
**DOCKETED**

SEP 1 5 2011

DOCKETED BY
ne

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF JOHNSON UTILITIES, LLC, DBA JOHNSON UTILITIES COMPANY FOR AN INCREASE IN ITS WATER AND WASTEWATER RATES FOR CUSTOMERS WITHIN PINAL COUNTY, ARIZONA. | DOCKET NO. WS-02987A-08-0180 <br><br> **DECISION NO.  72579** <br><br> **ORDER AMENDING DECISION NO. 71854** |

**Open Meeting**
**September 6, 2011**
**Phoenix, Arizona**

**BY THE COMMISSION:**

## FINDINGS OF FACT

1.      Johnson Utilities LLC ("Johnson Utilities" or "Company") is engaged in providing water and waste water service within Pinal County, Arizona.

2.      Johnson Utilities current rates were approved in Decision No. 71854 entered August 25, 2010.

3.      On February 28, 2011, Johnson Utilities filed with the Arizona Corporation Commission ("Commission") a Petition to Amend Decision No. 71854 pursuant to A.R.S § 40-252.

4.      Johnson Utilities' Petition to Amend requested that the Commission modify Decision No. 71854 in the following manner:

      a.      Change the $40 per month late fee in the Company's wastewater division tariff to a late fee of 1.5% per month on the unpaid account balance, consistent with the Company's water division tariff.

      b.      Add back into rate base wastewater division plant of $18,244,755 which was

Docket No. WS-2987A-08-0180

1            disallowed in the rate case.  This sum includes the addition back into rate base

2            the $10,892,391 disallowance for inadequately supported plant cost and the

3            $7,352,364 disallowance related to affiliate profit.

4      c.    Remove from the water division rate base $6,931,078 in unexpended test year

5            hook-up fees.

6      d.    Reinstate the Company's previously authorized hook-up fees for new water and

7            wastewater divisions' connections.

8      e.    Establish a rate of return for the Company based upon its weighted average

9            cost of capital in the range of 8.18% to 11.89%.

10     f.    Reclassify $2,201,386 of wastewater plant identified as post test year plant to

11          test year plant-in-service.

12     g.    Include in plant-in-service post test-year wastewater plant at $1,021,108,

13          which the Company alleges is necessary to serve the test year-end level of

14          customers.

15     h.    Include explicit language for Johnson Utilities to request income tax expense

16          prospectively in a future A.R.S. § 40-252 Petition if the Commission changes

17          its policy on imputed income tax expense.

18     5.    At its July 12, 2011 Open Meeting, the Commission voted to reopen Decision No.

19 71854, and directed the Company to notice its customers concerning:  (a) the rate impacts of granting

20 the relief requested, (b) a public comment session in Pinal County, and (c) the August 11, 2011 Open

21 Meeting at which the Commission would consider the Company's request for relief.

22     6.    Johnson Utilities noticed its customers as directed by the Commission and filed proof

23 of notice in the docket.

24     7.    On July 26, 2011, Johnson Utilities filed an Amendment to Petition to Amend

25 Decision No. 71854.  The amendment modified its Petition to Amend to request a rate of return based

26 upon a weighted average cost of capital of 8.0%.

27     8.    On August 4, 2011, Chairman Pierce mailed and docketed a letter to the parties

28 requesting proposed amendments to aid in the Commission's consideration of the Petition.

1       9.    On August 9, 2011, Johnson Utilities filed a proposed amendment modifying Decision

2  No. 71854 concerning the relief requested.  The amendment was adopted by Chairman Pierce for

3  purposes of discussion and consideration at the August 11, 2011 Open Meeting.

4       10.   At the August 11, 2011 Open Meeting, the Commission discussed and considered the

5  proposed amendment to Decision No. 71854 in accordance with A.R.S. § 40-252, and provided all

6  parties an opportunity to be heard concerning the requested relief.

