1  **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Tisha Castillo, et al., | No. CV-17-04688-PHX-DLR |
|---|---|
| Plaintiffs, | **ORDER** |
| v. | |
| George Harry Johnson, et al., | |
| Defendants. | |

This action alleges bribery of the Chairman of the Arizona Corporation Commission ("Commission") by George Johnson, the owner of Johnson Utilities LLC ("Johnson Utilities"), to allow the company to charge excessive rates, and the illicit transfer of the ill-begotten revenue through a network of affiliated entities. Plaintiffs Tisha Castillo, Karen Christian, and Steve Pratt were ratepayers for water and wastewater services provided by Johnson Utilities.[1] Plaintiffs allege that Johnson, Johnson Utilities, Johnson International, Incorporated ("Johnson International"), and lobbyist James Franklin Norton (collectively the "Bribery Defendants") violated the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), by conspiring to unlawfully raise utility rates through racketeering, wire fraud, and bribery of a public servant. Plaintiffs also allege that the Bribery Defendants were unjustly enriched, and that Johnson Utilities violated the Arizona Consumer Fraud Act ("ACFA"), A.R.S. § 44-1522.

---

[1] Plaintiffs bring this suit individually and on behalf of others similarly situated.

Plaintiffs further allege that Johnson, Johnson Utilities, The George H. Johnson and Jana S. Johnson Revocable Trust, Ultra Management LLC ("Ultra"), Hunt Management LLC ("Hunt"), Roadrunner Transit LLC, Chris Johnson ("Chris"), Barbara Johnson ("Barbara"), Pinetop Trust II, December Companies Incorporated, The B.A.J. Living Trust ("BAJ Trust"), and The Chris Johnson Family Trust (collectively the "Transfer Defendants") conspired, agreed, and acted to fraudulently transfer the assets of Johnson Utilities to and among themselves in violation of Arizona's Uniform Fraudulent Transfer Act ("AUFTA"), A.R.S. §§ 44-1004 and -1005. Finally, Plaintiffs seek a declaratory judgment that the Transfer Defendants shared unity of control.

Before the Court are Defendants' motions to dismiss. (Docs. 77 and 78.) The Bribery Defendants move to dismiss the action as barred by the filed rate doctrine (Doc. 78), while the Transfer Defendants move to dismiss for lack of subject matter jurisdiction, lack of ripeness, and for failure to state a claim for relief (Doc. 77). The Bribery Defendants and Transfer Defendants cross-join in each other's motions. The motions are fully briefed, and the Court heard oral argument on May 23, 2019. For the following reasons, Defendants' motions are denied.

## **BACKGROUND**[2]

**I. Bribery Scheme**

As a provider of water and wastewater services in Arizona, Johnson Utilities is subject to regulation by the Commission. (Doc. 44 ¶ 2.) The Commission, which regulates utilities and determines rate adjustments, is comprised of five elected commissioners. (¶ 26.) On August 24, 2010, the Commission unanimously rejected Johnson Utilities' requests (1) for a rate increase premised on an increased rate base and (2) to allow Johnson, the sole employee and ultimate decision maker for Johnson Utilities, to have his personal income taxes reimbursed by payments made by Johnson Utilities' customers. (¶¶ 11, 28.) Commissioner Gary Pierce voted as part of a unanimous Commission against the requests. (¶ 29.)

---

[2] This section draws from the allegations in the complaint, which are accepted as true for purposes of this Order.

After Pierce assumed Chairmanship of the Commission in September 2011, Johnson Utilities' requested rate base increase was voted on again. This time the Commission approved the request, with three votes to grant (including Pierce's), one abstention, and one dissent. (¶¶ 30-31.) Subsequently, the Commission also re-voted on Johnson Utilities' request to allow recovery of Johnson's personal income tax payments from utility revenues. (¶ 32.) Again, Pierce reversed his prior vote and the request was approved by the Commission. (¶ 33.) The new rate base and the ability to seek reimbursement for personal income tax expenses went into effect.

