**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tisha Castillo, et al., | No. CV-17-04688-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| George Harry Johnson, et al., | |
| Defendants. | |

Before the Court is Plaintiffs' motion for preliminary injunction against Defendant Johnson Utilities ("JU") to prevent JU from distributing the proceeds of its asset sale, which is fully briefed. (Docs. 229, 232, 234.) The Court will grant Plaintiffs' motion, as explained below.

**I. Background**

JU is under contract to sell its assets to EPCOR Water Arizona, Inc. ("EPCOR"), the entity appointed by the Arizona Corporation Commission ("ACC") to take over JU's management and operations. (Doc. 229 at 2.) On October 5, 2020, JU and EPCOR applied for asset sale approval, which the ACC granted on December 22, 2020.[1] (Doc. 229-1.) The asset sale price is $110,300,000. (Doc. 234-1.)

Plaintiffs' Second Amended Complaint ("SAC"), *inter alia*, contains claims arising

---

[1] Pursuant to stipulation, Defendants agreed not to distribute sale proceeds prior to January 11, 2021, regardless of the issuance date of the Court's order addressing Plaintiffs' motion for preliminary injunction. (Doc. 231.)

from allegations that Defendant George Johnson fraudulently caused JU to transfer tens of millions of dollars out of JU to related entities and others referred to as the "Fraudulent Transfer Defendants." (Doc. 207.) Concerned that JU might engage in similar conduct following the asset sale, thereby thwarting Plaintiffs from collecting on a potential judgment,[2] on December 11, 2020, Plaintiffs filed an emergency application seeking, *inter alia*, a preliminary injunction to prevent JU from transferring or otherwise disposing of the proceeds from the asset sale. (Doc. 229.) Recognizing the potential financial constraints that such an injunction might impose, Plaintiffs suggest allowing JU to retain up to $5 million of the sale proceeds to cover its expenses and to deposit the remaining proceeds in an interest-bearing federally insured account or in publicly-traded securities during the injunction period. Plaintiffs' motion is now ripe.

**II. Discussion**

Having carefully considered the parties' briefs, the Court finds that it has the authority to grant the requested injunction and that Plaintiffs have carried their burden on all four elements of the preliminary injunction test.

**A. Authority**

The Court may grant an injunction to preserve the status quo and prevent the dissipation of assets when the plaintiff seeks equitable relief in the underlying action. *Johnson v. Couturier*, 572 F.3d 1067, 1084 (9th Cir. 2009) (quoting *De Beers Consol. Mines v. U.S.*, 325 U.S. 212, 220 (1945)). The "nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets." *In re Focus Media Inc.*, 387 F.3d 1077, 1085 (9th Cir. 2004) (quoting *United States v. Oncology Assocs., P.C.*, 198 F.3d 489, 496 (4th Cir. 1999)).

Here, the Court has the authority to enter a preliminary injunction preserving the proceeds from the asset sale for two reasons. First, Plaintiffs seek equitable relief in the

---

[2] Plaintiffs assert that their maximum claim as of December 31, 2020 was $66 million (if damages are trebled), and damages (if trebled) continue to accrue at the rate of $5.7 million per year. (Doc. 234.)

underlying action. Namely, they assert fraudulent transfer claims in counts five through seven of their SAC that ultimately request an injunction to unwind JU's alleged prior fraudulent transfers and to prevent JU from transferring its assets in the future. *See Focus Media*, 387 F.3d at 1085 (affirming preliminary injunction preventing shareholder from transferring company assets in case in which the plaintiff pled fraudulent conveyance); *Wimbledon Fund, SPC Class TT v. Graybox, LLC*, 648 F. App'x. 701, 702 (9th Cir. 2016) (explaining that the district court had the authority to grant an injunction preventing the dissipation of assets because "this is a fraudulent conveyance case and one in which [the plaintiff seeks] equitable relief"). Second, a nexus ties Plaintiffs' proposed injunction to the relief sought in the underlying action. Plaintiffs' requested injunction is not merely "similar in character" to the equitable relief sought in the underlying action; the requests to prevent future fraudulent transfers in this motion and in the underlying action overlap. Nevertheless, the requested injunction and the relief sought in the underlying action need not be identical. *See Couturier*, 572 F.3d at 1084 (rejecting the defendants' argument that the district court impermissibly granted the plaintiffs' injunction because the relief sought was "different in character than any judgment that might finally issue," noting that the court had authority to grant the injunction because "this is not a case where the preliminary injunction 'deals with a matter lying wholly outside the issues in the suit'"). In sum, because Plaintiffs seek equitable relief in the underlying action and the injunction requested deals with matters directly at issue in the case, the Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65.