7       11.   The Commission determined that certain of the Company's requested modifications

8  to Decision No. 71854 did not warrant further Commission consideration, but voted to direct the

9  Utilities Division ("Staff") to prepare and docket an order incorporating the following requested

10  modifications to be considered at September, 2011 Open Meeting:

11          a.    The change of the wastewater late fee from $40 per month to 1.5% per month.

12          b.    The addition back of $ 18,244,755 in disallowed wastewater plant, which

13                   includes the $10,892,391 disallowance for inadequately supported plant and

14                   the $7,352,364 disallowance related to affiliate profit.

15          c.    The reinstatement of hook-up fee tariffs for water and wastewater divisions.

16          d.    The determination of a rate of return of 8.0% for the wastewater division.

17          e.    The inclusion of language permitting the Company to request income tax

18                   expense prospectively in a future A.R.S. § 40-252 Petition if the Commission

19                   changes its policy relating to imputed income tax expense.

20      12.   The Commission also determined that if the relief requested was granted, that new

21  rates should go into effect October 1, 2011, and that the Company could not a file a rate case with a

22  test year ending earlier than December 31, 2012.

23      13.   The Commission directed Staff and the Company to meet, discuss and analyze the rate

24  impacts concerning the remaining requested modifications to Decision No. 71854, and thereafter for

25  Staff to docket a report concerning the resulting revenue and rate design analysis.

26      14.   On August 26, 2011, Staff docketed its report as directed by the Commission.

27      15.   Upon due consideration of these matters pursuant to A.R.S. § 40-252, and in balancing

28  the implicated public interest concerning the certainty of Commission orders with the opportunity to

Decision No.   **72579**

Docket No. WS-2987A-08-0180

1  take appropriate regulatory ratemaking measures presented by the circumstances herein, we find and
2  conclude that it is in the public interest to modify Decision No. 71854 as determined in this decision.

3          16.    The Company's hook up fee tariffs for its water and wastewater in effect prior to
4  Decision No. 71854 are reinstated, with the condition that new tariffs be filed with wording in
5  conformance with the hook-up fee templates on the Commission's website.

6          17.    The Company is permitted to request income tax expense prospectively in a future
7  A.R.S. § 40-252 Petition if the Commission changes its policy relating to imputed income tax
8  expense.

9          18.    The Company's wastewater division current tariff for a $40 late payment fee is
10 modified to a late fee of 1.5% on the unpaid account balance, consistent with the similar tariff for the
11 Company's water division.

12         19.    The Company's wastewater rate base shall be increased to allow the additional
13 inclusion of plant in the amount of $18,244,755. As a result, the Company's adjusted fair value rate
14 base ("FVRB") for its wastewater division is modified, and is determined to be $17,270,554, an
15 increase of $17,133,992 over $136,562 authorized in Decision No. 71854.

16         20.    The rate of return on the Company's wastewater division adjusted FVRB shall be 8.0
17 percent. This rate of return applied to the Company's adjusted wastewater division FVRB results in
18 an increase to the Company's Required Operating Income in the amount of $1,091,034 over the
19 $290,610 authorized in Decision No. 71854. The new Required Operating Income is determined to
20 be $1,381,644.

21         21.    Because we make these modifications in this decision, the new revenue requirement is
22 determined to be 11,591,861, which is an increase of $1,904,866 over the $9,686,995 authorized in
23 Decision No. 71854.

24         22.    In Staff's August 26, 2011 filing, Staff sets out an analysis with a revised rate design
25 with new rates intended to provide the Company the opportunity to earn the return authorized herein.
26 We approve the new rates as set out by Staff and attached to this decision as Exhibit A, and shall
27 require the Company to file new tariffs reflecting these approved rates.

28         23.    Under the new rates approved by this decision, a residential wastewater customer on a

Docket No. WS-2987A-08-0180

1 ¾ inch meter would experience an increase of $6.56 or approximately 20% over the rates approved in
2 Decision No. 71854, from $32.79 to $39.35 per month.