Around the time of the Commission's approval of the rate base increase, a scheme was created to funnel payments from Johnson Utilities to Commissioner Pierce. Norton arranged for his then-wife, Kelly Norton, and her consulting company, KNB Consulting ("KNB"), to enter into a sham consulting contract with Johnson Utilities, and for KNB to hire Commissioner Pierce's wife, Sherry, enabling Johnson Utilities to funnel bribe payments through KNB and Sherry to Commissioner Pierce. (¶¶ 35, 44.) Under the arrangement, Johnson or his affiliates would pay KNB $6,000 per month, and in turn, KNB was to pay Sherry $3,500 per month from those funds. (¶ 36.)

Prior to this agreement, KNB had not been pursuing a consulting contract with Johnson Utilities. (¶ 37.) Nor did KNB interview or receive a resume from Sherry before hiring her. In fact, Sherry had no consulting experience and no history of professional employment for the previous 21 years. (¶ 38.) To make the arrangement appear legitimate, Kelly was asked to have regular meetings and exchange emails with Sherry. (¶ 40.) The arrangement was consummated at a dinner party in September 2011. (¶¶ 41-42.) Sherry subsequently signed an "Independent Contractor Agreement" with KNB, as well as a confidentiality agreement. (¶ 43.)

In November 2011, Kelly opened a checking account in KNB's name and deposited the first $6,000 payment from Johnson. (¶¶ 45-47.) At this point, Sherry had done no work for Johnson or any of his affiliates. Nevertheless, Sherry received a $3,500 check from KNB. (¶ 48.) From December 2011 through June 2012, Johnson made monthly $6,000

payments to KNB, and KNB made monthly $3,500 payments to Sherry, which she deposited into an account shared with Commissioner Pierce. (¶¶ 49-63, 65.) Although KNB did not receive payment from Johnson in July, KNB still paid Sherry $3,500. (¶ 65.)

In June 2012, Commissioner Pierce again attempted to have the Commission approve the change in personal income tax reimbursement regulations Johnson requested, filing on the Commission's docket a policy statement concerning "Income Tax Expense for Pass-Through Entities." (¶ 64.) Commissioner Pierce's efforts were unsuccessful as the measure failed. (¶ 66.) At this time, Johnson elected to stop funneling bribes to Commissioner Pierce. (*Id.*)

At the direction of Norton, on July 31, 2012, Kelly notified Sherry that her affiliation with KNB had been terminated. (¶ 67.) In response, Sherry emailed Kelly acknowledging the end of the payments from Johnson and stating that Commissioner Pierce "told me about his conversation with [Norton] so I was already aware." (¶ 68.) After receiving a final $6,000 payment from Johnson in August 2012, Kelly emailed Sherry stating: "Just got my final check in the mail . . . [I] will get a check out to you tomorrow." (¶¶ 69-70.) Thereafter, Sherry received a $3,500 payment from KNB. (¶ 71.) Johnson and Johnson Utilities are alleged to have engaged in other illicit schemes, an attempted land deal (¶¶ 79-84) and a $25,000 payment (¶¶ 74-78), to bribe Commissioner Pierce. The $25,000 payment was made by Johnson to the Norton's two days after the personal income tax reimbursement regulation was changed. (¶¶ 74-78.) According to Norton, the payment was a "thank you" from Johnson. (*Id.*)

**II. Fraudulent Transfer and Depletion of Johnson Utilities' Assets**

Johnson Utilities does not directly provide water or wastewater services to its clients. (¶ 87.) Instead, Johnston Utilities contracts with Ultra for all its operations. (¶ 89.) Ultra, however, has no employees. (¶¶ 90, 98.) The entity contracts with Hunt for all the employees and administrative services necessary to complete operations for Johnson Utilities. (¶¶ 90, 92.) Johnson Utilities pays Ultra approximately $15.5 million per year in management fees. Of that, $6-7 million is passed through to Hunt and $8-9 million