**B. Preliminary Injunction Test**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). These elements may be balanced on a sliding scale, whereby a stronger showing of one element

may offset a weaker showing of another. *See Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131, 1134-35 (9th Cir. 2011). But the sliding-scale approach does not relieve the movant of the burden to satisfy all four prongs for the issuance of a preliminary injunction. *Id.* at 1135. Instead, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* The movant bears the burden of proof on each element of the test. *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

### 1. Likelihood of Success on the Merits

Here, Plaintiffs have met their burden by, at the very least, demonstrating the existence of "serious questions going to the merits" on their claims where the balance of hardships tips sharply towards Plaintiffs. Plaintiffs' claims fall into two categories: those concerning bribery of a public servant and those alleging fraudulent transfer. The Court will address each category, in turn.

### a. Bribery of a Public Servant

Defendants' alleged bribery scheme, involving bribery of a public servant, serves as the basis of counts one through four of Plaintiffs' SAC. In Arizona, a person commits bribery of a public servant if, with corrupt intent, that person "offers, confers or agrees to confer any benefit upon a public servant [] with the intent to influence the public servant's [] vote, opinion, judgment, exercise of discretion or other action in his official capacity [.]" A.R.S. § 13-2602. Here, *inter alia*, Plaintiffs point to witness testimony from Kelly Norton, which meets each element of the Arizona bribery statute. Specifically, during the related criminal trial, Ms. Norton testified that she helped Johnson repeatedly funnel money to Gary Pierce through his wife, Sherry, with the intent to influence Mr. Pierce's vote as an ACC Commissioner. (Doc. 2291-1 at 47-77.) Although Defendants seek to undercut this evidence by casting Ms. Norton's credibility into doubt, it is the factfinders' role during trial, not the Court's role at this juncture, to assess Ms. Norton's credibility. At this stage,

Plaintiffs have met their burden in demonstrating the presence of serious questions going to the merits of their bribery claim by proffering evidence suggesting that Defendants offered a benefit to a public servant with the intent to influence his vote.

### b. Fraudulent Transfer

Plaintiffs allege fraudulent transfer as the basis for counts five through seven of their SAC. (Doc. 207.) In Arizona, a transfer of assets by a debtor is fraudulent if the transfer is "made with the intent to hinder, delay or defraud a creditor." A.R.S. § 44-1004(A)(1). When assessing intent, the Court considers—among other factors—whether the transfer was made to an "insider," A.R.S. § 44-1004(B)(1), and whether "[t]he value of the consideration received [] was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." A.R.S § 44-1004(B)(7).

Here, Plaintiffs have pointed to evidence indicating that the Fraudulent Transfer Defendants transferred cash from JU to themselves—insiders. They have also offered evidence that a reasonable juror might conclude shows that the Fraudulent Transfer Defendants did so with the intent to hinder, delay or defraud a creditor. Particularly, evidence indicates that JU created shell affiliates, such as Ultra, exclusively to funnel substantial cash to insiders while avoiding liability. For example, the ACC concluded that Ultra "does not benefit JU in any way, is completely superfluous for the purposes of JU's operations (because everything is done by Hunt employees), is simply a way to provide revenues to Chris and Barbara Johnson, and is actually detrimental to JU's financial well-being and the adequacy of its service and operations." (Doc. 229-1 at 34). Similarly, Gary Drummond, successor to Johnson, testified that Ultra was set up as a shell entity to isolate JU assets from liability. (*Id.* at 22.) Despite the lack of assistance that Ultra provided to JU, Ultra retained up to $9.5 million annually for the benefit of its owners—Johnson's children, Chris and Barbara—evidence strongly suggesting that JU did not receive a reasonably equivalent value for its transfers. (*Id.* at 39.) Looking to this evidence, the Court finds that Plaintiffs have demonstrated a likelihood of success on their claims that the Fraudulent Transfer Defendants transferred cash from JU to themselves with the intent

to hinder, delay, or defraud a creditor.