3     24.    We find and conclude that the modifications made herein to Decision No. 71854 result
4 in just and reasonable rates for the Company and its ratepayers.

5     25.    We further find and conclude that the modifications made herein to Decision No.
6 71854 shall be effective prospectively, and all other provisions, terms and rates in Decision No.
7 71854 remain in full force and effect except where inconsistent with this Decision on rehearing.

8     26.    We further find and conclude that because we make these modifications to Decision
9 No. 71854, the public interest requires a stay out provision that prohibits the Company from filing a
10 future rate increase application that uses a test year ending earlier than December 31, 2012.

11     27.    We further find and conclude that it is in the public interest that new rates and tariffs
12 resulting from this Decision shall be effective for all service rendered on and after October 1, 2011.

13 **CONCLUSIONS OF LAW**

14     1.    Johnson Utilities is a public service corporation within the meaning of Article XV of
15 the Arizona Constitution and A.R.S. §§ 40-250, 40-251, 40-367, 40-202, 40-321, and 40-361.

16     2.    The Commission has jurisdiction over Johnson Utilities and the subject matter set
17 forth in the Company's rate application  and in the Company's Petition to Amend Decision No.
18 71854 pursuant to  A.R.S. § 40-252.

19     3.    Pursuant to A.R.S. § 40-252, the Commission, having reviewed the Petition and the
20 Staff's Memorandum dated August 26, 2011, concludes that it is in the public interest to approve the
21 modification to Decision No. 71854 as discussed herein.

22 **ORDER**

23     IT IS THEREFORE ORDERED that Decision No. 71854 is modified by the Commission in
24 the manner determined by this Decision.

25     IT IS FURTHER ORDERED that Johnson Utilities shall not file for an increase in rates using
26 a test year ending earlier than December 31, 2012.

27     IT IS FURTHER ORDERED that all other matters set forth in Decision No. 71854 continue
28 to be in full force and effect except where inconsistent with the Decision.

Decision No.   **72579**

Docket No. WS-2987A-08-0180

1      IT IS FURTHER ORDERED that Johnson Utilities shall file a tariff in conformance with this

2  Decision for rates as shown in Exhibit A to go into effect for all service rendered on and after

3  October 1, 2011, and notice its customers of the new rates on or before September 23, 2011.

4      IT IS FURTHER ORDERED that in the event the Commission alters its policy to allow S-

5  corporation and LLC entities to impute a hypothetical income tax expense for ratemaking purposes,

6  Johnson Utilities may file a motion to amend this Order prospectively, and Johnson Utilities'

7  authorized revenue requirement hereunder, pursuant to A.R.S. § 40-252, to reflect the change in

8  Commission policy.

9      IT IS FURTHER ORDERED that Johnson Utilities shall file new hook-up fee tariffs for both

10  water and sewer with wording conforming to the wording on the Commission's hook-up fee

11  templates on its website and the charges shall be the same as those on Johnson Utilities' former hook-

12  up fee tariffs.

13      IT IS FURTHER ORDERED that this Decision shall be effective immediately.

14  . . .

15  . . .

16  . . .

17  . . .

18  . . .

19  . . .

20  . . .

21  . . .

22  . . .

23  . . .

24  . . .

25  . . .

26  . . .

27  . . .

28  . . .

Decision No. **72579**

Docket No. WS-2987A-08-0180

1

## BY ORDER OF THE ARIZONA CORPORATION COMMISSION

2

3

4
CHAIRMAN                                      COMMISSIONER

5
                                              Commissioner Burns
6                                             Abstained

7
COMMISSIONER          COMMISSIONER            COMMISSIONER

8
              IN   WITNESS   WHEREOF,  I,  ERNEST  G.  JOHNSON,
9             Executive Director of the Arizona Corporation Commission,
              have hereunto, set my hand and caused the official seal of this
10            Commission to be affixed at the Capital, in the City of Phoenix,
              this _15th_ day of _September_ 2011.
11