remains with Ultra. (¶¶ 88, 93.) Despite having no employees and providing no services, Ultra is paid millions annually. Ultra is owned by Johnson's children, Chris and Barbara Johnson, through Pinetop Trust II. (¶ 89.) Hunt's members are Chris and Margaret Johnson as trustees of the Chris Johnson Family Trust, and Barjo. Barjo's sole member is Barbara as trustee of the BAJ Trust. (¶¶ 15, 25.) Based on this arrangement, Plaintiffs contend Ultra merely serves as a shell entity that isolates the assets of Johnson Utilities from liability and provides asset protection for the company. (¶¶ 100-04.) Gary Drummond, Johnson's replacement as manager of Johnson Utilities, has opined to the same. (¶ 105.)

## **DISCUSSION**

### I. The Bribery Defendants' Motion to Dismiss

The Bribery Defendants move to dismiss Plaintiffs' RICO, CAFA, and common law claims as barred by the filed rate doctrine. (Doc. 78.) Specifically, the Bribery Defendants argue that Plaintiffs' claims must be dismissed for lack of subject matter jurisdiction pursuant to 12(b)(1), and alternatively pursuant to 12(b)(6). (*Id.* at 10 n. 6.) Finding "persuasive case law which holds that the filed rate doctrine is not a subject matter jurisdiction issue" but rather a defense on the merits, the Court treats the Bribery Defendants' motion as a motion to dismiss brought under 12(b)(6). *See, e.g.*, *Hoover v. HSBC Mortg. Corp.*, 9 F. Supp. 3d 223, 237 (N.D. N.Y. 2014) (collecting cases); *Perryman v. Litton Loan Servicing, LP*, No. 14-CV-221-JST, 2014 WL 4954674, at *6 n. 4 (N.D. Cal. Oct. 1, 2014) (expressing doubt that filed rate doctrine applies to 12(b)(1)).

#### A. Federal Filed Rate Doctrine

"The filed rate doctrine is a judicial creation that arises from decisions interpreting *federal statutes* that give *federal agencies* exclusive jurisdiction to set rates for specified utilities, originally through rate-setting procedure involving the filing of rates with the agencies." *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 867 (9th Cir. 2013) (emphasis added). The doctrine's justification is threefold: (1) "federal law require[s] the primacy of filed rates and tariffs," (2) "federal preemption (or the supremacy of federal law)," and (3)

"deference to federal agency expertise (or primary jurisdiction)." *Id.* at 868. "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question." *Wah Chang v. Duke Energy Trading & Mtkg., LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007).

In short, the federal filed rate doctrine applies when federal statutes create a federal regulatory scheme for setting federal rates. Because no federal rate is implicated here, the federal filed rate doctrine is inapplicable. *See, e.g.*, *Pink Dot, Inc. v. Teleport Commc'ns Grp.*, 107 Cal. Rptr.2d 392, 398 (Cal. Ct. App. 2001) (declining to apply federal filed rate where no federal rate was implicated); *Satellite Sys., Inc. v. Birch Telecom of Okla., Inc.*, 51 P.3d 585, 588 (Okla. 2002) (finding that, because the defendant was required to file its tariffs with state commission, "the federal filed tariff doctrine is not controlling in this appeal").

### B. Arizona Filed Rate Doctrine

Next, the Court looks to whether Arizona has adopted an analogous filed rate doctrine applicable to state ratemaking agencies that would preclude the claims at issue here. This is a complex inquiry that requires the Court to examine whether the state courts have adopted or disclaimed the doctrine and the extent to which the state's regulatory scheme codifies the doctrine. *See, e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992-93 (9th Cir. 2000); *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 764 (3d Cir. 2009). These considerations can lead to competing conclusions.