In a final effort to dispute that Plaintiffs have met their prong-one burden, Defendants point to the fact that the jury hung in their criminal trial to suggest that Plaintiffs cannot demonstrate a likelihood of success on the merits in their civil suit. The fact that the jury could not reach a unanimous verdict convicting Defendants in the criminal trial when applying the stricter beyond-a-reasonable-doubt standard does not suggest that serious questions going to the merits are absent, here. To the contrary, the fact that some jurors did vote to convict, even when applying a more exacting standard, indicates that Plaintiffs may likely prove their claims by a preponderance of the evidence. Similarly, Defendants argue that Plaintiff cannot have not raised serious questions going to the merits because the Ninth Circuit (by granting Defendants' Rule 23(f) petition) and this Court (by granting a stay while the interlocutory appeal remains pending) have indicated that Defendants are likely to prevail on the merits. To the contrary, this Court noted in its stay order that the Ninth Circuit's acceptance of Defendants' petition for appeals "show[s] at a minimum, the presence of serious questions on the merits." (Doc. 227 at 1 (citations omitted)). Each side may simultaneously introduce serious questions going to merits. The Court rejects Defendants' contentions and concludes that Plaintiffs have met their burden on the first prong.

### 2. Irreparable Harm

A plaintiff suffers irreparable injury when there is "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Couturier*, 572 F.3d at 1085. A defendant's prior attempts to conceal or transfer assets demonstrates a likelihood that, without an injunction to prevent future transfers, the defendant will engage in similar conduct in the future, inhibiting plaintiff from satisfying its potential judgment. *See Arch Ins. Co. v. Sierra Equip. Rental*, No. CIV S-12-0617 KJM KJN, 2012 WL 5897327, at *5 (E.D. Cal. Nov. 13, 2013) (the movant demonstrated a likelihood of irreparable harm by showing there was a substantial danger that the defendant would transfer or conceal the subject assert, thereby preventing the movant's potential

1 recovery, based on evidence that the defendant had concealed and transferred funds in the
2 past); *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir.
3 2003) (affirming asset freeze because the "family's history of fraudulent intra-family
4 transfers" supported a finding of irreparable harm).  Here, there is evidence that the
5 Fraudulent Transfer Defendants transferred tens of millions of dollars out of JU to
6 themselves for no legitimate business purpose. Instead, that evidence suggests that
7 Defendants have transferred assets to shield them from JU's creditors, even to the detriment
8 of JU.  (Doc. 229-1 at 34).  Nevertheless, Defendants argue that an injunction is not
9 necessary to prevent irreparable harm to Plaintiffs because the people and entities that JU
10 allegedly transferred its assets to in the past are now defendants in the case and within the
11 Court's reach, should a transfer occur.  This argument ignores the possibility that JU, in
12 the absence of an injunction, would simply transfer sale proceeds to non-defendants in
13 order to conceal them.  Plaintiffs have met their burden of establishing the likelihood of
14 irreparable injury in the absence of an injunction.

### 3. Balance of Equities

Turning to the third prong of the preliminary injunction test, the Court balances "the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)).  In the absence of an injunction, Plaintiffs face the prospect of being unable to collect on a potential judgment.  In contrast, if an injunction freezes the sale proceeds in their entirety, JU will be unable to pay its ongoing legitimate expenses, including attorney and professional fees, taxes on the sale proceeds, and other future liabilities.  Acknowledging the financial constraints that the injunction would pose, Plaintiffs propose that the injunction freeze all but $5 million of the sale proceeds, giving JU a not insignificant sum with which to pay its expenses while the lawsuit continues.  The Court, in setting a bond, has considered the highest amount of recoverable damages that could be realized at the conclusion of this matter and has recognized JU's need to handle burdensome ongoing expenses.    Looking to the value of

Plaintiffs' current maximum claim—$66 million, the $5.7 million maximum annual accrual rate, the stage in the litigation, and asset sale's $110.3 million value, the Court will exclude $15.5 million from the injunction's freeze.[3] With this arrangement, JU will have adequate access to funds to manage its ongoing financial obligations[4] while preserving Plaintiffs' ability to recover their maximum potential judgment. In the absence of this arrangement, Plaintiffs may never see recovery. Therefore, the balance of hardships of an injunction that prevents JU from transferring the asset sale proceeds (excluding the $15.5 million) tips sharply towards the Plaintiffs.