12

13

14
              ERNEST G. JOHNSON
15            Executive Director

16

17

18

19  DISSENT

20

21  DISSENT: _____

22

23

24

25

26

27

28

7                          Decision No. __72579__

Johnson Utilities L.L.C. - Wastewater Division
Docket No. WS-02987A-08-0180
Test Year Ended December 31, 2007

EXHIBIT A
Page 1 of 2

## EXHIBIT A
## WASTEWATER DIVISION

| Monthly Minimum Charge | PER DECISION NO. 71854 | NEW RATES PER ARS 40-252 |
|---|---|---|
| Meter Sizes (All Zones and Classes) | | |
| 5/8 Inch | $ 29.8100 | $ 35.7700 |
| 3/4 Inch | $ 32.7900 | $ 39.3500 |
| 1 Inch | $ 41.7300 | $ 50.0800 |
| 1 1/2 Inch | $ 53.6508 | $ 64.3900 |
| 2 Inch | $ 86.4400 | $ 103.7300 |
| 3 Inch | $ 327.8700 | $ 393.4700 |
| 4 Inch | $ 625.9300 | $ 751.1700 |
| 6 Inch | $ 864.3700 | $ 1,037.3300 |
| 8 Inch | $ 1,092.6000 | $ 1,430.8000 |
| 10 Inch | $ 1,748.3300 | $ 2,056.7800 |
| | | |
| Effluent    per 1,000 gallons | $ 0.5280 | $ 0.6300 |
| per acre foot | $ 170.3200 | $ 205.2900 |
| Service Charges | | |
| | | |
| Establishment | $ 25.00 | $ 25.00 |
| Establishment (After hours) | $ 40.00 | $ 40.00 |
| Deposit Requirement (Residential) | (a) | (a) |
| Deposit Requirement (Non Residential Meter) | (a) | (a) |
| Deposit Interest | (b) | (b) |
| Re-Establishment (With-in 12 months) | (c) | (c) |
| Re-Establishment (After Hours) | (c) | (c) |
| NSF Check | 15.00 | 15.00 |
| Deffered Payment, Per Month | 1.50% | 1.50% |
| After Hours service charge, per Rule R14-2-603D | Refer to Above Charges | Refer to Above Charges |
| | | |
| Late Charge per month | 40.00 | 1.50% |
| Service Line Connection Charge | 350.00 | 350.00 |
| Main Extension Tariff, per Rule R14-2-606B | | |
| except refunds shall be based upon five percent (5%) of | | |
| gross revenues from bonafide customers, | Cost | Cost |
| until all advances are fully refunded to Developer. | N/A | (d) |
| Off-site Facilities Hook-up Fee | | |

(a) Residential - two times the estimated average monthly bill. Non-residential - two and one-half times the estimated maximum monthly bill.
(b) Interest per Rule R14-2-603(B).
(c) Minimum charge times number of full months off the system, per Rule R14-2-603(B).
(d) New wastewater installations. May be assessed only once per parcel, service connection, or lot within a sub-division.

Decision No. **72579**

Johnson Utilities - Wastewater Division
Docket No. W-02987A-08-0180
Test Year Ended December 31, 2007