For example, Arizona courts have not expressly adopted the filed rate doctrine. *Johnson v. First Am. Title Ins. Co.*, No. CV-08-01184-PHX-DGC, 2008 WL 4850198, at 4 (D. Ariz. 2008) ("Arizona has never adopted the filed rate doctrine."); *SolarCity Corp. v. Salt River Project Agric. Improvement*, No. 15-CV-374-PHX-DLR, 2015 WL 6503439, at *14 (D. Ariz. Oct. 27, 2015) ("Several states have adopted the doctrine, but Arizona has not."). And when faced with the issue, Arizona courts have "ducked the question." *Patel v. Specialized Loan Serv., LLC*, 904 F.3d 1314, 1333 (11th Cir. 2018) (Johnson, J.,

dissenting); *see, e.g.*, *Qwest Corp. v. Kelly*, 59 P.3d 789, 800 (Ariz. Ct. App. 2002) ("We need not determine, however, whether Arizona should adopt this federal doctrine and apply it when a state regulatory agency is involved[.]").

With that said, "the Second Circuit Court of Appeals approved the [Connecticut] district court's conclusion that Arizona's constitution, which gives the Commission exclusive authority to set rates of public utilities, essentially codifies the filed rate doctrine." *Qwest*, 59 P.3d at 800 (discussing *Sun City Taxpayers' Ass'n v. Citizens Utilities Co.*, 847 F. Supp. 281 (D. Conn. 1994), *aff'd*, 45 F.3d 58 (2d Cir. 1995)). The *Qwest* court observed, however, that "Sun City is a federal case by a circuit court different from the one that serves Arizona" and that "there is persuasive authority" opposing adopting the filed rate doctrine. *Id.* The *Qwest* court also "found it significant" that an earlier Arizona Court of Appeals decision did not mention "the filed rate doctrine after thoroughly discussing the Commission's jurisdiction and finding the judiciary does have the authority to address and is capable of resolving traditional tort . . . claims, even if one of the parties is a regulated utility." *Id.* (discussing *Campbell v. Mountain States Tel. & Tel. Co.*, 586 P.2d 993 (Ariz. Ct. App. 1978)).

Turning to the Arizona Constitution, the Commission is vested with "full power to . . . prescribe . . . just and reasonable rates and charges to be made and collected." Ariz. Const. art. 15 § 3. Further, Arizona has a statutory scheme establishing procedures for direct challenges to Commission decisions. Utility customers may complain to the Commission that the rates charged by a public service corporation violate "any provision of law or any order or rule of the commission," A.R.S. § 40-246(A), and seek a rehearing of the Commission's decision within twenty days of entry, § 40-253(A). Within thirty days of rehearing or denial of rehearing, the aggrieved party may file an action for judicial review of the decision. § 40-254(A). Arizona courts, in such proceedings, can hear and resolve any claim that a Commission decision offends the federal constitution. *See, e.g.*, *Western Gillette, Inc. v. Ariz. Corp. Comm'n*, 121 592 P.2d 375 (Ariz. Ct. App. 1979); *State ex rel. Corbin v. Ariz. Corp. Comm'n*, 693 P.2d 362 (Ariz. Ct. App. 1984).

Although the Court recognizes that Arizona's statutory scheme creates a method for direct challenges, it is less clear whether that scheme prevents collateral attacks and, assuming it does, to what extent. "When state-law regulatory authority provides the basis of the filed rate doctrine, the doctrine should be based on a careful analysis of the text and purpose of the underlying state law, rather than blanket application of the filed rate doctrine to all challenges which touch a regulated industry." *Id.* at *8; *see also Pink Dot, Inc.*, 107 Cal. Rptr.2d at 398 ("In California, there are limits to the filed rate doctrine, . . . a public utility could be liable for fraud"); *Satellite Sys.*, 51 P.3d at 588 ("Even if a state filed tariff doctrine has been adopted in Oklahoma, it does not bar a common law fraud claim."). The Arizona Supreme Court "minced no words in its characterization of the Commission's power: 'The Commission was not designed to protect public service corporations and their management but, rather, was established to protect our citizens from the results of speculation, mismanagement, and abuse of power.'" *Johnson Utilities LLC v. Ariz. Corp. Comm'n*, 438 P.3d 656, 660 (Ariz. Ct. App. 2019) (citing *Ariz. Corp. Comm'n v. Woods*, 830 P.2d 807, 817 (Ariz. 1992) (en banc)). Assuming, unlikely though it might be, that Arizona has a filed rate doctrine, the Court doubts that it would bar claims of a utility bribing a commissioner and sheltering improperly obtained revenue, especially given the import Arizona places on protecting consumers from utility overreach.