### 4. Public Interest

Plaintiffs' injunction, by protecting Plaintiffs' ability to recover a potential future judgment, advances "the public's interest in seeing the satisfaction of judgment debts." *Life Share Collateral Holdings, LLC v. Dewitty*, No. CV 16-1907 PSG (ASx), 2018 WL 3357462, at *1 (C.D. Cal. May 7, 2018); *State Farm Mut. Auto. Ins. Co. v. Am. Rehab and Physical Therapy, Inc.*, 376 F. App'x. 182, 184 (3d Cir. 2010). The public's interest in the seeing the satisfaction of the potential judgment, here, is particularly strong. The plaintiff class is enormous, consisting of 40,000 wastewater customers and 30,000 water customers, and the outcome of the lawsuit and the enforcement of any judgment necessarily carries public consequences. Plaintiffs have consequently met their burden on the fourth prong.

### C. Bond

Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Yet, the district court maintains the discretion to determine "the amount of

---

[3] The Court arrived at the $15.5 million figure by adding five years of the maximum value of additional accrued damages (acknowledging that this suit is likely to endure for several more years) to the $66 million current maximum recovery. The Court then subtracted this sum from the $110.3 million sale value.

[4] Although the Court presently determines that $15.5 million is a reasonable sum to be excluded based on Plaintiffs' maximum potential recovery, should Defendants find themselves in a position in which JU requires a larger sum to fulfill its obligations, Defendants may file a motion demonstrating that they have expended the $15.5 million on legitimate obligations, listing their remaining legitimate outstanding obligations, and explaining why a larger sum should be made available.

security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir.1999)).  Moreover, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* Additionally, where public policy favors an injunction and the plaintiffs lack the means to pay a bond, the bond requirement should be nominal. *See Barahona-Gomez*, 167 F.3d at 1237 (affirming $1,000 bond based on "the public interest underlying the litigation and the unremarkable financial means of the class as a whole"). Further, substantial bonds are inappropriate where the defendant has not established financial harm if the injunction is granted. *See, e.g.*, *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 485 (C.D. Cal. 2012).

Here, Defendants assert that they will be harmed by the preliminary injunction because it will render them unable to fulfill legitimate future financial obligations and argue that a bond is necessary to protect them from damages that they will incur should the preliminary injunction later be found erroneous. This argument in unpersuasive because the Court will set aside $15.5 million for Defendants and will permit Defendants to file a motion requesting a greater allotment in the future, should the $15.5 million be insufficient to maintain JU's fulfillment of legitimate obligations. Moreover, Defendants have not proposed a bond amount that they believe would act as an appropriate safeguard against damages incurred from an erroneous preliminary injunction. Considering the public interest underlying the litigation, the unremarkable financial means of the class, and Defendants' failure to make any showing of cost, the Court will impose a nominal bond of $1,000. In sum,

**IT IS ORDERED** that Plaintiffs' motion for preliminary injunction (Doc. 229) is **GRANTED**. Johnson Utilities is hereby **ENJOINED** from transferring or otherwise disposing of the proceeds of the asset sale to EPCOR Water Arizona, Inc, excluding $15.5 million. The parties shall confer and submit a stipulation outlining how the sale proceeds shall be preserved pending resolution of the litigation no later than January 11, 2021 at 12:00 p.m. Should the parties fail to reach an agreement, they shall submit a joint memo,

1  limited to five pages, that describes the parties' respective positions by no later than January
2  11, 2021 at 12:00 p.m.
3        **IT IS FURTHER ORDERED** that Plaintiffs shall be required to post a cash bond
4  in the amount of $1,000 no later than January 11, 2021 at 12:00 p.m.
5        Dated this 8th day of January, 2021.

*[signature]*
Douglas L. Rayes
United States District Judge