EXHIBIT A
Page 2 of 2

## COMPARISON OF RATE BASE AND REVENUE REQUIREMENT PER DECISION NO 71854 AND ARS 40-25?

|  | [A] DECISION NO. 71854 | [B] ARS 40-252 | [C] CHANGE |
|---|---|---|---|
| Gross Plant-in-Service | $ 95,566,588 | $ 113,811,344 | $ 18,244,756 |
| Accumulated Depreciation | (6,375,814) | (7,486,577) | (1,110,763) |
| Net Plant in Service | $ 89,190,774 | $ 106,324,766 | $ 17,133,992 |
| Advances in Aid of Construction | (52,231,631) | (52,231,631) | - |
| Net Contribution in Aid of Construction | (36,822,582) | (36,822,582) | - |
| Rate Base | $ 136,562 | $ 17,270,554 | $ 17,133,992 |
|  | Operating Margin 3.00% | Rate of Return 8.00% |  |
| Required Operating Margin/Rate of Return |  |  |  |
| Required Operating Income | $ 290,610 | $ 1,381,644 | $ 1,091,034 |
| Operating Income Deficiency | $ (1,631,136) | $ 232,727 | $ 1,863,863 |
| Tax Gross-up Factor | 1.0220 | 1.0220 |  |
| Gross Revenue Increase (Decrease) | $ (1,667,020) | $ 237,847 | $ 1,904,867 |
| Adjusted Test Year Revenue | $ 11,354,014 | $ 11,354,014 | $ - |
| Revenue Requirement | $ 9,686,995 | $ 11,591,861 | $ 1,904,866 |
| Percentage Increase in Revenue Requirement(Decrease) | -14.68% | 2.09% | 19.66% |
| Impact on 3/4 Inch Residential Bill Average 3/4 Inch Residential Bill | $ 32.79 | $ 39.35 | $ 6.56 |

Decision No. **72579**



**COMMISSIONERS**
GARY PIERCE - Chairman
BOB STUMP
SANDRA D. KENNEDY
PAUL NEWMAN
BRENDA BURNS

**ARIZONA CORPORATION COMMISSION**

**SANDRA D. KENNEDY**
**COMMISSIONER**

Direct Line:  (602) 542-3625
Fax:  (602) 542-3669
E-mail:  skennedy@azcc.gov

September 14, 2011

Arizona Corporation Commission
Docket Control
WS02987A-08-0180

      Re:    **Johnson Utilities; Dissent Letter**
              **WS-02987A-08-0180**

To all Interested Parties;

I am submitting my dissent letter explaining my No vote of September 6, 2011 on the rehearing of Johnson Utilities Company's (Company) application for an increase in its Water and Wastewater Rates for Customers within Pinal County, AZ.

The case and record before the Commission posed many concerns on how the company was operating and keeping vital business records.  Due to those issues and concerns, in my opinion, the original order issued on August 2010 (Decision No. 71854) was the correct one.

While having said that, when the company petitioned the Commission for a rehearing, I voted to give the company another opportunity to present new evidence that was not part of the previous record.  However, that did not occur.

With no additional evidence or an amended recommended opinion and order presented to the Commissioners, there was nothing new to persuade me that we erred in Decision No.71854. Given the lack of new evidence or information, I do not believe the record supports the vote to amend Decision No. 71854 and the resulting increases in rates for Johnson Utilities' customers.

I am concerned that the manner in which the Commission reversed several key ratemaking components will lead to a precedent that may be used or referenced by other companies when they do not support their rate cases with proper documentation.  As I mentioned earlier, the record was very clear on the fact the company was not maintaining appropriate day-to-day record keeping, and raised with concerns that transactions with affiliates and related parties may lack needed transparency and were not conducted at arms length.  For me, the Commission's Decision based on the record presented did not support a finding that amending Decision No. 71854 is in the public interest.

**Page 2**
**Johnson Utilities WS02987A-08-0180**

I know this rate case has been a learning process for Johnson Utilities. The company seems committed from this point on to conduct their business in a professional manner. I believe this is evident by the Company's statements that they have made reorganizational changes. However, that was not the record before us and I could not vote for a decision that will increase the wastewater rates that lack the proper documentation.

Our job as Commissioners is to find just and reasonable rates that are in the public interest, to allow investors the opportunity to get a reasonable return on their investments. However, the utility that holds a monopoly has a responsibility to show that it indeed made those investments. Without adequate documentation, it is unfair to make the ratepayers bear that burden.

It is because of these facts I voted against increasing the rates.

Sincerely,

Corporation Commissioner
Sandra D. Kennedy

Decision No. **72579**