Complicating matters further, were the Court to assume that Arizona has adopted its own version of the filed rate doctrine, applying it to bar Plaintiffs' RICO claims presents a host of supremacy and preemption issues that neither party has briefed. Some out-of-circuit authorities have weighed in on these issues, finding that a federal law like RICO must be interpreted consistent with a state regulatory scheme because utility regulation is an area of traditional state authority. *See, e.g.*, *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 495 (8th Cir. 1992) ("allowing a RICO action . . . would similarly disrupt the state administrative process and constitute a 'collateral attack on a rate order,' contrary to state law"); *Taffet v. S. Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (filed rate doctrine "applies with equal force to preclude recovery under RICO whether the rate at issue has been set by

a state rate-making authority"). But, the Ninth Circuit has not weighed in on the question, and district courts within the circuit have offered compelling counter-arguments. For instance, the *Perryman* court explained:

> When a federal statute grants strong and pervasive authority to a federal agency, it is understandable why courts interpret the statute to supersede other laws that would stand in the statute's way. Inconsistent state laws are preempted under the Supremacy Clause, and inconsistent federal laws are interpreted to be subordinate to the "stronger" statute. But it is unclear why the California Insurance Commissioner's regulatory authority would impede the otherwise appropriate reach of a federal statute. By arguing that California's state-law regulatory authority bars even otherwise valid federal RICO claims, Defendants' arguments would seem to stand the Supremacy Clause on its head.

2014 WL 4954674, at *8.

Having exhaustively examined the relevant authorities, the Court is not left firmly persuaded that Arizona has adopted a version of the filed rate doctrine. Moreover, assuming Arizona has adopted a form of the doctrine, it is unclear whether it would apply to the type of conduct at issue here. In an appropriate case, it might be proper to certify these questions to the Arizona Supreme Court. *See Outdoor Sys., Inc. v. City of Mesa*, 902 F.2d 1579 (Table), 1990 WL 68860, at *4 (9th Cir. 1990). This, however, is not an appropriate case because the Court can resolve the pending motion without definitively answering these questions.[3]

Even if the Court were to assume (without deciding) that Arizona has adopted a filed rate doctrine and that it applies to the types of claims alleged here, the doctrine is "open to repudiation by the . . ." relevant agency. *Carlin*, 705 F.3d at 869. For example, in *Perryman* the defendants argued that the filed rate doctrine barred the plaintiffs' claims because the charges applied to their escrow accounts were consistent with the amounts the California Department of Insurance had approved. 2014 WL 4954674, at *1-2. The court disagreed, finding that the California's Insurance Commissioner had disclaimed authority to regulate the conduct challenged in the complaint. *Id.* at *8. In support, the court

---
[3] For this reason, the Bribery Defendants argument under the *Burford* abstention doctrine is unavailing.

- 9 -

observed that the Commissioner previously found that it "has no jurisdiction" over similar conduct when a state court judge sought guidance on the matter, noting that "another court already attempted to defer to the [] Commissioner on exactly the type of claim before this court, and the Commissioner refused to accept the offered deference." *Id.* The court reasoned that "if the [] Commissioner felt that allowing civil actions of this type would undermine the agency's authority to regulate insurance rates, he would have expressed the opportunity to express an opinion about the reasonableness of the rate pass-alongs when asked directly to do so." *Id.* at *9. The court added that it "will not be more concerned with the agency's authority than the agency itself." *Id.*

Like in *Perryman*, the Commission disclaimed jurisdiction over *Delton Munday, et al.,* ACC Docket No. WS-02987A-17-0192, a previous action brought before the Commission that raised similar claims to those alleged here. (*See* Doc. 96-1 at 105-12.) The *Munday* plaintiffs' allegations also concerned the bribery of Chairman Pierce by Johnson Utilities for votes on a rate increase and tax pass-through. (*Id.* 106-07 ¶ 11.) Aside from challenging the reasonableness of the rate under A.R.S. § 40-246(A), the *Munday* plaintiffs alleged that Johnson Utilities, Johnson International, R&R Partners, and the Commission violated Arizona's Civil RICO statute, and brought common law claims for conspiracy, constructive fraud, aiding and abetting, breach of contract, and breach of the implied covenant of good faith and fair dealing. (*Id.* at 109-12.)

The Commission dismissed the conspiracy, constructive fraud, aiding and abetting, breach of contract, breach of the implied covenant of good faith and fair dealing, and Arizona RICO claims, deferring to "trial courts of general jurisdiction" on "traditional claims" due to courts superior familiarity and capability with resolving them.[4] (Doc. 96-2 at 25-26 ¶¶ 31-35.) The Commission reasoned that, although it has "broad constitutional and statutory powers over many aspects of public service corporations," and "has

---

[4] Johnson Utilities and Johnson International moved to dismiss the plaintiffs' complaint, arguing that "jurisdiction over the unsupported claims lies exclusively in the Superior Court of Arizona" and that the Commission "is constitutionally constrained from adjudicating civil claims pursuant to its limited grant of authority." (Doc. 96-1 at 115.) R&R Partners and the Commission Utility Division also moved to dismiss.

developed specialized expertise in matters related to [] regulation of the service and financial aspects of public service corporations," "claims based upon theories of tort and contract are far afield of the Commission's area of expertise and statutory responsibility[.]" (¶ 31.) The Commission also declined to exercise jurisdiction over the non-public service corporation parties. (¶ 35.)

The Bribery Defendants argue that the Commission has not repudiated jurisdiction because it declined to dismiss the *Munday* plaintiffs' challenge to the reasonableness of the rate finding that it had jurisdiction to assess "the reasonableness of any rates or charges," that the *Munday* plaintiffs and Johnson Utilities jointly stipulated to dismiss the challenge to the reasonableness of the rate, and that the Commission left open the opportunity for the plaintiffs to reassert their reasonableness claim in an ongoing action where Johnson Utilities sought to increase its rate base.

The Court finds this argument unavailing. Plaintiffs are not challenging the reasonableness of Johnson Utilities' rate. Plaintiffs are challenging the Bribery Defendants' conduct in inducing a new, higher rate base. That is, Plaintiffs do not claim the increased rate base was unreasonable. Instead, they challenge whether it was procured through bribery and fraud. The Commission expressly disclaimed jurisdiction over these claims. The Commission also disclaimed jurisdiction over any non-public service corporations. Accordingly, even if Arizona has adopted a filed rate doctrine that would normally apply to claims such as these, the doctrine does not bar Plaintiffs' claims because the Commission evidently has repudiated the doctrine in this instance.

## II. The Transfer Defendants' Motion to Dismiss

The Transfer Defendants move to dismiss Plaintiffs' claims of fraudulent transfer and declaratory judgment for failure to state a claim for which relief can be granted.[5] When

---

[5] The Transfer Defendants also moved to dismiss these claims for lack of subject matter jurisdiction, arguing that the Court lacks subject matter jurisdiction over Plaintiffs' state law fraudulent transfer claims because it lacks jurisdiction over Plaintiffs' RICO, ACFA, and unjust enrichment claims. For reasons explained above, the Court finds that it has jurisdiction over the RICO, ACFA, and unjust enrichment claims. The Court therefore has supplemental and ancillary jurisdiction over Plaintiffs' fraudulent transfer and declaratory judgment claims. *See, e.g.*, *Tomar Elecs., Inc. v. Watkins*, No. 09-CV-170-PHX-ROS, 2010 WL 11434976, at *3 (D. Ariz. Sept. 2, 2010).

analyzing a complaint for failure to state a claim to relief under Rule 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Legal conclusions couched as factual allegations are not entitled to the assumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and therefore are insufficient to defeat a motion to dismiss for failure to state a claim, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). To avoid dismissal, the complaint must plead sufficient facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

### A. Fraudulent Transfer Claims

As a preliminary matter, the Transfer Defendants contend that Federal Rule of Civil Procedure 9(b)'s heightened particularity requirement applies to Plaintiffs' fraudulent transfer claims. (Doc. 77 at 7.) The Transfer Defendants, however, provide no controlling Ninth Circuit authority that applies the heightened pleading requirement to fraudulent transfer claims under AUFTA. Nor have district courts in this circuit applied Rule 9(b) to AUFTA claims. *See e.g.*, *Armed Forces Bank NA v. Dragoo*, No. 17-CV-786-PHX-ROS, 2018 WL 8621584, at *2-3 (D. Ariz. Sept. 28, 2018); *Anderson v. Chandler*, No. 12-CV-813-PHX-SMM, 2013 WL 3864225, at *3 (D. Ariz. July 25, 2013); *U.S. v. Reading*, No. 11-CV-698-PHX-JFM, 2012 WL 4120439, at *2-3 (D. Ariz. Sept. 19, 2012). Finding no principled reason for applying Rule 9(b)'s pleading requirements to Plaintiffs' fraudulent transfer claims, the Court declines to do so.

A fraudulent transfer claim is different than the fraud claims to which Rule 9(a) would normally apply. In a common law fraud claim, the defendant is alleged to have made false statements or material omissions to the plaintiff, who is in a position to plead those statements or omissions with specificity. *See, e.g.*, *Pence v. U.S.*, 316 U.S. 332, 338 (1942); 2A J. Moore, Federal Practice ¶ 9.03. A fraudulent transfer claim, by contrast,

involves a third-party defendant who has no relationship with the plaintiff, and thus the plaintiff usually has insufficient information to plead its claim with specificity. *See Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) (opining that Rule 9(b) "requires that plaintiffs specifically plead those facts surrounding alleged acts of fraud to which they can reasonably be expected to have access").

Even if the Court were to apply Rule 9(b)'s heightened pleading standard, Plaintiffs' complaint contains sufficiently particular allegations. "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001). For actually fraudulent transfers, "the complaint must allege facts establishing a 'transfer [was] made . . . by a debtor . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor.'" *Armed Forces Bank*, 2018 WL 8621584, at *2 (quoting A.R.S. § 44-1004(A)(1)). The debtor's actual intent "may be shown by direct proof or by circumstantial evidence from which actual intent may be reasonably inferred." *Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1136 (D. Ariz. 2006). For constructive fraudulent transfer claims, the plaintiff must allege that the debtor did not "receiv[e] a reasonably equivalent value in exchange for the transfer or obligation," and the debtor either:

> (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (b) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

A.R.S. § 44-1004(A)(2); *see id.* § 44-1005 (debtor's transfer fraudulent as to creditor when "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation").

Plaintiffs' complaint sufficiently notifies the Transfer Defendants of their alleged

role in the fraudulent transfers. Plaintiffs allege that Johnson Utilities funnels money through Ultra and Hunt. Specifically, Johnson Utilities, which has only one employee (Johnson) and does not directly provide water or wastewater services, contracts with Ultra, which has no employees, and which in turn contracts with Hunt for all the employees and administrative services necessary to complete operations for Johnson Utilities. (Doc. 44 ¶¶ 87-92, 98.) Plaintiffs also allege that Johnson Utilities pays Ultra $15.5 million in management fees, which account for half of Johnson Utilities' annual revenue. Ultra, in turn, keeps nearly two-thirds, or $8-9 million of this money, to simply contract with Hunt. (¶¶ 91, 93.) Chris Johnson has stated he does not know why Ultra was created (¶ 96), and Hunt's Chief Operating Officer has stated that nobody from Hunt actually works with Ultra because it has no employees (¶ 97). Based on Johnson Utilities' arrangement with Ultra and Hunt, Plaintiffs allege that "Ultra provides nothing in value for the money" it receives, and that it is a "shell entity that collects millions in dollars from Johnson Utilities." (¶¶ 101-02.) Gary Drummond, Johnson's replacement as manager of Johnson Utilities, believes the same. (¶ 105.) The arrangement outlined in the complaint states plausible claims for fraudulent transfer and provides sufficiently specific notice of the alleged misconduct so that the Transfer Defendants can defend against the charges.

### B. Declaratory Judgment

Finally, the Transfer Defendants seek to dismiss Plaintiffs' declaratory judgment claim. In effect, Plaintiffs' claim seeks a determination that the Transfer Defendants are an alter ego of Johnson, Barbara, and Chris. (¶¶ 173-74.) Although Arizona does not recognize "alter ego as an independent cause of action," Plaintiffs may seek derivative liability under an alter ego theory against the Transfer Defendants if they can "prove both (1) unity of control and (2) that observance of the corporate form would sanction a fraud or promote injustice." *Jes Solar Co. Ltd. v. Manitee Energy Inc.*, No. 12-CV-626-TUC-DCB, 2019 WL 2869666, at *9 (D. Ariz. July 3, 2019).

"Arizona courts consider various factors when determining whether unity of interest and ownership exists under the alter ego doctrine, such as commingling of personal and

corporate funds and assets, failure to keep funds from various entities separate, and unauthorized diversion of corporate funds or assets for non-corporate purposes." *Id.* at *8. At the motion to dismiss stage, a plaintiff alleging alter ego liability "must do more than make conclusory statements regarding an alter ego relationship between individual and corporate defendants; the plaintiff must allege specific facts supporting application of the alter ego doctrine." *Barba v. Lee*, No. 09-CV-1115-PHX-SRB, 2009 WL 8747368, at *4 (D. Ariz. Nov. 4, 2009).

Taking the facts alleged in the complaint as true, as the Court must, Plaintiffs have pled a cognizable alter ego theory by alleging that the Transfer Defendants intermingled assets and employees between various corporations, transferred corporate funds without adequate consideration by funneling money through Ultra, and controlled, dominated and operated the entities as their individual business and alter ego. For instance, Plaintiffs allege that Ultra is owned by Chris and Barbara through Pinetop Trust II. (Doc. 44 ¶ 89.) Ultra, which does not conduct business with other entities and has no employees, appears to merely act as a middleman between Johnson Utilities and Hunt, collecting millions in management fees in exchange for no consideration. (¶¶ 92, 98.) In addition to owning the entity, Ultra pays Chris and Barbara as its managers. (¶¶ 92.) Notwithstanding his ownership of Ultra, his role as the company's manager, and his membership in Hunt, Chris is unaware why Ultra was created, who created it, how much money flows through the company, or how much Ultra pays Hunt. (¶¶ 92-96). Drummond, Johnson Utilities' manager, believes Hunt and Ultra were created to isolate Johnson Utilities' assets from liabilities. (¶ 105.)

## **CONCLUSION**

The Court is unpersuaded that Arizona has adopted a version of the filed rate doctrine. Nor is the Court persuaded that the doctrine, assuming one has been adopted, would apply to the type of conduct at issue here. Nevertheless, even assuming that Arizona has adopted a filed rate doctrine and that it applies under these circumstances, the doctrine does not bar Plaintiffs' claims because the Commission repudiated the doctrine in this

instance. The Court therefore denies the Bribery Defendants' motion to dismiss. The Court also denies the Transfer Defendants' motion to dismiss, finding that Plaintiffs have plead sufficient facts to state claims for fraudulent transfer and declaratory judgment. Accordingly,

**IT IS ORDERED** that Defendants' motions to dismiss (Docs. 77, 78) are **DENIED.**

Dated this 5th day of September, 2019.

Douglas L. Rayes
United States District Judge